1
2
3
4
5

Aaron M. Sheanin (SBN 214472)
asheanin@robinskaplan.com
Christine S. Yun Sauer (SBN 314307)
cyunsauer@robinskaplan.com
**ROBINS KAPLAN LLP**
2006 Kala Bagai Way, Suite 22
Berkeley, CA 94704
Telephone: (650) 784-4040
Facsimile: (650) 784-4041

6
7

*Attorneys for Plaintiffs*
*and the Proposed Classes*

8

[Additional counsel on signature page]

9
10

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20

| | |
|---|---|
| DEBORAH WESCH, DARIUS CLARK, JOHN H. COTTRELL, WILLIAM B. COTTRELL, RYAN HAMRE, GREG HERTIK, DAISY HODSON, DAVID LUMB, KYLA ROLLIER and JENNY SZETO, individually and on behalf of all others similarly situated, | Case No. 3:20-cv-5991 (SK) <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| v. | |
| YODLEE, INC., a Delaware corporation, and ENVESTNET, INC., a Delaware corporation, | |
| Defendants. | |

21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

SUMMARY OF ALLEGATIONS ................................................................................1

JURISDICTION AND VENUE ..................................................................................4

PARTIES .....................................................................................................................8

    I.      Plaintiffs .............................................................................................8

    II.     Defendants .........................................................................................12

FACTUAL ALLEGATIONS ....................................................................................13

    I.      The Founding of Yodlee .................................................................13

    II.     Envestnet | Yodlee Collects and Sells Individuals' Financial Data Without Their Consent ...............................................................15

    III.    Envestnet | Yodlee Stores Consumers' Data for Backup Purposes ......................20

    IV.    Envestnet | Yodlee's Failure to Disclose Violates Several Privacy Laws ............21

    V.     Government and Industry Leaders Agree that Defendants' Conduct Is Wrong, Risky, Dangerous and Bad for Consumers ................................................25

    VI.    Plaintiffs and Class Members Lost Indemnification Rights and Other Rights and Protections ..........................................................................28

    VII.   Plaintiffs and Class Members Lost Control Over Valuable Property and the Ability to Receive Compensation for It .........................................29

    VIII.  Plaintiffs and Class Members Suffered an Increased Risk of Identity Theft and Fraud ...................................................................32

    IX.    Plaintiffs and Class Members Have a Reasonable Expectation of Privacy ..........32

    X.     Defendants Lack Adequate Safeguards to Protect Consumers' Data ...................34

    XI.    Members of Congress Requested an FTC Investigation into Defendants' Practices ..........................................................37

TOLLING, CONCEALMENT AND ESTOPPEL ...................................................38

CLASS ACTION ALLEGATIONS .........................................................................39

CALIFORNIA LAW APPLIES TO THE NATIONWIDE CLASS .......................41

CLAIMS FOR RELIEF ...........................................................................................42

i

Deborah Wesch, Darius Clark, John H. Cottrell, William B. Cottrell, Ryan Hamre, Greg Hertik, Daisy Hodson, David Lumb, Kyla Rollier and Jenny Szeto (together, "Plaintiffs"), on behalf of themselves and all others similarly situated, assert the following against Defendants Yodlee, Inc. ("Yodlee" or "Envestnet | Yodlee") and Envestnet Inc. ("Envestnet") (collectively "Defendants"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## SUMMARY OF ALLEGATIONS

1. The Internet age has spawned the development of a vast data economy. Among its key players are data harvesters, companies that collect and repackage data from various sources for sale to advertisers, investors, researchers, and other third parties.

2. Envestnet | Yodlee is one of the largest such companies in the world. Its business focuses on harvesting highly sensitive financial data—such as bank balances, credit card purchase details, loan information, and other transaction histories—from individuals throughout the United States and then selling it to Defendants' "data and analytics" customers.

3. This data is not available from public sources and is so sensitive that the individuals it concerns would not voluntarily turn it over. Instead, Defendants acquire it by deceit.

4. Envestnet | Yodlee surreptitiously collects such data from software products—either application programming interfaces ("APIs"), software development kits ("SDKs"), or both—that it markets and sells to some of the largest financial institutions in the country. These institutions include the nation's 15 top banks (e.g., Bank of America, Merrill Lynch, and Citibank), 10 top wealth management firms, and digital payment platforms like PayPal.

5. Envestnet | Yodlee, in turn, acquires financial data about each individual that interacts with the software installed on its customers' systems. However, these individuals often have no idea they are dealing with Envestnet | Yodlee.

6. This is by design. Given the highly sensitive nature of the data that Envestnet | Yodlee collects, its software is developed to be seamlessly integrated directly into the host company's existing website and/or mobile app in a way that obscures whom the individual is dealing with and where their data is going. For example, when individuals connect their bank

accounts to PayPal, they are prompted to enter their credentials into a log in screen that mirrors what they would see if they directly logged into their respective bank's website. Their financial institution's logo is prominently displayed on each of the screens that they interact with and the individuals use the same usernames and passwords they would use to log in to their financial institution's own website or mobile app. At no point are the individuals prompted to create or use an Envestnet | Yodlee account.

7.     Moreover, to the extent Envestnet | Yodlee is mentioned, individuals are not given accurate information about what Envestnet | Yodlee does or how it collects their data. For example, PayPal discloses to individuals that Envestnet | Yodlee is involved in connecting their bank account to PayPal's service for the limited purpose of confirming the individual's bank details, checking their balance, and transactions, "as needed." While this might be true for that initial log in, Envestnet | Yodlee's involvement with the individual's data goes well beyond the limited consent provided to facilitate a connection between their bank account and PayPal.

8.     From the moment of that initial linkage, unbeknownst to consumers, Envestnet | Yodlee obtains 90 days of transaction history—including all details about every purchase the user made in that period, no matter how intimate, as well as biographic and demographic data. And even if a user only connects a particular account to the app, such as her checking account, Envestnet | Yodlee will take information from *all* accounts linked to those credentials, including checking, savings, credit, loan, and even retirement or brokerage accounts.

9.     In fact, Envestnet | Yodlee stores a copy of each individual's bank log in information (i.e., her username and password) on its own system *after* the connection is made between that individual's bank account and any other third party service (e.g., PayPal). Envestnet | Yodlee then exploits these credentials to routinely extract data from that user's accounts without consent, even when there is no PayPal transaction at issue. Defendants use that data to construct individualized profiles for millions of Americans, and they profit by selling access to that data in the form of large text files containing data on specific transactions for millions of users.

10.     This process continues even if, for example, an individual severs the connection between its bank account and the third-party service (e.g., PayPal) that Envestnet | Yodlee

facilitated. In that instance, Envestnet | Yodlee relies on its own stored copy of the individual's credentials to extract financial data from her accounts long after the access is revoked.

11.     As U.S. Senator Ron Wyden explained to the Federal Trade Commission ("FTC") in a letter concerning Envestnet | Yodlee's practices, this unagreed-to data collection is particularly problematic because, "[c]onsumers' credit and debit card transactions can reveal information about their health, sexuality, religion, political views, and many other personal details."[1] It is no wonder that Envestnet | Yodlee has been highly successful as, according to the *Wall Street Journal*, companies are willing to pay as much as $4 million a year for access to this sort of highly personal data.

12.     Plaintiffs connected their bank accounts to PayPal using an Envestnet | Yodlee-powered portal in order to facilitate transfers among those accounts. At no time was it disclosed by PayPal, Defendants, or Plaintiffs' banks, that the Defendants would continuously access Plaintiffs' accounts to extract and sell data without their consent.

13.     Defendants also fail to take reasonable precautions to protect the highly sensitive data they collect from individuals without authorization. Defendants make the data available to their data and analytics customers as large text files containing data on specific transactions, each traceable to a particular user because it is labeled by a "Yodlee-specific identifier." Defendants distribute this data in unencrypted plain text files. Users and developers have raised concerns about this practice. These files, which can be read by anyone who acquires them, contain highly sensitive information that make it possible to identify the individuals involved in each transaction.

14.     Defendants' failure to take even the most basic steps to protect this highly sensitive data (e.g., requiring a password to open such files) has caused Plaintiffs and Class members significant harm. While Defendants claim to only acquire, use or disclose data after receiving the "necessary permissions," Envestnet | Yodlee makes no disclosures to consumers itself, instead relying on third party apps like PayPal to disclose Envestnet | Yodlee's practices. Prior to its

---

[1] Letter from Sen. Ron Wyden et al., Cong. of the U.S., to Joseph J. Simons, Chairman, Fed. Trade Comm'n (July 31, 2020), https://www.wyden.senate.gov/imo/media/doc/073120%20 Wyden%20Cassidy%20Led%20FTC%20Investigation%20letter.pdf.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:20-CV-5991 (SK)

acquisition by Envestnet, Yodlee admitted in filings with the United States Securities and Exchange Commission ("SEC") that it "does not audit its customers to ensure that they have acted, and continue to act, consistently with such assurances."[2] Envestnet | Yodlee, accordingly, cannot guarantee Plaintiffs or other Class members that its clients, or anyone with whom its clients share Class members' sensitive personal data, are not using such data for nefarious purposes.

15.     Plaintiffs and Class members suffered actual harm, injury, damage and loss as a result of Defendants' illegal conduct, including, but not limited to economic damages and harm to their dignitary rights.

16.     Defendants have deprived Plaintiffs and Class members of indemnification rights and other rights and protections they enjoyed as long as their data remained in the protected banking environment. Defendants also have deprived Plaintiffs and Class members of control over their valuable property (namely, their sensitive personal data), including the ability to receive compensation for that data and the ability to withhold their data for sale.

17.     Defendants' practices and conduct have subjected Plaintiffs and Class members to an increased risk of identity theft and fraud.

18.     Had Plaintiffs and Class members known the true nature, significance and extent of Defendants' data practices, they would not have used Envestnet | Yodlee.

## JURISDICTION AND VENUE

19.     Pursuant to 28 U.S.C. § 1331, this Court has original subject matter jurisdiction over the claims that arise under the Stored Communications Act, 18 U.S.C. § 2702 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. This Court has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367(a).

20.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and a

---

[2] Yodlee, Inc., Proxy Statement/Prospectus, (Oct. 21, 2015), https://www.sec.gov/Archives/edgar /data/1337619/000104746915007906/a2226277z424b3.htm.

significant portion of putative Class members are citizens of a state different from Defendants.

21.    This Court has general personal jurisdiction over Envestnet | Yodlee because Envestnet | Yodlee's principal place of business is in Redwood City, California.

22.    This Court has specific personal jurisdiction over Envestnet because Plaintiffs' claims arise out of or relate to Envestnet's contacts with the State. Envestnet has intentionally created extensive contacts with California through its data collection, aggregation and analytics business, which, as explained in detail below, collects data from Class members in California without consent and sells that data to customers that include businesses located in that State. Envestnet has also created suit-related contacts with California through Envestnet | Yodlee, a wholly-owned subsidiary located in this District with which Envestnet shares executives, employees, offices, data, systems and resources.

23.    The claims against Envestnet arise from Envestnet's forum-related activity, namely, its involvement in the scheme to collect and sell data from consumers, including those in California, without authorization.

24.    After purchasing Yodlee, Envestnet rebranded all of its new acquisition's offerings as "Envestnet | Yodlee" to showcase the merger of the two companies into one. This includes, for example, Envestnet | Yodlee's financial data extraction and aggregation service, its transaction data enrichment service, and its financial aggregation service, among others. Figures 1, 2 and 3 show how, in each of these lines of business, the company presents the formerly-independent Yodlee as a department of Envestnet now known as Envestnet | Yodlee:

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:20-CV-5991 (SK)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Figure 1**



**Figure 2**



SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:20-CV-5991 (SK)

1

**Figure 3**

2

ENVESTNET Yodlee

3

4

OVERVIEW      BENEFITS      RESOURCES      CASE S

5

6

7

**Disrupt With The Market Leader**

8

# Financial Aggregation

9

As the market leader in financial data aggregation, Envestnet |
Yodlee can help you grow from startup to success. Our APIs
deliver data from over 21,000 global data sources, so you can
easily get the bank, credit card, investment, loans, rewards, and
financial account data you need. The possibilities are infinite.

10

11

12

THIS PRODUCT IS AVAILABLE VIA

13

14

 APP      ☁ API

15

16    25.     Following the acquisition, Envestnet absorbed Yodlee's operations into its own in

17  numerous other ways. Envestnet turned Yodlee's Redwood City, California office into the

18  headquarters of Envestnet's Data & Analytics group. In that office, employees of Envestnet | Yodlee

19  collect highly sensitive financial data from consumers in California and nationwide. Envestnet then

20  compiles this information and, from the Envestnet | Yodlee office space, markets and sells it to

21  customers in California and nationwide.

22    26.     Envestnet profits from these sales. In his letter to the FTC, Senator Wyden wrote

23  that "Envestnet sells to data brokers, who in turn sell that data to hedge funds and other investors

24  that trade based on market trends they observe," culminating in a market for intimate data worth

25  billions of dollars.[3]

26    27.     Envestnet's operations at the California office are so significant that Envestnet

27

---

28  [3] *See* Wyden, *supra* n. 1.

7

chooses to maintain a primary copy of its books and records there. Envestnet is registered with the California Secretary of State and has designated an agent for service of process in California.

28.     To the extent the allegations in this Complaint relate only to conduct by Yodlee employees and not Envestnet employees, personal jurisdiction over Envestnet is nonetheless proper because Yodlee is merely an incorporated department, or instrumentality, of Envestnet. Envestnet owns 100% of Yodlee. After Envestnet acquired Yodlee, Yodlee was delisted from the exchanges where its stock was sold. Envestnet has the right to substantially control all of Yodlee's day-to-day decisions and activities, including relating to its finances. Envestnet and Yodlee do not maintain separate operations, as demonstrated by the shared offices, employees, leadership, and name Envestnet | Yodlee, or observe corporate formalities. Envestnet and Yodlee have overlapping managers, directors, and employees.

29.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c), and (d) because Defendants transact business in this District; a substantial portion of the events giving rise to the claims occurred in this District; and because Yodlee is headquartered in this District.

30.     Intra-district Assignment: A substantial part of the events and omissions giving rise to the violations of law alleged herein occurred in the County of San Mateo, and as such, this action may be properly assigned to the San Francisco or Oakland divisions of this Court pursuant to Civil Local Rule 3-2(c).

## **PARTIES**

### I.    **PLAINTIFFS**

31.     Plaintiff **Deborah Wesch** is a natural person and citizen of the State of New Jersey and a resident of Monmouth County.

32.     Ms. Wesch is a PayPal user who connected her PNC Bank account to PayPal through Envestnet | Yodlee's account verification application programming interface ("API") in order to facilitate transfers among those accounts. At no time was it disclosed by PayPal, Defendants, or PNC Bank that Envestnet | Yodlee would retain a copy of her credentials and continuously access Ms. Wesch's accounts to extract data. Defendants collected, retained, and sold Ms. Wesch's data without her knowledge or consent. On information and belief, at the time that Ms. Wesch linked

her account to PayPal, Envestnet | Yodlee obtained—without her knowledge or authorization—90 days' worth of detailed transaction history from all accounts connected to her credentials, and continues to supplement that data on an ongoing basis by collecting new data from Plaintiff Wesch's accounts.

33.    Plaintiff **Darius Clark** is a natural person, a citizen of the State of Ohio and a resident of Hamilton County.

34.    Mr. Clark is a PayPal user who connected his Alliant Credit Union, UMB/Fidelity, and BBVA Simple accounts to PayPal through Envestnet | Yodlee's API in order to facilitate transfers among those accounts. At no time was it disclosed by PayPal, Defendants, Alliant Credit Union, UMB/Fidelity, or BBVA Simple that Envestnet | Yodlee would retain a copy of his credentials and continuously access Mr. Clark's accounts to extract data. Defendants collected, retained, and sold Mr. Clark's data without his knowledge or consent. On information and belief, at the time that Mr. Clark linked his accounts to PayPal, Envestnet | Yodlee obtained—without his knowledge or authorization—90 days' worth of detailed transaction history from all accounts connected to his credentials, and continues to supplement that data on an ongoing basis by collecting new data from Plaintiff Clark's accounts.

35.    Plaintiff **John H. Cottrell** is a natural person, a citizen of the State of Texas and a resident of Collin County.

36.    Mr. John Cottrell is a PayPal user who connected his BBVA Bank account to PayPal through Envestnet | Yodlee's API in order to facilitate transfers among those accounts. At no time was it disclosed by PayPal, Defendants, or BBVA Bank that Envestnet | Yodlee would retain a copy of his credentials and continuously access Mr. John Cottrell's accounts to extract data. Defendants collected, retained, and sold Mr. John Cottrell's data without his knowledge or consent. On information and belief, at the time that Mr. John Cottrell linked his account to PayPal, Envestnet | Yodlee obtained—without his knowledge or authorization—90 days' worth of detailed transaction history from all accounts connected to his credentials, and continues to supplement that data on an ongoing basis by collecting new data from Plaintiff John Cottrell's accounts.

37.    Plaintiff **William B. Cottrell** is a natural person, a citizen of the State of Arkansas

1   and a resident of Hot Spring County.

2        38.    Mr. William Cottrell is a PayPal user who connected his Bank of Little Rock account

3   to PayPal through Envestnet | Yodlee's API in order to facilitate transfers among those accounts.

4   At no time was it disclosed by PayPal, Defendants, or Bank of Little Rock that Envestnet | Yodlee

5   would retain a copy of his credentials and continuously access Mr. William Cottrell's accounts to

6   extract data. Defendants collected, retained, and sold Mr. William Cottrell's data without his

7   knowledge or consent. On information and belief, at the time that Mr. William Cottrell linked his

8   account to PayPal, Envestnet | Yodlee obtained—without his knowledge or authorization—90 days'

9   worth of detailed transaction history from all accounts connected to his credentials, and continues

10  to supplement that data on an ongoing basis by collecting new data from Plaintiff William Cottrell's

11  accounts.

12       39.    Plaintiff **Ryan Hamre** is a natural person, a citizen of the State of Maine and a

13  resident of Knox County.

14       40.    Mr. Hamre is a PayPal user who connected his Chase, BBVA and TD Bank accounts

15  to PayPal through Envestnet | Yodlee's API in order to facilitate transfers among those accounts.

16  At no time was it disclosed by PayPal, Defendants, Chase, BBVA or TD Bank that Envestnet |

17  Yodlee would retain a copy of his credentials and continuously access Mr. Hamre's accounts to

18  extract data. Defendants collected, retained, and sold Mr. Hamre's data without his knowledge or

19  consent. On information and belief, at the time that Mr. Hamre linked his accounts to PayPal,

20  Envestnet | Yodlee obtained—without his knowledge or authorization—90 days' worth of detailed

21  transaction history from all accounts connected to his credentials, and continues to supplement that

22  data on an ongoing basis by collecting new data from Plaintiff Hamre's accounts.

23       41.    Plaintiff **Greg Hertik** is a natural person and citizen of the State of Georgia and a

24  resident of Forsyth County.

25       42.    Mr. Hertik is a PayPal user who connected his USAA account to PayPal through

26  Envestnet | Yodlee's API in order to facilitate transfers among those accounts. At no time was it

27  disclosed by PayPal, Defendants, or USAA that Envestnet | Yodlee would retain a copy of his

28  credentials and continuously access Mr. Hertik's accounts to extract data. Defendants collected,

retained, and sold Mr. Hertik's data without his knowledge or consent. On information and belief, at the time that Mr. Hertik linked his account to PayPal, Envestnet | Yodlee obtained—without his knowledge or authorization—90 days' worth of detailed transaction history from all accounts connected to his credentials, and continues to supplement that data on an ongoing basis by collecting new data from Plaintiff Hertik's accounts.

43.     Plaintiff **Daisy Hodson** is a natural person, a citizen of the State of Utah and a resident of Salt Lake County.

44.     Ms. Hodson is a PayPal user who connected her Wells Fargo account to PayPal through Envestnet | Yodlee's API in order to facilitate transfers among those accounts. At no time was it disclosed by PayPal, Defendants, or Wells Fargo that Envestnet | Yodlee would retain a copy of her credentials and continuously access Ms. Hodson's accounts to extract data. Defendants collected, retained, and sold Ms. Hodson's data without her knowledge or consent. On information and belief, at the time that Ms. Hodson linked her account to PayPal, Envestnet | Yodlee obtained— without her knowledge or authorization—90 days' worth of detailed transaction history from all accounts connected to her credentials, and continues to supplement that data on an ongoing basis by collecting new data from Plaintiff Hodson's accounts.

45.     Plaintiff **David Lumb** is a natural person, a citizen of the State of Tennessee and a resident of Shelby County.

46.     Mr. Lumb is a PayPal user who connected his Commercial Bank & Trust account to PayPal through Envestnet | Yodlee's API in order to facilitate transfers among those accounts. At no time was it disclosed by PayPal, Defendants, or Commercial Bank & Trust that Envestnet | Yodlee would retain a copy of his credentials and continuously access Mr. Lumb's accounts to extract data. Defendants collected, retained, and sold Mr. Lumb's data without his knowledge or consent. On information and belief, at the time that Mr. Lumb linked his account to PayPal, Envestnet | Yodlee obtained—without his knowledge or authorization—90 days' worth of detailed transaction history from all accounts connected to his credentials, and continues to supplement that data on an ongoing basis by collecting new data from Plaintiff Lumb's accounts.

47.     Plaintiff **Kyla Rollier** is a natural person and citizen of the State of Florida and a

resident of Volusia County.

48.     Ms. Rollier is a PayPal user who connected her Launch Credit Union account to PayPal through Envestnet | Yodlee's API in order to facilitate transfers among those accounts. At no time was it disclosed by PayPal, Defendants, or Launch Credit Union that Envestnet | Yodlee would retain a copy of her credentials and continuously access Ms. Rollier's accounts to extract data. Defendants collected, retained, and sold Ms. Rollier's data without her knowledge or consent. On information and belief, at the time that Ms. Rollier linked her account to PayPal, Envestnet | Yodlee obtained—without her knowledge or authorization—90 days' worth of detailed transaction history from all accounts connected to her credentials, and continues to supplement that data on an ongoing basis by collecting new data from Plaintiff Rollier's accounts.

49.     Plaintiff **Jenny Szeto** is a natural person and citizen of the State of California and a resident of San Francisco County.

50.     Ms. Szeto is a PayPal user who connected her J.P. Morgan Chase account to PayPal through Envestnet | Yodlee's API in order to facilitate transfers among those accounts. At no time was it disclosed by PayPal, Defendants, or J.P. Morgan Chase that Envestnet | Yodlee would retain a copy of her credentials and continuously access Ms. Szeto's accounts to extract data. Defendants collected, retained, and sold Ms. Szeto's data without her knowledge or consent. On information and belief, at the time that Ms. Szeto linked her account to PayPal, Envestnet | Yodlee obtained— without her knowledge or authorization—90 days' worth of detailed transaction history from all accounts connected to her credentials, and continues to supplement that data on an ongoing basis by collecting new data from Plaintiff Szeto's accounts.

## II.     DEFENDANTS

51.     Defendant Yodlee, Inc. is a Delaware corporation with principal executive offices located at 3600 Bridge Parkway, Suite 200, Redwood City, CA 94065.

52.     Defendant Envestnet, Inc. is a Delaware corporation, with principal executive offices located at 35 East Wacker Drive, Suite 2400, Chicago, Illinois 60601.

53.     The Complaint refers to Yodlee as "Yodlee" prior to its acquisition by Envestnet and "Envestnet | Yodlee" after its acquisition by Envestnet. Envestnet and Yodlee are referred to

1   collectively as "Defendants."

2                                **FACTUAL ALLEGATIONS**

3   **I.      THE FOUNDING OF YODLEE**

4          54.      Yodlee was founded in 1999. Initially, Yodlee was focused on providing banks and

5   financial institutions with software that would improve the user experience, for example, making it

6   possible for banking clients to view bank statements, financial accounts, and investment portfolios

7   all at once without relying on multiple logins or webpages.

8          55.      Yodlee later expanded its business to develop APIs for financial apps and software

9   (collectively, "FinTech Apps"). This includes payment apps, such as PayPal; personal budgeting

10  apps, such as Personal Capital; and apps for particular banks. Envestnet | Yodlee's software silently

11  integrates into its clients' existing platforms to provide various financial services, like budgeting

12  tools, savings trackers, or account history information. In each instance, the customer believes that

13  she is interacting with her home institution (e.g., her bank) and has no idea she is logging into or

14  using an Envestnet | Yodlee product.

15         56.      Defendants profit from these interactions in two ways. First, the financial institutions

16  that use Defendants' software pay a licensing fee to integrate Envestnet | Yodlee's API into their

17  platform. Second, Envestnet | Yodlee collects the financial data of each individual that connects to

18  one of the FinTech Apps through a bank or other financial institution using its software. This

19  information, which includes an individual's bank account balances, transaction history and other

20  data, is then compiled into a large data set with that of other individuals and sold to third parties for

21  a fee.

22         57.      Envestnet | Yodlee's reach and the amount of data it collects is extraordinary. More

23  than 150 financial institutions and a majority of the 20 largest U.S. banks integrate Defendants' API

24  into their platforms. According to filings with the SEC, more than 900 companies subscribe to the

25  Yodlee platform to power customized FinTech Apps and services for millions of their users.

26         58.      Given its widespread success, Yodlee went public on NASDAQ in October of 2014,

27  generating almost $100 million that year. Prior to its public offering, Yodlee claims it only provided

28  data to third parties for "research uses," such as "enhanc[ing] predictive analysis."

                                        13

59. In 2015, Yodlee was acquired by Envestnet. The deal valued Yodlee at $590 million or approximately $19 per share. The acquisition was considered the second largest FinTech deal in U.S. history at the time.

60. That same year, the *Wall Street Journal* released a report revealing for the first time that a large part of Yodlee's revenue was actually generated by a different lucrative source: selling user data. The report concluded that Yodlee has been selling data it gathers from users for at least the last year.

61. Yodlee denied the *Wall Street Journal* report, claiming it had only "a very limited number of partnerships with firms to develop . . . sophisticated analytics solutions." Yodlee claimed these partners only received "a small, scrubbed, de-identified, and dynamic sample of data to enable trend analysis. Yodlee does not offer, nor do partners receive, raw data." But, as discussed below, these statements were false.

62. Currently, Defendants sell sensitive personal data of tens of millions of individuals to a large customer base, including investment firms and some of the largest banks in the United States, like J.P. Morgan.[4] One of Envestnet | Yodlee's products, called its "Data Platform," offers "the best and most comprehensive financial data at massive scale across retail banking, credit, and wealth management." Envestnet | Yodlee explains "[t]his is made possible through the strengths of our data acquisition capabilities, extensive data cleaning and enrichment expertise, and massive scale."[5]

63. Defendants' conduct violates Plaintiffs' and Class members' privacy rights and several state and federal laws because, as explained below, Defendants' collect and sell Plaintiffs' and Class members' highly sensitive personal data without their knowledge or consent. Furthermore, Envestnet | Yodlee fails to implement adequate security measures to protect Plaintiffs' and Class members' data, leaving their highly sensitive personal data vulnerable to hackers,

---

[4] Joseph Cox, *Leaked Document Shows How Big Companies Buy Credit Card Data on Millions of Americans*, Vice, (Feb. 19, 2020), https://www.vice.com/en/article/jged4x/envestnet-yodlee-credit-card-bank-data-not-anonymous.

[5] *Id.*

criminals, and other unauthorized third parties.

## II.   ENVESTNET | YODLEE COLLECTS AND SELLS INDIVIDUALS' FINANCIAL DATA WITHOUT THEIR CONSENT

64.   While Envestnet | Yodlee claims that it only sells "small . . . sample[s] of data," in reality, Defendants sell millions of users' sensitive personal data to hundreds of clients. As explained below, this data is collected without the individual's consent by leveraging credentials provided to Envestnet | Yodlee for a different, specific, and limited purpose.

65.   For example, PayPal uses Envestnet | Yodlee's account verification API to validate an individual's bank account so that the individual can use that account with PayPal's services. An individual is prompted by the following screen when attempting to connect her bank account:

**Figure 4**




66.   The first screen displayed in Figure 4 states that "[PayPal] use[s] Yodlee to confirm your bank details and to check your balance and transaction as needed, which can help your PayPal payments go through." This limited interaction is all that the individual consents to. Nowhere does she give either PayPal or Envestnet | Yodlee permission to collect and store data for resale.

67.     Yet if a user uses Envestnet | Yodlee to link their bank account to PayPal, Envestnet | Yodlee will harvest a copy of the user's login credentials for its own purposes that far exceed the disclosed scope in at least three ways. *First*, Defendants will use those credentials without any regard for what is "needed" to "help [the user's] Paypal payments go through." Rather, they will acquire massive quantities of data for their own purposes. *Second*, by Envestnet | Yodlee's own admission, Defendants immediately obtain 90 days' worth of transaction information once a user links an account—even though those 90 days of transactions are unrelated to the single transaction for which consumers linked their banking institution with PayPal. Defendants then retain the usernames and passwords to "refresh" individuals' account information on an ongoing, daily basis, whether or not the individual uses PayPal on a given day. Indeed, even if the user never uses PayPal again, Envestnet | Yodlee continues to collect data from their accounts on an ongoing basis. *Third*, Defendants then sell this data as part of large compilations of individual transactions that remain traceable to particular individuals. Nowhere does the user give either PayPal or Defendants permission to do any of this.

68.     The second screen displayed in Figure 4 is also misleading. This screen informs consumers that, "[y]ou can choose which eligible bank accounts from WELLS FARGO you want to link to Paypal." This communicates to consumers that only chosen accounts, a subset of their banking information, will be accessed. This is false. In truth, after acquiring a user's credentials by linking even a single account, Envestnet | Yodlee repeatedly accesses *all* activity and *all* accounts connected to those credentials.

69.     The individual never consents to this kind of data collection, which solely benefits Defendants.

70.     An individual cannot opt out of or turn off Envestnet | Yodlee's access to her bank account information after providing her credentials. For example, while the first screen in Figure 4 states, "[y]ou can turn off our use of Yodlee by removing permissions for this Bank in your Profile," this pertains only to PayPal's access to user data. Envestnet | Yodlee still retains the individual's credentials and continues to access her bank account to collect and sell highly sensitive financial data without consent even after PayPal's permissions

to that data are removed.

71.     Envestnet | Yodlee's recurring collection of and continued access to an individual's financial data is never disclosed. Envestnet | Yodlee's privacy policy only applies to its own direct-to-consumer products and does not cover the APIs that power FinTech Apps or facilitate log in transactions like that described in Figure 4.[6] Instead, Envestnet | Yodlee directs an individual using "Yodlee powered services delivered through a Yodlee client" such as PayPal to refer to the "client's data governance and privacy practices." Thus, where an individual unknowingly uses Envestnet | Yodlee to connect her bank accounts to a FinTech App, there is nowhere she could have looked in Envestnet | Yodlee's policies to learn the full extent of data Defendants were collecting from her or the fact that Defendants were selling her data.

72.     Nor does Envestnet | Yodlee require its FinTech App clients to make any such disclosures. For example, while the PayPal Privacy Statement linked to in the first screen of Figure 4 discloses that PayPal does not "sell [individuals'] personal data," it says nothing about whether service providers, such as Envestnet | Yodlee, collect and sell such sensitive financial data. Likewise, while the PayPal Privacy Statement provides that "you *may* be able to manage how your personal data is collected, used, and shared by [third-parties]," it does not provide individuals with a way to manage what data Defendants collect about them through PayPal or how Defendants use and share that data with others. Such controls would have to come directly from Envestnet | Yodlee, which does not allow individuals to manage their personal data, because doing so would undermine Defendants' highly profitable data business.

73.     Not only do Defendants collect more data than is necessary from individuals that interact with their FinTech Apps—Defendants' service is not necessary at all.

74.     Historically, in order to allow a third party access to a bank account, a user had to submit her bank routing and account numbers; transfer a small trial deposit (usually a few cents); and then return to the bank to verify the amount transferred. This process usually took several days,

---

[6] Yodlee, Inc., *Privacy Notice* (last updated July 31, 2020), https://www.yodlee.com/legal/privacy-notice.

a delay that could—in the fast-moving Internet age—cause potential users of FinTech Apps to give up on using the app at all.

75.     One alternative to this process is "OAuth." Users are likely familiar with this procedure because it has become the industry-standard protocol for users who wish to grant a website or an app permission to access certain information from another website or app. Crucially, OAuth "enables apps to obtain limited access (scopes) to a user's data without giving away a user's password."[7] For instance, consider an example in which a user wishes to grant Facebook permission to access her Twitter account so that it can integrate its social media accounts together. Before it can do so, the user will be redirected from Facebook to Twitter, where it must login to ensure it is authorized to grant those permissions.[8] Then, a dialogue box pops up, asking which permissions the user is granting and which it is denying. The dialogue box might look something like this:[9]

**Figure 5**



76.     In this example, note that the user grants Facebook permission to update her Twitter profile and even post to the user's Twitter account ("This application will be able to . . . Update your profile; Post Tweets for you"), but *denies* Facebook permission to see the user's Twitter

---

[7] *See* Matt Raible, *What the Heck is Oauth?* Oᴋᴛᴀ (June 21, 2017), https://developer.okta.com /blog/2017/06/21/what-the-heck-is-oauth..

[8] Redirection from the app the user is currently using to the app where it retains the data to which it is granting permission is a hallmark of OAuth.

[9] Raible, *supra* n.7.

password ("This application will not be able to . . . See your Twitter password"). Instead, the user provides her Twitter username and password only to Twitter. Twitter then sends a "token" to Facebook, essentially confirming to Facebook that the user's login to Twitter was legitimate. Scopes are one of the "central components" and perhaps even "the first key aspect" of OAuth.

77.     But as with the old-fashioned way of authorizing a bank account by providing account and routing numbers and waiting for a small deposit, OAuth requires a user to leave the app and be redirected to another site or interface to log in. This supposedly undermines an app's ability to sign up new users by driving away individuals who decide it is not worth the trouble of dealing with the OAuth process.

78.     Envestnet | Yodlee's API purports to solve this problem, but the distinctions between Envestnet | Yodlee's API and true OAuth underscore the grave risk that Envestnet | Yodlee poses to individuals. *First*, Envestnet | Yodlee does not provide a clear dialogue box outlining the scopes of the permissions that the user is granting to Envestnet | Yodlee or the permissions the user is denying to Envestnet | Yodlee. Indeed, the user has no option to deny Envestnet | Yodlee any permissions at all.

79.     *Second*, the core principle of OAuth—and what has made it the industry-standard authorization protocol—is that it provides for access to an individual's data *without disclosing the individual's password* to the service requesting authorization. This places the individual in control because she can cut off the service's access to her data by revoking the service's OAuth access. Envestnet | Yodlee specifically designed its API to circumvent this protection, deceiving users into providing Defendants with their bank usernames and passwords so that Defendants can use those credentials to collect sensitive financial information on an ongoing basis without giving the individual a way to revoke access to that data. As explained above, Defendants accomplish this by deceiving users into thinking that they are logging into their financial institutions' app or website, when in fact they are entering their credentials directly into Defendants' portal.

80.     Envestnet | Yodlee is capable of integrating OAuth into its API. It has done so in Europe to comply with the European Union's Second Payment Services Directive. Yet in the United States, Defendants continue to deploy credential-based authentication because, though it falls short

19

of the industry standard, it is a source of immense profit.

81.     By failing to provide disclosures or obtain users' consent to collect and sell their sensitive personal data, Defendants violated Plaintiffs' and Class members' privacy rights and state and federal law.

## III.   ENVESTNET | YODLEE STORES CONSUMERS' DATA FOR BACKUP PURPOSES

82.     As noted above, once a consumer uses the Envestnet | Yodlee API to link her financial account to a FinTech app, Envestnet | Yodlee receives the credentials for the user, generates a unique identifier, and opens a profile for that user. Envestnet | Yodlee then immediately harvests 90 days' worth of transactional data from all of that user's accounts and continues to extract user data going forward. Envestnet | Yodlee then adds the data to that user's profile.

83.     Envestnet | Yodlee provides this data to developers who incorporate the Envestnet | Yodlee API into their FinTech apps. Developers are able to store this information on their own databases and perform analytics as necessary for their FinTech apps to function.

84.     Envestnet | Yodlee stores a copy of consumers' data for backup purposes on behalf of developers. For example, if a developer loses access to the data, it can download the data again from Envestnet | Yodlee's servers.

85.     Envestnet | Yodlee also stores a copy of consumers' financial transaction data for its own backup purposes. As Envestnet | Yodlee reported in its prospectus prior to the proposed merger with Envestnet, the company "has formal disaster recovery programs for Yodlee's internal services and Yodlee's customers' applications. . . . In addition, Yodlee's infrastructure consists of highly redundant environments. This includes redundant equipment at every layer with various configurations such as active/active and active/failover. . . . [T]he Company and each of its Subsidiaries has implemented and maintains commercially reasonable security, backup and disaster recovery policies, procedures and systems designed to reasonably maintain the security and operation of the respective businesses of the Company and each of its Subsidiaries."[10] Envestnet

---

[10] Yodlee, Inc., Proxy Statement/Prospectus, (October 14, 2015), https://www.sec.gov/Archives/edgar/data/1337619/000104746915007906/a2226277z424b3.htm.

likewise discloses that "[i]n the event of an internal or external [significant business disruption] that causes the loss of our paper records, we will access electronic versions of these records in our various systems and platforms. If our primary site is inoperable, we will continue operations from our backup site or an alternate location. For the loss of electronic records, we will recover the electronic data from our backup records stored in the disaster recovery site, or, if our primary site is inoperable, continue operations from our backup site."[11]

86.   On information and belief, the data described in these disclosures include Plaintiffs' and Class members' financial transaction data.

87.   Envestnet | Yodlee reserves Plaintiffs' and Class members' financial transaction data for future use, or in the event that it needs to be transmitted again.

88.   While in electronic storage, Envestnet | Yodlee divulges Plaintiffs and Class members' financial transaction data to its clients.

## IV.   ENVESTNET | YODLEE'S FAILURE TO DISCLOSE VIOLATES SEVERAL PRIVACY LAWS

89.   As discussed above, Envestnet | Yodlee's privacy policy only applies to its "direct-to-consumer services and websites." For consumers who access Envestnet | Yodlee's services through one of Envestnet | Yodlee's clients, such as PayPal, Envestnet | Yodlee pushes off the burden of providing adequate disclosures to consumers onto the client.

90.   This is an abdication of Defendants' duties under the law.

91.   In California, several statutes require Defendants to provide clear disclosures to consumers about their conduct, including that they collect and sell consumers' sensitive personal data.

92.    For example, the California Consumer Privacy Act ("CCPA") protects consumers' personal information from collection and use by businesses without providing proper notice and obtaining consent.

93.   The CCPA applies to Defendants because they individually earn more than $25

---

[11] Envestnet, Inc., *Business Continuity*, (June 19, 2020), https://www.envestnet.com/business-continuity.

million in annual gross revenue. Additionally, the CCPA applies to Defendants because they buy, sell, receive, or share, for commercial purposes, the personal information of more than 50,000 consumers, households, or devices.

94. The CCPA requires a business that collects consumers' personal information, such as Defendants' business, to disclose either "at or before the point of collection . . . the categories of personal information to be collected and the purposes for which the categories of personal information shall be used." Cal. Civ. Code § 1798.100(b).

95. Furthermore, "[a] business shall not collect additional categories of personal information or use personal information collected for additional purposes without providing the consumer with notice consistent with this section." *Id.*

96. Other state statutes that govern Defendants' disclosures include California's Financial Information Privacy Act ("CalFIPA"), Cal. Fin. Code § 4053(d)(1), and the California Online Privacy Protection Act ("CalOPPA"), Cal. Bus. & Prof. Code § 22575. CalFIPA requires that the language in privacy policies be "designed to call attention to the nature and significance of the information" therein, use "short explanatory sentences," and "avoid[] explanations that are imprecise or readily subject to different interpretations." Cal. Fin. Code § 4053(d)(1). The text must be no smaller than 10-point type and "use[] boldface or italics for key words." *Id.* In passing CalFIPA, the California legislature explicitly provided that its intent was "to afford persons greater privacy protections than those provided in . . . the federal Gramm-Leach-Bliley Act, and that this division be interpreted to be consistent with that purpose." Cal. Fin. Code § 4051. *See infra.*

97. CalOPPA requires that an operator of any online service, as defined therein, "conspicuously post" its privacy policy. Cal. Bus. & Prof. Code § 22575. Under the statute, to "conspicuously post" a privacy policy via a text hyperlink, the hyperlink must include the word "privacy," be "written in capital letters equal to or greater in size than the surrounding text," or be "written in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks that call attention to the language." Cal. Bus. Prof. Code § 22577(b).

98. The Graham Leach Bliley Act (the "GLBA") and the regulations promulgated

thereunder impose strict requirements on financial institutions regarding their treatment of consumers' private financial data and the disclosure of their policies regarding the same. Defendants are financial institutions subject to those regulations, which include the Privacy of Consumer Financial Information regulations (the "Privacy Rule"), 16 C.F.R. Part 313, re-codified at 12 C.F.R. Part 1016 ("Reg. P"), and issued pursuant to the GLBA, 15 U.S.C. §§ 6801-6803, and the GLBA's "Safeguards Rule" (16 C.F.R. Part 314).

99.    This regulatory scheme has clear requirements for applicable privacy policies. Under those rules, a financial institution "must provide a clear and conspicuous notice that accurately reflects [its] privacy policies and practices." 16 C.F.R. § 313.4. Privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). Ways a company can call attention to its privacy policy include "[using] a plain-language heading" (16 C.F.R. § 313.3(b)(2)(ii)(A); "[using] a typeface and type size that are easy to read" (16 C.F.R.§ 313.3(b)(2)(ii)(B)); (c) "[using] boldface or italics for key words" (16 C.F.R. § 313.3(b)(2)(ii)(D)); or (d) "[using] distinctive type size, style, and graphic devices, such as shading or sidebars," when combining its notice with other information (16 C.F.R. § 313.3(b)(2)(ii)(E)). A company must ensure that "other elements on the web site (such as text, graphics, hyperlinks, or sound) do not distract attention from the notice." 16 CFR § 313(b)(2)(iii). The notice should appear in a place that users "frequently access." 16 CFR § 313.3(b)(2)(iii)(A), (B). Privacy notices must "accurately reflect[]" the financial institution's privacy policies and practices. 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. The notices must include the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies. 16 C.F.R.§ 313.6; 12 C.F.R. § 1016.6.

100.    Both GLBA and CalFIPA require that privacy policies provide consumers with an opportunity to opt out of the sharing of their personal data. 16 C.F.R. § 313.10; Cal. Fin. Code.

§ 4053(d)(2).

101.    Defendants violated these statutory and regulatory requirements because they do not disclose through the Envestnet | Yodlee privacy policy that they collect consumers' personal information, let alone the categories of personal information they collect, nor the purposes for which this information is collected.

102.    Envestnet | Yodlee's privacy policy is not "clear and conspicuous." Worse still, Envestnet | Yodlee *does not even maintain* a privacy policy that applies to users of third party Fintech Apps, such as Plaintiffs and Class members here. Envestnet | Yodlee's privacy policy applies only to users of its direct-to-consumer apps and does not cover the unauthorized data collection practices alleged throughout this Complaint.

103.    Nor does Envestnet | Yodlee make these necessary disclosures at the "point of collection." For example, as discussed above, when consumers connect their bank account to PayPal through Envestnet | Yodlee, nowhere is it disclosed that Envestnet | Yodlee collects and sells consumers' sensitive personal data. All that is disclosed is that "[PayPal] use[s] Yodlee to confirm your bank details and to check your balance and transaction as needed, which can help your PayPal payments go through." This is materially false and misleading in that it does not disclose: (1) that Envestnet | Yodlee collects and sells users' sensitive personal data; (2) the categories of data that Envestnet | Yodlee collects and sells; or (3) the true purpose for Envestnet | Yodlee's conduct, i.e., to earn monetary compensation by selling Plaintiffs' and Class members' data to other entities. Other apps that incorporate Envestnet | Yodlee's API, such as Personal Capital, do not disclose their use of Envestnet | Yodlee in the screens that consumers see while using the app.

104.    Further, Envestnet | Yodlee's privacy policy provides an insufficient opportunity to opt out, including because it fails to use the heading "Restrict Information Sharing With Other Companies We Do Business With To Provide Financial Products And Services." Cal. Fin. Code § 4053 (d)(1)(A).

105.    In addition to being financial institutions themselves, governed by the GLBA and CalFIPA, Defendants also received data from other financial institutions. As such, they violated the

following CalFIPA provision as well:

> **An entity that receives nonpublic personal information pursuant to any exception set forth in Section 4056 shall not use or disclose the information except in the ordinary course of business** to carry out the activity covered by the exception under which the information was received.

Cal. Fin. Code § 4053.5 (emphasis added).

106.    One of the exceptions noted in Section 4056 allows sharing of nonpublic personal information "with the consent or at the direction of the consumer." Cal. Fin. Code. § 4056. Plaintiffs and Class members did not consent to or direct the release of their sensitive nonpublic personal information for the reasons described herein. But even if they did, Section 4053.5 still provides that an entity like Envestnet | Yodlee can *only* use such information to carry out the activity *for which the user provided consent*. Defendants' use of the data for any reason other than connecting users' bank accounts violates this statutory protection.

## V.    GOVERNMENT AND INDUSTRY LEADERS AGREE THAT DEFENDANTS' CONDUCT IS WRONG, RISKY, DANGEROUS AND BAD FOR CONSUMERS

107.    Government and industry leaders agree that Defendants' conduct runs afoul of basic standards of decency and proper treatment of consumer data.

108.    The Consumer Financial Protection Bureau's ("CFPB") 2017 Consumer Protection Principles for data harvesters like Envestnet | Yodlee provide that such services should not "require consumers to share their account credentials with third parties"—i.e., anyone other than the user or the bank.[12] Of course, Defendants do exactly that.

109.    Likewise, the Consumer Protection Principles provide that the data practices of a company like Envestnet | Yodlee must be, "fully and effectively disclosed to the consumer, understood by the consumer, not overly broad, and consistent with the consumer's reasonable expectations in light of the product(s) or service(s) selected by the consumer." Defendants'

---

[12] CFPB, *Consumer Protection Principles: Consumer-Authorized Financial Data Sharing and Aggregation*, (Oct. 18, 2017), https://files.consumerfinance.gov/f/documents/cfpb_consumer-protection-principles_data-aggregation.pdf.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:20-CV-5991 (SK)

disclosures were not full and effective, as described above. Defendants' data practices were likely to and did deceive Plaintiffs and Class members, are overly broad, and are not consistent with consumers' reasonable expectations, because they are out of proportion with what is necessary to link financial accounts to FinTech apps.

110.    The Consumer Protection Principles also provide that data access terms must address "access frequency, data scope, and retention period." Nowhere do Defendants disclose how they access consumers' data, how much data they gather, and how long they keep it—perhaps because consumers would be outraged to hear the answers.

111.    The Consumer Protection Principles also provide that consumers must be informed of any third parties that access or use their information, including the "identity and security of each such party, the data they access, their use of such data, and the frequency at which they access the data." Defendants do not disclose this information.

112.    The CFPB recently issued an advance notice of proposed rulemaking ("ANPR") to address the abuses and increasing privacy concerns stemming from the conduct of data harvesters like Envestnet | Yodlee.[13] The ANPR is evidence of increasing government and agency concern over the numerous ways in which practices like Envestnet | Yodlee's harm millions of consumers.

113.    Major financial institutions and their trade associations have also voiced concerns. In April 2016, J.P. Morgan CEO Jamie Dimon said the bank is "extremely concerned" about "outside parties," including "aggregators" (like Yodlee), for three reasons: first, "[f]ar more information is taken than the third party needs in order to do its job"; second, "[m]any third parties sell or trade information in a way [users] may not understand, and the third parties, quite often, are doing it for their own economic benefit – not for the customer's benefit"; and third, "[o]ften this is being done on a daily basis for years after the customer signed up for the services, which they may

---

[13] CFPB, *Consumer Financial Protection Bureau Releases Advance Notice of Proposed Rulemaking on Consumer Access to Financial Records*, (October 22, 2020), https://www. consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-releases-advance-notice-proposed-rulemaking-consumer-access-financial-records/.

no longer be using."[14] Dimon recommended that users not share their login credentials with third parties like Envestnet | Yodlee, in part to avoid loss of important indemnification rights: "When [users] give out their bank passcode, they may not realize that if a rogue employee at an aggregator uses this passcode to steal money from the customer's account, the customer, not the bank, is responsible for any loss. . . . This lack of clarity and transparency isn't fair or right." J.P. Morgan hit the nail on the head in identifying the egregious invasions of privacy that are not simply incidental to Defendants' business, but lie at the heart of it.

114.    Envestnet | Yodlee admits that major financial institutions have expressed security concerns about its practices. In 2017, the company said that "several large banks had told it that it would lose access to at least some data in the near future if it did not agree to new restrictions on the data it is pulling."[15] That same year, Jason Kratovil, the vice president for government affairs for payments at the Financial Services Roundtable, a trade association for banks, said, "[w]hen you think about millions of customers handing over their bank-account credentials to third parties, who currently have no real oversight or examination of their security controls, you start to understand why our members get pretty nervous."[16]

115.    In 2017, the American Bankers Association ("ABA") wrote to the CFPB to express similar concerns.[17] The ABA stated that "few consumers appreciate the risks presented when they provide access to financial account data to non-bank fintech companies," including the risk of removing such data from the secure bank environment; that "consumers are not given adequate

[14] *See* Jamie Dimon, Chairman and CEO of JPMorgan Chase & Co., Letter to Shareholders, (Apr. 6, 2016), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/investor-relations/documents/2015-annualreport.pdf.

[15] Nathaniel Popper, *Banks and Tech Firms Battle Over Something Akin to Gold: Your Data*, N.Y. Times (March 23, 2017), https://www.nytimes.com/2017/03/23/business/dealbook/banks-and-tech-firms-battle-over-something-akin-to-gold-your-data.html

[16] *Id.*

[17] Rob Morgan, Vice President, Emerging Technologies of American Bankers Association, Letter Response to Request for Information Regarding Consumer Access to Financial Records Docket No.: CFPB-2016-0048 (Feb. 21, 2017), https://www.aba.com/-/media/documents/comment-letter/aba-comment-cfpb-data-aggregators.pdf?rev=a5603ffb382c4905 9ebab1dfda631abf.

information or control over what information is being taken, how long it is accessible, and how it will be used in the future"; that companies like Envestnet | Yodlee make "little effort to inform consumers about the information being taken, how it is being used or shared, how often it is being accessed, and how long the aggregator will continue to access it"; and that "[c]onsumers assume that data aggregators take only the data needed to provide the service requested," but in reality, "too often it is not the case."

## VI.    PLAINTIFFS AND CLASS MEMBERS LOST INDEMNIFICATION RIGHTS AND OTHER RIGHTS AND PROTECTIONS

116.    Under federal regulations, a consumer is not liable for unauthorized electronic fund transfers from her financial accounts, subject to certain limits and conditions. *See, e.g.*, 12 C.F.R. § 1005.2(m). But Defendants' conduct eliminates consumers' rights to indemnification under these regulations. If Defendants induced Plaintiffs and Class members to provide their bank credentials to Defendants, and a malicious user subsequently uses those credentials to access and improperly transfer funds from Plaintiffs and Class members' accounts, banks consider that transfer to have been authorized because of the initial provision of the credentials to Defendants. As noted above, J.P. Morgan CEO Jamie Dimon expressed concern that consumers do not generally understand that they will be responsible for any such loss. For instance, a theft of $10,000 from a consumer's account would ordinarily leave a consumer liable for only $50; but if Defendants' conduct in any way contributes to that unlawful access, the consumer may now be liable for the full $10,000, a loss in value of $9,950.

117.    In 2019, J.P. Morgan Chase acted on these concerns by entering an agreement with Envestnet | Yodlee to prohibit Defendants from harvesting Chase customers' banking credentials. The agreement specified that users' data would no longer be transmitted via Envestnet | Yodlee's unsecure API. Instead, the data would be transmitted to Envestnet | Yodlee via JPM's own custom, secure API. Chase's head of digital banking stated that the change "will help our customers manage exactly who they give their information to, and understand how their information will be used."[18]

---

[18] Business Wire, *JPMorgan Chase, Envestnet Yodlee Sign Agreement to Increase Customers' Control of Their Data* (December 5, 2019), https://www.businesswire.com/news/home/2019

The press release stated, "[b]ecause the secure API uses a token-based approach, customers will no longer need to give out their username and password – confidential credentials that should always be treated with the utmost care." Other banks such as Bank of America, Citi and Wells Fargo have taken similar action.

118.    By removing Plaintiffs' and Class members' data from their bank's secure environment and storing it in Defendants' own computer systems, networks or servers, Defendants have destroyed the rights and protections to which Plaintiffs and Class members are otherwise entitled. That amounts to an economic loss to Plaintiffs and Class members.

119.    Even if a particular Plaintiff's or Class member's account has not been compromised, the indemnification and related rights are vested rights that Plaintiffs and Class members are entitled to assert against their bank in the event their data is misused. Those rights are lost as soon as Envestnet | Yodlee remove Plaintiffs' and Class members' data from their bank's secure environment, as the bank is no longer in control of (and thus responsible for) what happens to that data. Just as a person derives a benefit from having an insurance policy in place and loses that benefit if he is deprived of that policy—regardless of whether he has made a claim against that policy—Plaintiffs' and Class members' loss of indemnification rights and related rights and protections occurs even if they have not sought to enforce them. Plaintiffs' and Class members' loss of indemnification rights and related rights and protections amounts to cognizable and measurable economic damage and loss of money and property.

## VII.    PLAINTIFFS AND CLASS MEMBERS LOST CONTROL OVER VALUABLE PROPERTY AND THE ABILITY TO RECEIVE COMPENSATION FOR IT

120.    The data that Defendants collect, retain and sell has enormous value both to Defendants and to the Plaintiffs and Class members from whom Defendants illicitly obtain it.

121.    First, the data at issue is valuable to Defendants. The market for consumer data is worth as much as $200 billion.[19] In 2015, Envestnet announced an acquisition of Yodlee for $590

1205005462/en/JPMorgan-Chase-Envestnet-l-Yodlee-Sign-Agreement-to-Increase-Customers%E2%80%99-Control-of-Their-Data.

[19] Catherine Tucker, *Buying Consumer Data? Tread Carefully*, Harvard Business Review, (May 1,

million, based in large part on the universe of consumer data that Yodlee had accumulated. Defendants package and sell the data they collect to third party customers, thus demonstrating that there is an active market for Plaintiffs' and Class members' data. The sheer size of this mountain of data, as well as Defendants' ability to continue accessing Plaintiffs' and Class members' transaction histories on an ongoing basis, creates a competitive advantage that Defendants may exercise over their competitors. Once Defendants acquire the data, however, Plaintiffs and Class members have no control over what Defendants do with it, including how they package it and to whom they sell it.

122.    The data at issue is also valuable to Plaintiffs and Class members, but Defendants' conduct has impeded the possibility of a robust and equitable market for consumer data emerging in which Plaintiffs and Class members would be compensated for it.

123.    Marketplaces exist in which data brokers purchase consumers' data from them. For instance, Brave is a web browser that allows consumers to surf the internet free of surveillance (unlike some other browsers), while offering the option to allow Brave to observe their activity and collect data in exchange for basic attention token ("BAT"), a currency that can be traded for approximately one dollar per BAT.

124.    Brave estimated in 2019 that users would be able to earn between $60 and $70 that year—and possibly over $200 in 2020—by selling access to their data through the Brave software.[20] There is currently over $1 billion in BAT outstanding, with as much as $54 million worth of the currency traded per day.[21]

125.    Brave states that its mission is to allow users to "take back control" and to stop "data harvesters [which] are . . . granted access to your personal identity and online habits so that they

2020), https://hbr.org/2020/05/buying-consumer-data-tread-carefully.

[20] Michael Kan, *Brave Browser Will Pay You to View Ads (But There's a Catch)*, PC Magazine, (Jan. 15, 2019), https://www.pcmag.com/news/brave-browser-will-pay-you-to-view-ads-but-theres-a-catch.

[21] Coincap.io Data Market Website (last visited March 14, 2021), https://coincap.io/.

1    can make billions in annual profits."[22] Brave garnered 20 million users in 2020, which shows that

2    consumers have substantial interest in receiving compensation for their data.

3          126.   In the context of consumer financial data, no such market presently exists. A

4    company called Datacoup paid consumers as much as $8 per month for access to, among other

5    things, their credit card transaction data. But Datacoup dissolved because it could not achieve the

6    same scale as companies like Envestnet | Yodlee, which harvests data from millions of consumers

7    without paying them. As *Forbes* reported at the time, "The problem for such new companies is that

8    marketers will not pay much for details about just thousands of people when data brokers who pay

9    nothing to individuals offer detailed dossiers on millions."[23]

10          127.   Such a market would allow Plaintiffs and Class members to retain agency, control

11   and power over their intimate information, and receive compensation in exchange for knowingly

12   and willingly turning it over. But any hope of such a market emerging has only become less likely

13   in the face of Defendants' abusive practices. Envestnet | Yodlee's stockpile of consumer financial

14   data and the user credentials it deploys to constantly refresh that data operate as a barrier to entry

15   by any new competitors. Any new entrant who planned to pay users for the same type of data that

16   Envestnet | Yodlee takes would face an extraordinary task of accumulating sufficient data to

17   support a viable business. Instead, Defendants dominate a multi-billion dollar market in which they

18   alone derive economic benefit from consumers' private, highly sensitive, and valuable data.

19          128.   Defendants' conduct is a substantial factor inhibiting the development of a market

20   for Plaintiffs and Class members to sell access to their data. Envestnet | Yodlee has thus deprived

21   consumers of the value of their data by impeding such markets from developing. This amounts to

22   an economic loss of money and property for Plaintiffs and Class members.

23

24

25   ─────────────────────

26   [22] *Get Rewarded for Paying Attention*, Brave, (Mar. 11, 2021) https://brave.com/compare
     /chrome/earning/.

27   [23] Adam Tanner, *Others Take Your Data for Free, This Site Pays Cash*, Forbes Magazine, (March
     3, 2019), https://www.forbes.com/sites/adamtanner/2014/03/03/others-take-your-data-for-free-this-
28   site-pays-cash/?sh=5c62f4679461.

## VIII.   PLAINTIFFS AND CLASS MEMBERS SUFFERED AN INCREASED RISK OF IDENTITY THEFT AND FRAUD

129.   Defendants' conduct increases the likelihood that Plaintiffs' and Class members' accounts will be compromised. As the ABA recognizes, the "sheer volume and value of the aggregated data" warehoused at entities like Defendants makes them "a priority target for criminals, including identity thieves." Databases like Defendants' create a one-stop shop for malicious actors to gain access to all of a consumer's accounts, creating a "rich reward for a single hack." Defendants' consolidation of risk to consumers at a single point of entry creates tangible, economic injury to Plaintiffs and Class members, who must spend time and money closely monitoring their credit reports and other financial records for any evidence that their accounts have been compromised. Plaintiffs and Class members face an expanded and imminent risk of economic harm from unauthorized transfers, identity theft, and fraud.

130.   Given the secret, undisclosed nature of Defendants' data collection practices, Plaintiffs anticipate that discovery and expert analysis are likely to demonstrate additional types of economic loss or damage and/or damage to money and property and reserve their rights to amend this Complaint to assert those theories at the appropriate time.

## IX.   PLAINTIFFS AND CLASS MEMBERS HAVE A REASONABLE EXPECTATION OF PRIVACY

131.   Plaintiffs' and Class members' expectation of privacy in their highly sensitive personal data, which Defendants collected, sold, or otherwise misused, is enshrined in California's Constitution. Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*." Art. I., Sec. 1, Cal. Const. (emphasis added).

132.   The phrase "*and privacy*" was added in 1972 after a proposed legislative constitutional amendment designated as Proposition 11. Significantly, the argument in favor of Proposition 11 reveals that the legislative intent was to curb businesses' control over the unauthorized collection and use of consumers' personal information, stating in relevant part:

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:20-CV-5991 (SK)

**The right of privacy is the right to be left alone.** It is a fundamental and compelling interest. It protects **our homes**, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose. **It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.**

**Fundamental to our privacy is the ability to control circulation of personal information.** This is essential to social relationships and personal freedom. The proliferation of government and business records over which we have no control limits our ability to control our personal lives. Often we do not know that these records even exist and we are certainly unable to determine who has access to them.[24]

133.    Consistent with the language of Proposition 11, numerous studies examining the collection of consumers' personal data confirm that the surreptitious taking of personal, confidential, and private information from millions of individuals, as Envestnet | Yodlee has done here, violates expectations of privacy that have been established as general social norms.

134.    Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its users' personal data.

135.    For example, a recent study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing their data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them. Moreover, according to a study by *Pew Research*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.

136.    Defendants failed to disclose that they collected, sold, and otherwise misused consumers' sensitive personal data, and failed to obtain consent to do so. This constitutes a violation of Plaintiffs' and Class members' privacy interests, including those enshrined in the California

---

[24] Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) at 27 (emphasis added).

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:20-CV-5991 (SK)

1   Constitution.

2   **X.   DEFENDANTS LACK ADEQUATE SAFEGUARDS TO PROTECT CONSUMERS'**
3       **DATA**

4        137.    When Envestnet | Yodlee sells Plaintiffs and Class members' data, it claims to sell

5   it only in "aggregated" form, with all information "de-identified." But in fact, Defendants' Data

6   and Analytics products consist of bulk records of individual transactions, or what Envestnet itself

7   has called "aggregated transaction-level account data elements."[25] Thus, even though Defendants'

8   data products may be "aggregated" in the sense that they contain data from thousands or millions

9   of individual consumers, they still contain details about individual transactions. Third party

10  purchasers receive more than enough information to re-identify particular individuals from the data

11  set.

12       138.    Envestnet | Yodlee claims that, "[p]rotecting the personal information of those who

13  use our services is [their] top priority," and that it employs, "leading industry standards of de-

14  identification processing," and "technical, administrative, and contractual measures to protect

15  consumers' identities, such as prohibiting analytics and insights users from attempting to re-identify

16  any consumers from the data."[26] These statements are false.

17       139.    According to leaked documents obtained by *Vice News*, Envestnet | Yodlee's data

18  anonymization process involves "removing names, email addresses, and other personally

19  identifiable information (PII) from the transaction data.[27] This includes "masking patterns of

20  numbers such as account numbers, phone numbers, and SSNs and replacing them with 'XXX'

21  symbols" and "mask[ing] the financial institution's name in the transaction description."[28]

22       140.    However, Envestnet | Yodlee's customers (and potential identity thieves) still

23  receive a wealth of information that can be used to re-identify an individual. For example, even

24  Envestnet | Yodlee's "masked" information still provides a unique identifier for who made the

---

25  [25] Envestnet, Inc., Form 10-k at 8, (December 31, 2020), https://sec.report/Document/000
26  1628280-21-003457/.

    [26] *See* Vice (Joseph Cox), *supra* n. 4.

27  [27] *Id.*

28  [28] *Id.*

purchase, the amount of the transaction, date of sale, the city, state and zip code of the business where the purchase was made, and primary and secondary merchant fields, that can be combined to identify the specific individual involved in each transaction.

141.    Moreover, because Envestnet | Yodlee keeps a unique identifier for each individual consumer in its data set, and these identifiers are preserved across all transactions, marketers (and cybercriminals) can de-anonymize the data by linking multiple transactions by the same user and combining that information with other publicly available data.

142.    As Yves-Alexandre de Montjoye, an associate professor at Imperial College London explained, this data is more "pseudonymized" than anonymized, meaning that while "it doesn't contain information that'd directly identify a person such as names or email addresses . . . someone with access to the dataset and some information about you . . . might be able to identify you."

143.    Vivek Singh, an associate professor at Rutgers University, raised the same concern, because the data "does not remove spatio-temporal traces of people that can be used to connect back the data to them." Spatio-temporal traces are data associated with the transaction, including the date, merchant, and physical location.

144.    Singh and de Montjoye authored a 2015 study published in *Science* in which they successfully identified individuals using a dataset of similar "de-identified" data with just three months of transactions—the amount of data Envestnet | Yodlee initially collects from Class members—covering 1.1 million people.[29] Singh explained with just "three to four" transactions, an attacker "can unmask the person with a very high probability." The study concluded that it was possible to determine the identity of an individual from so-called "anonymized" credit card data 90% of the time through simple extrapolation.[30]

145.    Significantly, last year, scientists from the Imperial College London and Université Catholique de Louvain reported that they have developed a model that can re-identify 99.98% of

---

[29] Y. de Montjoye, V. Singh et al., *Unique in the Shopping Mall: On the Reidentifiability of Credit Card Metadata*, 357 Science 6221, 536-539 (Jan. 30, 2015), https://science.sciencemag.org/content/347/6221/536?mod=article_inline.

[30] *Id.*

Americans from datasets using as few as fifteen demographic attributes. Notably, these researchers have made their software code available for anyone on the internet.

146.    Consumers whose information is collected and sold by Envestnet | Yodlee are especially vulnerable because a user's credit and debit card transactions can reveal a wealth of other personal and demographic information, such as health, sexuality, religion, and political views that can be used to re-identify individuals like Plaintiffs and Class members.

147.    These studies confirm that Envestnet | Yodlee's purported "deanonymization" provides little to no protection for Plaintiffs and Class members, given the immense amount of data that Envestnet | Yodlee has been able to collect through its network of over 17,000 connections to financial institutions, billers, reward networks, and other endpoints.

148.    Furthermore, despite Envestnet | Yodlee's claim that it employs "technical, administrative, and contractual measures to protect consumers' identities, such as prohibiting analytics and insights users from attempting to re-identify any consumers from the data," [31] Defendants do not have reasonable safeguards in place to protect consumers' sensitive personal data.

149.    Envestnet | Yodlee admitted in a 2015 filing with the SEC that it "does not audit its customers to ensure that they have acted, and continue to act, consistently with such assurances." [32] After selling consumer data, Defendants take no steps to ensure this information remains private, that their clients are not attempting to re-identify consumers, or use that data for malicious purposes.

150.    Nor could they. Envestnet | Yodlee's choice not to employ technical safeguards to protect consumers' sensitive personal data and instead to sell that data to their clients in large text files removes their ability to exert any control over the information once it has been sold.

151.    In 2015, Envestnet | Yodlee hired Peter Swire, a professor of law and ethics at Georgia Institute of Technology and former Obama administration official, to review its privacy practices after receiving questions from the Wall Street Journal. Swire told the Journal that

---

[31] *See* Vice (Joseph Cox), *supra* n. 4.

[32] Yodlee, Inc., Proxy Statement/Prospectus, *supra* n. 10.

Envestnet | Yodlee is "doing the technical and administrative things that regulators have recommended" to make sure consumers remain anonymous. Professor Swire also provided a comment for Envestnet | Yodlee's website, opining that Professors Singh and de Montjoye's findings "do not apply to the Yodlee facts."[33] But that statement no longer appears on the Envestnet | Yodlee website. And in 2020, when a reporter asked Swire if he stood by his statements from 2015, he said only, "I have no comment."[34]

## XI.  MEMBERS OF CONGRESS REQUESTED AN FTC INVESTIGATION INTO DEFENDANTS' PRACTICES

152.    Last year, three members of Congress wrote a letter urging the FTC to investigate Defendants for selling Americans' highly sensitive data without their knowledge or consent.[35]

153.    In the letter, Senator Ron Wyden, Senator Sherrod Brown, and Representative Anna Eshoo wrote that "Envestnet [] sells access to consumer data . . . The consumer data that Envestnet collects and sells is highly sensitive. Consumers' credit and debit card transactions can reveal information about their health, sexuality, religion, political views, and many other personal details . . . And the more often that consumers' personal information is bought and sold, the greater the risk that it could be the subject of a data breach."[36]

154.    The three members of Congress were deeply worried that "Envestnet and the companies to which it had sold data [did not] have the required technical controls in place to protect Americans' sensitive financial data from re-identification, unauthorized disclosure to hackers or foreign spies, or other abusive data practices." [37]

155.    The letter further warned that:

> Envestnet does not inform consumers that it is collecting and selling their personal financial data . . . Instead, Envestnet only asks its partners, such as banks, to disclose this information to consumers in

---

[33] *See* Vice (Joseph Cox), *supra* n.4.

[34] *Id.*

[35] *See* Wyden, *supra* n.1.

[36] *Id.*

[37] *Id.*

1
2
3
4

> their terms and conditions or privacy policy. That is not sufficient
> protection for users. Envestnet does not appear to take any steps to
> ensure that its partners actually provide consumers with such notice.
> And even if they did, Envestnet should not put the burden on
> consumers to locate a notice buried in small print in a bank's or apps'
> [sic] terms and conditions . . . in order [to] protect their privacy.

5
6
7
8

The authors argued that FTC policy prohibits "hid[ing] important facts about how consumer data
is collected or shared in the small print of a privacy policy" and FTC has stated that, "companies
have an obligation to disclose 'facts [that] would be material to consumers in deciding to install the
software.'"

9
10
11
12
13
14

156.    According to Envestnet's Form 10-K for the 2019 fiscal year, in February 2020, the
FTC issued a civil investigative demand to Envestnet for various documents related to this matter.
Envestnet itself recognizes the risk that as a result of the FTC's investigation, proceedings may be
initiated and they may be found to have violated applicable laws, which could have a material
adverse effect on their operations and financial condition. Envestnet reported in its Form 10-K for
the 2020 fiscal year that the FTC had closed the matter.

15

**TOLLING, CONCEALMENT AND ESTOPPEL**

16
17
18
19
20
21
22
23
24
25
26
27
28

157.    The statutes of limitation applicable to Plaintiffs' claims are tolled as a result of
Defendants' knowing and active concealment of their conduct alleged herein. Among other things,
Defendants design their software to deceive users into thinking that they are interacting directly
with their banks when providing log in credentials to facilitate a connection between their bank
accounts and a third-party service. Defendants also fail to disclose to each individual user—either
through their own privacy policy, website, or other document—that they store the bank log in
information provided in such log in transactions and use those credentials to collect financial data
from the individual's bank accounts on an ongoing basis, even though the individual never
consented to such data collection. Nor do Defendants inform each individual user that this data
collection will continue even if the individual revokes the permissions granted to the third-party
service it sought to connect to her bank account. By these actions, Defendants intentionally
concealed the nature and extent of their data collection operation to maximize profits resulting from
the sale of Plaintiffs' and Class members' highly sensitive financial information. To the extent the

Defendants' customers or others made statements regarding Defendants' service or their privacy policies, Defendants either approved those inadequate statements or failed to timely correct them in service of their ongoing scheme to conceal the true nature of their conduct.

158.   Plaintiffs and Class members could not, with due diligence, have discovered the full scope of Defendants' conduct, due to Defendants' deliberate efforts to conceal it. All applicable statutes of limitation also have been tolled by operation of the discovery rule. Under the circumstances, Defendants were under a duty to disclose the nature and significance of their data and privacy policies and practices but did not do so. Defendants therefore are estopped from relying on any statute of limitations.

159.   Further, this Complaint alleges a continuing course of unlawful conduct by which Defendants have inflicted continuing and accumulating harm within the applicable statutes of limitations.

160.   Each time Defendants engaged in an unlawful act complained of here, Defendants undertook an overt act that has inflicted harm on Plaintiffs and other members of the Classes.

161.   For these reasons, the statutes of limitations have been tolled with respect to the claims of Plaintiffs and members of the Classes asserted in this Complaint.

162.   Defendants' fraudulent concealment and omissions are common to Plaintiffs and all Class members.

## CLASS ACTION ALLEGATIONS

163.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

> **Nationwide Class:** All natural persons in the United States whose accounts at a financial institution were accessed by Yodlee using login credentials obtained through Yodlee's software incorporated in a mobile or web-based fintech app that enables payments (including ACH payments) or other money transfers from 2014 through the present.

> **California Class:** All natural persons in California whose accounts at a financial institution were accessed by Yodlee using login credentials obtained through Yodlee's software incorporated in a mobile or web-based fintech app that enables payments (including ACH payments) or other money transfers from 2014 through the present.

39

164.   Excluded from each of the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which a Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendants' counsel.

165.   **Numerosity:** The exact number of members of the Classes is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Classes likely consist of millions of individuals, and the members can be identified through Defendants' records.

166.   **Predominant Common Questions:** The Classes' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Classes include, but are not limited to, the following:

a.   Whether Defendants violated Plaintiffs' and Class members' privacy rights;

b.   Whether Defendants' acts and practices complained of herein amount to egregious breaches of social norms;

c.   Whether Defendants' conduct was negligent;

d.   Whether Defendants' conduct was unlawful;

e.   Whether Defendants' conduct was unfair;

f.   Whether Defendants' conduct was fraudulent;

g.   Whether Plaintiffs and the Class members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement;

h.   Whether Plaintiffs and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief; and

i.   Whether Plaintiffs and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

167.   **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Classes. The claims of Plaintiffs and the members of the Classes arise from the same conduct by

1    Defendants and are based on the same legal theories.

2        168.    **Adequate Representation:** Plaintiffs have and will continue to fairly and

3    adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel

4    competent and experienced in complex litigation and class actions, including litigations to remedy

5    privacy violations. Plaintiffs have no interest that is antagonistic to those of the Classes, and

6    Defendants have no defenses unique to any Plaintiff. Plaintiffs and their counsel are committed to

7    vigorously prosecuting this action on behalf of the members of the Classes, and they have the

8    resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other

9    members of the Classes.

10        169.    **Substantial Benefits:** This class action is appropriate for certification because class

11    proceedings are superior to other available methods for the fair and efficient adjudication of this

12    controversy and joinder of all members of the Classes is impracticable. This proposed class action

13    presents fewer management difficulties than individual litigation, and provides the benefits of

14    single adjudication, economies of scale, and comprehensive supervision by a single court. Class

15    treatment will create economies of time, effort, and expense and promote uniform decision-making.

16        170.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions

17    based on facts learned and legal developments following additional investigation, discovery, or

18    otherwise.

19                    **CALIFORNIA LAW APPLIES TO THE NATIONWIDE CLASS**

20        171.    California's substantive laws apply to every member of the Nationwide Class,

21    regardless of where in the United States the Class member resides. The State of California has

22    sufficient contacts to Defendants' relevant conduct for California law to be uniformly applied to

23    the claims of the Nationwide Class.

24        172.    Further, California's substantive laws may be constitutionally applied to the claims

25    of Plaintiffs and the Nationwide Class under the Due Process Clause, 14th Amend. § 1, and the Full

26    Faith and Credit Clause, Art. IV § 1 of the U.S. Constitution. California has significant contacts, or

27    significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members,

28    thereby creating state interests that ensure that the choice of California state law is not arbitrary or

1   unfair.

2   173.    Envestnet | Yodlee's headquarters and principal place of business is located in

3   California. Defendants also own property and conduct substantial business in California, and

4   therefore California has an interest in regulating Defendants' conduct under its laws. Defendants'

5   conduct originated in, and emanated from, California and impacted a significant percentage of

6   California residents, rendering the application of California law to the claims here constitutionally

7   permissible.

8   174.    The application of California laws to the Nationwide Class is also appropriate under

9   California's choice of law rules because California has significant contacts to the claims of

10  Plaintiffs and the proposed Nationwide Class, and California has a greater interest in applying its

11  laws here than any other interested state.

12  **CLAIMS FOR RELIEF**

13  **FIRST CLAIM FOR RELIEF**

14  **Common Law Invasion of Privacy – Intrusion Upon Seclusion**
15  **(On Behalf of Plaintiffs and the Classes)**

16  175.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with

17  the same force and effect as if fully restated herein.

18  176.    Defendants intruded upon Plaintiffs and Class members' seclusion by (1) collecting

19  and selling their sensitive personal data in which they had a reasonable expectation of privacy; and

20  (2) in a manner that was highly offensive to Plaintiffs and Class members, would be highly

21  offensive to a reasonable person, and was an egregious violation of social norms.

22  177.    Defendants' conduct violated Plaintiffs' and Class members' interests by collecting,

23  selling, and otherwise misusing their sensitive personal data, including information concerning

24  private financial transactions (i.e., their informational privacy rights), as well as their interests in

25  making intimate personal decisions or conducting personal activities without observation, intrusion,

26  or interference (i.e., their autonomy privacy rights). Defendants' conduct is especially egregious as

27  they fail to have any adequate security measures in place to control what their clients do with

28  Plaintiffs' and Class members' information once it is sold, such as re-identifying Plaintiffs and

Class members or using it for nefarious purposes.

178.  The surreptitious taking and disclosure of personal, confidential, and private information from millions of individuals was highly offensive because it violated expectations of privacy that have been established by general social norms.

179.  Polls and studies consistently show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is shared. For example, one study by *Pew Research* found that 93% of Americans believe it is important to be in control of who can get information about them.

180.  Defendants' conduct would be highly offensive to a reasonable person in that it violated federal and state laws designed to protect individual privacy, in addition to social norms.

181.  Defendants intentionally engaged in the misconduct alleged herein for their own financial benefit unrelated to any service they provide. Specifically, Defendants collected and sold Plaintiffs' and Class members' lucrative (and private) sensitive information for their own financial benefit.

182.  As a result of Defendants' actions, Plaintiffs and Class members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

183.  Plaintiffs and Class members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation.

184.  Plaintiffs and Class members are entitled to appropriate relief, including compensatory damages for the harm to their privacy and dignitary interests, loss of valuable rights and protections, heightened risk of future invasions of privacy, and mental and emotional distress.

185.  Plaintiffs and Class members are entitled to an order requiring Defendants to disgorge profits or other benefits that Defendants acquired as a result of their invasions of privacy.

186.  Plaintiffs and Class members also seek injunctive relief. They do not have an adequate remedy at law because many of the resulting injuries are reoccurring, and Plaintiffs and Class members will be forced to bring multiple lawsuits to rectify the same conduct. If an injunction is not issued, Plaintiffs and Class members will suffer irreparable injury. Plaintiffs and Class members are entitled to an order enjoining Defendants from engaging in the unlawful conduct

alleged in this complaint, requiring Defendants to delete Plaintiffs' and Class members' sensitive personal data, requiring Defendants to cease further collection of Plaintiffs' and Class members' sensitive personal data, requiring Defendants to improve their privacy disclosures, requiring Defendants to obtain adequately informed consent, and other appropriate equitable relief.

187.    Plaintiffs and Class members are entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

188.    Plaintiffs also seek such other relief as the Court may deem just and proper.

## SECOND CLAIM FOR RELIEF

**Stored Communications Act ("SCA")**
**18 U.S.C. § 2702**
**(On Behalf of Plaintiffs and the Classes)**

189.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

190.    The SCA provides that a person "providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service[.]" 18 U.S.C. § 2702(a)(1).

191.    "Electronic communication" is broadly defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce[.]" 18 U.S.C. § 2510(12).

192.    "Electronic storage" is defined as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and any storage of such communication by an electronic communication service for purposes of backup protection of such communication[.]" 18 U.S.C. § 2510(17)(A)-(B).

193.    "Electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications[.]" 18 U.S.C.

44

§ 2510(15).

194.    "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

195.    "User" is defined as "any person or entity who—(A) uses an electronic communication service; and (B) is duly authorized by the provider of such service to engage in such use." 18 U.S.C. § 2510(13).

196.    Yodlee and Envestnet, as corporations, are persons as defined under 18 U.S.C. § 2510(6).

197.    Defendants provide a service that allows Plaintiffs and Class members the ability to send and receive electronic communications from their financial institutions and third-party applications, such as PayPal. Defendants provide this service "to the public" because Defendants' FinTech and personal financial management technology is incorporated in hundreds of applications used by millions of individuals, including Plaintiffs and Class members.

198.    Plaintiffs and Class members reasonably expected that Defendants' service did not include accessing, collecting, selling, and otherwise disclosing their "electronic communications," i.e., their data (as broadly defined), based, in part, on Defendants' failure to provide *any* disclosures or obtain consent for permission to do so.

199.    Defendants store Plaintiffs' and Class members' electronic communications for backup purposes on behalf of developers and for itself. Defendants also reserve Plaintiffs' and Class members' data for future use, or in the event that it needs to be transmitted again.

200.    Defendants divulge Plaintiffs and Class members' electronic communications while they are in electronic storage by selling them to third parties for monetary compensation, in reckless disregard for Plaintiffs' and Class members' privacy rights, for Defendants' own financial benefit.

201.    Defendants' actions were at all relevant times intentional, willful, and knowing, as evidenced by Defendants accepting monetary compensation in exchange for Plaintiffs' and Class members' electronic communications.

202.    As a result of Defendants' violations of the SCA, Plaintiffs and Class members have

suffered harm and injury, including but not limited to the invasion of their privacy rights.

203. Pursuant to 18 U.S.C. § 2707, Plaintiffs and Class members are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by Defendants as a result of the violation, but in no case less than the minimum statutory damages of $1,000 per person; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## THIRD CLAIM FOR RELIEF

### Unjust Enrichment
### (On Behalf of Plaintiffs and the Classes)

204. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

205. Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

206. In particular, Defendants received benefits from Plaintiffs and Class members in the form of the sensitive personal data that Defendants collected from Plaintiffs and Class members, without authorization and proper compensation. Defendants have collected, sold, and otherwise misused this information, for their own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation from the entities who purchased Plaintiffs' and Class members' sensitive personal data.

207. Defendants unjustly retained those benefits at the expense of Plaintiffs and Class members because Defendants' conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

208. The benefits that Defendants derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in California and every other state for Defendants to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

209.     Plaintiffs and Class members also seek injunctive relief. They do not have an adequate remedy at law because many of the resulting injuries are reoccurring, and Plaintiffs and Class members will be forced to bring multiple lawsuits to rectify the same conduct. If an injunction is not issued, Plaintiffs and Class members will suffer irreparable injury. Plaintiffs and Class members are entitled to an order enjoining Defendants from engaging in the unlawful conduct alleged in this complaint, requiring Defendants to delete Plaintiffs' and Class members sensitive personal data, requiring Defendants to cease further collection of Plaintiffs' and Class members sensitive personal data, requiring Defendants to improve their privacy disclosures, requiring Defendants to obtain adequately informed consent, and other appropriate equitable relief.

210.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds they received, and such other relief as the Court may deem just and proper.

## FOURTH CLAIM FOR RELIEF

### Violation of Cal. Civ. Code § 1709
### (On Behalf of Plaintiffs and the Classes)

211.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

212.     California Civil Code § 1709 provides that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." A defendant violates §1709 if (i) it had a duty to disclose a material fact to the plaintiff; (ii) it intentionally concealed that fact with intent to defraud; (iii) plaintiff was unaware of that fact (and would have acted differently if he were aware), and (iv) plaintiff sustained some damage as a result.

213.     California Civil Code § 1710 defines "deceit" as "1. [t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true; 2. [t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; 3. [t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, 4. [a] promise, made without

47

1   any intention of performing it."

2   214.    Defendants engaged in various acts of deceit. Defendants either suggested that

3   certain facts are true which they knew were not true or which they had no reasonable grounds to

4   believe were true. For example, when Plaintiffs and Class members link their bank accounts to

5   PayPal through Envestnet | Yodlee, the only disclosure provided is that Envestnet | Yodlee is used

6   "to confirm your bank details and to check your balance and transaction *as needed*, which can help

7   your PayPal payments go through." This statement is objectively false. Envestnet | Yodlee accesses

8   users' bank accounts beyond the purposes that it claims. Envestnet | Yodlee actually accesses users'

9   bank accounts to collect their sensitive personal data and sell it to their customers, well beyond

10  what is necessary to connect users' bank accounts to PayPal.

11  215.    Furthermore, Envestnet | Yodlee suppresses facts and provides other facts that are

12  likely to mislead. For example, Envestnet | Yodlee does not inform consumers that it collects and

13  sells their sensitive personal data. Envestnet | Yodlee improperly relies on its clients to provide

14  necessary disclosures of Envestnet | Yodlee's own practices and takes no steps to ensure that its

15  clients do so. By failing to disclose these material facts, Plaintiffs and Class members were deceived.

16  216.    Defendants willfully engaged in these acts of deceit with intent to induce Plaintiffs

17  and Class members to alter their position to their injury or risk, namely by turning over their

18  sensitive personal data to Defendants under false pretenses.

19  217.    Defendants had a duty to disclose these facts to Plaintiffs and Class members; they

20  intentionally concealed those facts with intent to defraud; Plaintiffs and Class members were

21  unaware of these facts, and would have acted differently if they were aware; and Plaintiffs and

22  Class members sustained damage as a result.

23  218.    Defendants willfully also engaged in these acts of deceit so that they could access,

24  collect, and sell Plaintiffs' and Class members' sensitive personal data for their own personal

25  benefit, including monetary compensation.

26  219.    Plaintiffs and Class members seek recovery of their resulting damages, including

27  economic damages, restitution, and disgorgement, as well as punitive damages and such other relief

28  as the Court may deem just and proper.

## FIFTH CLAIM FOR RELIEF

### Violation of California Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code § 17200
### (On Behalf of Plaintiffs and the Classes)

220.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

221.    Defendants' conduct as alleged herein constitutes unlawful, unfair, and/or fraudulent business acts or practices as prohibited by the UCL.

222.    Defendants' business acts and practices are "unlawful" under the UCL, because, as alleged above, Defendant violated the California common law, California Constitution, and the other statutes and causes of action described herein.

223.    Defendants' business acts and practices are "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interests, including protecting consumers' banking data. Defendants violated this public policy by, among other things, surreptitiously collecting, selling, and otherwise misusing Plaintiffs' and Class members' sensitive personal data without Plaintiffs' and Class members' consent. Defendants' conduct violates the policies of the statutes referenced above.

224.    Defendants' business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers. The gravity of the harm of Defendants' secretly collecting, selling, and otherwise misusing Plaintiffs' and Class members' sensitive personal data is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiffs and Class Members were completely unaware of Defendants' conduct, they could not have possibly avoided the harm.

225.    Defendants' business acts and practices are also "fraudulent" within the meaning of the UCL. Defendants have amassed a large collection of sensitive personal data without complete disclosure and therefore without consumers' knowledge or consent. Defendants' business acts and practices were likely to, and did, deceive members of the public including Plaintiffs and Class members into believing this data was private and only used "as needed," such as to connect users' bank accounts to third party applications. In fact, such information was not private, as Defendants

secretly collected, sold, and otherwise misused it for their own purposes, without any connection to transactions on the linked applications.

226.    Had Plaintiffs and Class members known that their information would be collected, sold, and otherwise misused for Defendants' benefit, they would not have used Defendants' services.

227.    Plaintiffs and Class members have a property interest in their sensitive personal data. Plaintiffs and Class members are the owners of the sensitive personal data that Defendants collected and sold. By surreptitiously collecting, selling, and otherwise misusing Plaintiffs' and Class members' information, Defendants have taken property from Plaintiffs and Class members without providing just or any compensation.

228.    Plaintiffs and Class members have lost money and property as a result of Defendants' conduct in violation of the UCL. They lost the indemnification rights and other rights and protections they enjoyed as long as their data remained in the protected banking environment. Such rights are vested rights to which Plaintiffs and Class members are entitled and the loss of those rights occurred as soon as Envestnet | Yodlee removed their data from the secure banking environment. Defendants' practices also have deprived Plaintiffs of control over their valuable property (namely, their sensitive personal data), the ability to receive compensation for that data, and the ability to withhold their data for sale. Plaintiffs seek restitution on behalf of themselves and Class members.

229.    Plaintiffs and Class members also seek injunctive relief. They do not have an adequate remedy at law because many of the resulting injuries are reoccurring, and Plaintiffs and Class members will be forced to bring multiple lawsuits to rectify the same conduct. If an injunction is not issued, Plaintiffs and Class members will suffer irreparable injury. Plaintiffs and Class members are entitled to an order enjoining Defendants from engaging in the unlawful conduct alleged in this complaint, requiring Defendants to delete Plaintiffs' and Class members sensitive personal data, requiring Defendants to cease further collection of Plaintiffs' and Class members sensitive personal data, requiring Defendants to improve their privacy disclosures, requiring Defendants to obtain adequately informed consent, and other appropriate equitable relief.

230.    The hardships to Plaintiffs and Class members if an injunction is not issued exceed

the hardships to Defendants if an injunction is issued. On the other hand, the cost to Defendants of complying with an injunction by complying with federal and California law and by ceasing to engage in the misconduct alleged herein is relatively minimal, and Defendants have a pre-existing legal obligation to avoid invading the privacy rights of consumers.

## SIXTH CLAIM FOR RELIEF

**Violation of California's Comprehensive Data Access and Fraud Act ("CDAFA"),
Cal. Pen. Code § 502
(On Behalf of Plaintiffs and the Classes)**

231.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

232.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, the California Class, under California law.

233.    A person violates the CDAFA if it commits one of fourteen categories of conduct. Defendants engaged in conduct that falls into at least four of those categories as follows.

234.    A person violates Cal. Penal Code § 502(c)(1) if it "*[k]nowingly accesses* and *without permission alters, damages, destroys, or otherwise uses . . . any data*, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive or extort, or (B) wrongfully control or obtain money, property or data." (Emphasis added.) Defendants violated § 502(c)(1) when they accessed and used Plaintiffs' and Class members' sensitive personal information. Defendants acted without permission for the reasons described herein. Plaintiffs and Class members had no notice, whether actual or constructive, that Defendants were a separate entity from the FinTech Apps, and thus no notice that Defendants were operating; had no way to remove Defendants' software; and do not have an opportunity to consent to Defendants' access to their sensitive personal data each time that Defendants access it. Defendants accessed and used this data in order to execute their scheme to defraud and deceive, because Defendants employed fraud and deceit to induce Plaintiffs and Class members to turn over their financial institution login credentials to Defendants. Additionally, Defendants accessed and used this data to wrongfully obtain money, property or data, both because it obtained the data under

false pretenses and because it used the data to develop analytics products that it then sold.

235.    A person violates Cal. Penal Code § 502(c)(2) if it "*[k]nowingly accesses* and *without permission takes, copies, or makes use of any data* from a computer, computer system, or computer network." (Emphasis added.) Defendants violated § 502(c)(2) when they accessed and made use of Plaintiffs' and Class members' sensitive personal information without permission as described herein.

236.    A person violates Cal. Penal Code § 502(c)(3) if it "*[k]nowingly and without permission uses or causes to be used computer services.*" (Emphasis added.) Defendants violated § 502(c)(3) when they knowingly and without permission used or caused to be used the computer services of Plaintiffs' and Class members' financial institutions, as described herein.

237.    A person violates Cal. Penal Code § 502(c)(7) if it "*[k]nowingly and without permission accesses or causes to be accessed* any computer, computer system, or computer network." (Emphasis added.) Defendants violated § 502(c)(7) when they knowingly and without permission used Plaintiffs' and Class members' login credentials, which they obtained under false pretenses, to access the computers, computer systems and computer networks of Plaintiffs and Class members' financial institutions, as described herein.

238.    Defendants accessed the data, computers, computer systems and computer networks above in ways that circumvented technical or code-based barriers.

239.    Plaintiffs have a private right of action because "[i]n addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief." Cal. Pen. Code § 502(e)(1).

240.    Plaintiffs and Class members are the owners of the sensitive personal data that Defendants collected and sold.

241.    Plaintiffs and Class members suffered damage and loss as a result of Defendants' conduct. They lost the indemnification rights and other rights and protections they enjoyed as long as their data remained in the protected banking environment. Such rights are vested rights to which

Plaintiffs and Class members are entitled and the loss of those rights occurred as soon as Envestnet | Yodlee removed their data from the secure banking environment. Defendants' practices also have deprived Plaintiffs of control over their valuable property (namely, their sensitive personal data), the ability to receive compensation for from that data, and the ability to withhold their data for sale.

242.   Plaintiffs and Class members are entitled to compensatory damages, punitive and/or exemplary damages because their violations were willful, and reasonable attorney's fees. Cal. Penal Code § 502(e)(2), (4).

243.   Plaintiffs and Class members also seek injunctive relief. They do not have an adequate remedy at law because many of the resulting injuries are reoccurring, and Plaintiffs and Class members will be forced to bring multiple lawsuits to rectify the same conduct. If an injunction is not issued, Plaintiffs and Class members will suffer irreparable injury. Plaintiffs and Class members are entitled to an order enjoining Defendants from engaging in the unlawful conduct alleged in this complaint, requiring Defendants to delete Plaintiffs' and Class members' sensitive personal data, requiring Defendants to cease further collection of Plaintiffs' and Class members' sensitive personal data, requiring Defendants to improve their privacy disclosures, requiring Defendants to obtain adequately informed consent, and other appropriate equitable relief.

244.   Plaintiffs also seek such other relief as the Court may deem just and proper.

### SEVENTH CLAIM FOR RELIEF

**Violation of California's Anti-Phishing Act of 2005**
**Cal. Bus. & Prof. Code § 22948.2**
**(On Behalf of Plaintiffs and the Classes)**

245.   Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

246.   Plaintiffs brings this claim on behalf of themselves and the Nationwide Class or, in the alternative, the California Class.

247.   The California Anti-Phishing Act of 2005 (the "Anti-Phishing Act") makes it unlawful to use the Internet "to solicit, request, or take any action to induce another person to

provide identifying information by representing itself to be a business without the authority or approval of the business." Cal. Bus. & Prof. Code § 22948.2. "Identifying information" includes bank account numbers, account passwords, and "[a]ny other piece of information that can be used to access an individual's financial accounts." Cal. Bus. & Prof. Code § 22948.1(b). An individual who is adversely affected by a violation of Section 22948.2 may bring an action. Cal. Bus. & Prof. Code § 22948.3(a)(2).

248.    As described herein, Defendants violated the Anti-Phishing Act by representing themselves to be Plaintiffs' and Class members' financial institutions. Defendants fraudulently and deceitfully impersonated those institutions in order to induce Plaintiffs and Class members to provide their login credentials to Defendants, as described herein. Defendants did so without obtaining the authority or approval of each financial institution.

249.    Plaintiffs and Class members have been adversely affected by Defendants' violations of the Anti-Phishing Act because Defendants engaged in this deceitful conduct in order to extract from Plaintiffs and Class members their login credentials and all of the transaction history and other data accessible with those credentials, as detailed above. Defendants caused actual injury, harm, damage and loss to Plaintiffs and Class members for the reasons described herein.

250.    Plaintiffs and Class members are entitled to relief under Cal. Bus. & Prof. Code § 22948.3(a)(2), including $5,000 per violation, which damages should be trebled because Defendants engaged in a pattern and practice of violating § 22948.2 (indeed, it is the essence of Defendants' business model); an injunction against further violations; costs of suit and reasonable attorney's fees; and such other relief as the Court may deem just and proper.

## EIGHTH CLAIM FOR RELIEF

**Violation of the Computer Fraud and Abuse Act**
**18 U.S.C. § 1030**
**(On Behalf of Plaintiffs and the Classes)**

251.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully restated herein.

A.    **VIOLATIONS OF 18 U.S.C. § 1030(A)(2)**

252.    A person violates 18 U.S.C. § 1030(a)(2) if it "intentionally accesses a computer

without authorization or exceeds authorized access, and thereby obtains—(A) information contained in a financial record of a financial institution . . . [or] (C) information from any protected computer." Protected computers include computers "exclusively for the use of a financial institution . . . or . . . used by . . . a financial institution . . . and the conduct constituting the offense affects that use by or for the financial institution," 18 U.S.C. § 1030(e)(2)(A), or computers "used in or affecting interstate or foreign commerce," 18 U.S.C. § 1030(e)(2)(B).

253.    The computer systems, data storage facilities, or communications facilities that Plaintiffs' and Class members' financial institutions use to store Plaintiffs' and Class members' data are "protected computers" under the statute because they are exclusively for the use of financial institutions or, in the alternative, were affected by Defendants' conduct, or were used in or affected interstate commerce. Defendants intentionally accessed these protected computers and thereby obtained information contained in the financial institutions' financial records. To the extent that Defendants received any valid authorization, their conduct exceeded that authorization for the reasons described above. *See* 18 U.S.C. § 1030(e)(6) (defining the term "exceeds authorized access" to mean "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter").

### B.    VIOLATIONS OF 18 U.S.C. § 1030(a)(4)

254.    A person violates 18 U.S.C. § 1030(a)(4) if it "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."

255.    Defendants knowingly accessed protected computers, and did so without authorization or in excess of authorization, for the reasons described herein.

256.    Defendants acted with intent to defraud because they devised a scheme to deceive Plaintiffs and Class members into thinking that they were providing their banking credentials directly to their bank, when in fact they were providing those credentials to Defendants. Through that conduct, Defendants furthered their fraud and obtained things of value, namely, Plaintiffs and

1    Class members' sensitive personal data.

2        **C.    DEFENDANTS CAUSED ECONOMIC LOSS IN EXCESS OF $5,000, AS**
         **WELL AS OTHER DAMAGE**

3    257.    Plaintiffs may bring a private right of action for economic damages resulting from

4    Defendants' violation of the CFAA, provided that Defendants caused "loss to 1 or more persons

5    during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. §§ 1030(g),

6    1030(c)(4)(A)(i)(I). The CFAA defines the term "damage" to include "any impairment to the

7    integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). The

8    CFAA defines the term "loss" to include "any reasonable cost to any victim, including the cost of

9    responding to an offense, conducting a damage assessment, and restoring the data, program, system,

10   or information to its condition prior to the offense, and any revenue lost, cost incurred, or other

11   consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

12       258.    Defendants' violations of the CFAA caused economic loss to Plaintiffs and Class

13   members that exceeds $5,000 per year individually or in the aggregate. They lost the

14   indemnification rights and other rights and protections they enjoyed as long as their data remained

15   in the protected banking environment. Such rights are vested rights to which Plaintiffs and Class

16   members are entitled and the loss of those rights occurred as soon as Envestnet | Yodlee removed

17   their data from the secure banking environment. Defendants' practices also have deprived Plaintiffs

18   of control over their valuable property (namely, their sensitive personal data), the ability to receive

19   compensation for that data, and the ability to withhold their data for sale.

20       259.    Plaintiffs and Class members have also suffered economic damages and losses of at

21   least $5,000 in the aggregate because their data can never be restored to its condition prior to the

22   offense.

23       260.    Plaintiffs and Class members also seek injunctive relief. They do not have an

24   adequate remedy at law because many of the resulting injuries are reoccurring, and Plaintiffs and

25   Class members will be forced to bring multiple lawsuits to rectify the same conduct. If an injunction

26   is not issued, Plaintiffs and Class members will suffer irreparable injury. Plaintiffs and Class

27   members are entitled to an order enjoining Defendants from engaging in the unlawful conduct

28

alleged in this complaint, requiring Defendants to delete Plaintiffs' and Class members' sensitive personal data, requiring Defendants to cease further collection of Plaintiffs' and Class members' sensitive personal data, requiring Defendants to improve their privacy disclosures, requiring Defendants to obtain adequately informed consent, and other appropriate equitable relief.

261.    Plaintiffs seek such other relief as the Court may deem just and proper.

262.    Plaintiffs bring this cause of action within two years of the date of the discovery of their damages. Thus, this action is timely under 18 U.S.C. § 1030(g).

## NINTH CLAIM FOR RELIEF

### Violation of Article I, Section I of the California Constitution
### (On Behalf of Plaintiff Szeto and the California Class)

263.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

264.    The California Constitution expressly provides for and protects the right to privacy of California citizens: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., art. I, § 1.

265.    Plaintiff Szeto and members of the California Class have a reasonable expectation of privacy in their confidential financial affairs, including without limitation in the personal information and banking data maintained at their financial institutions. Plaintiffs and California Class members reasonably expected that their login credentials, account numbers, balances, transaction history, and other information was private and secure within the institutions at which they maintain accounts. They reasonably expected that their information and data (a) would be protected and secured against access by unauthorized parties; (b) would not be obtained by unauthorized parties; (c) would not be transmitted or stored outside of the secure bank environment; and (d) would not be sold or used without their knowledge or permission.

266.    Plaintiff Szeto and California Class members have a legally protected privacy interest in preventing the unauthorized access, dissemination, sale, and misuse of their sensitive and confidential banking information and data.

267.   Defendants intentionally violated Plaintiff Szeto and California Class members' privacy interests. Defendants intruded upon Plaintiff Szeto and California Class members' sensitive and confidential banking information in a manner sufficiently serious in nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right.

268.   Defendants intentionally violated Plaintiff Szeto and California Class members' privacy interests by improperly accessing, downloading, transferring, selling, storing and using their private banking information and data.

269.   Defendants' violations of Plaintiffs' and California Class members' privacy interests would be highly offensive to a reasonable person, especially considering (a) the highly sensitive and personal nature of Plaintiffs' and California Class members' banking information and data; (b) the extensive scope of data obtained by Defendants, including years of historical transactional data; (c) Defendants' intent to profit from Plaintiffs' and California Class members' data by selling it outright and using it to develop further products and services; and (d) the fact that Defendants used subterfuge to intrude into Plaintiffs' and California Class members' banks' secure environment for the purpose of collecting their data. Defendants' intrusions were substantial and constituted an egregious breach of social norms.

270.   Plaintiff Szeto and California Class members did not consent to Defendants' violations of their privacy interests.

271.   Plaintiff Szeto and California Class members suffered actual and concrete injury as a result of Defendants' violations of their privacy interests. Plaintiffs and California Class members are entitled to appropriate relief, including damages to compensate them for the harm to their privacy interests, loss of valuable rights and protections, heightened risk of future invasions of privacy, and the mental and emotional distress and harm to human dignity interests caused by Defendants' invasions, as well as disgorgement of profits made by Defendants as a result of its violations of their privacy interests.

272.   Plaintiff Szeto and California Class members also seek injunctive relief. They do not have an adequate remedy at law because many of the resulting injuries are reoccurring, and

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:20-CV-5991 (SK)

Plaintiffs and Class members will be forced to bring multiple lawsuits to rectify the same conduct. If an injunction is not issued, Plaintiffs and Class members will suffer irreparable injury. Plaintiffs and Class members are entitled to an order enjoining Defendants from engaging in the unlawful conduct alleged in this complaint, requiring Defendants to delete Plaintiffs' and Class members' sensitive personal data, requiring Defendants to cease further collection of Plaintiffs' and Class members' sensitive personal data, requiring Defendants to improve their privacy disclosures, requiring Defendants to obtain adequately informed consent, and other appropriate equitable relief.

273.     Plaintiff Szeto and California Class members also seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and California Class members and made in conscious disregard of Plaintiffs' and California Class members' rights. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and the proposed Classes respectfully request that the Court enter an order:

A.     Certifying the Classes and appointing Plaintiffs as Class Representatives;

B.     Finding that Defendants' conduct was unlawful as alleged herein;

C.     Awarding declaratory relief against Defendants;

D.     Awarding such injunctive and other equitable relief as the Court deems just and proper;

E.     Awarding Plaintiffs and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F.     Awarding Plaintiffs and the Class members pre-judgment and post-judgment interest;

G.     Awarding Plaintiffs and the Class members reasonable attorneys' fees, costs, and expenses, including expert costs;

H.   Granting injunctive and other equitable relief because Plaintiffs and Class members do not have an adequate remedy at law; and

I.   Granting such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

Dated: March 15, 2021              /s/ Aaron M. Sheanin

Aaron M. Sheanin (SBN 214472)
Christine S. Yun Sauer (SBN 314307)
**ROBINS KAPLAN LLP**
2006 Kala Bagai Way, Suite 22
Berkeley, CA 94704
Telephone:   (650) 784-4040
Facsimile:    (650) 784-4041
asheanin@robinskaplan.com
cyunsauer@robinskaplan.com

Kellie Lerner (*pro hac vice* forthcoming)
David Rochelson
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone:   (212) 980-7400
Facsimile:    (212) 980-7499
klerner@robinskaplan.com
drochelson@robinskaplan.com

Thomas J. Undlin (*pro hac vice* forthcoming)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:   (612) 349-8500
Facsimile:    (612) 339-4181
tundlin@robinskaplan.com

Christian Levis
Amanda Fiorilla
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone:   (914) 997-0500
Facsimile:    (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:20-CV-5991 (SK)

Anthony M. Christina
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone:    (215) 399-4770
Facsimile:     (914) 997-0035
achristina@lowey.com

John Emerson
**EMERSON FIRM, PLLC**
2500 Wilcrest Drive
Suite 300
Houston, TX 77042
Telephone:    (800) 551-8649
Facsimile:     (501) 286-4659
jemerson@emersonfirm.com

Robert Kitchenoff (*pro hac vice* forthcoming)
**WEINSTEIN KITCHENOFF & ASHER LLC**
150 Monument Road, Suite 107
Bala Cynwyd, PA 19004
Telephone:    (215) 545-7200
kitchenoff@wka-law.com

Adam Frankel (*pro hac vice* forthcoming)
**GREENWICH LEGAL ASSOCIATES LLC**
881 Lake Avenue
Greenwich, CT 06831
Telephone:    (203) 622.6001
afrankel@grwlegal.com


*Attorneys for Plaintiffs and the Proposed Classes*

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:20-CV-5991 (SK)