# PLAINTIFFS' MOTION TO CERTIFY CLASSES
# REDACTED

Li Zhu (SBN 302210)
**ROBINS KAPLAN LLP**
55 Twin Dolphin Drive, Suite 310
Redwood City, CA 94065-2133
Telephone: (605) 784-4013
Facsimile: (605) 784-4041
lzhu@robinskaplan.com

Christian Levis (admitted *pro hac vice*)
Amanda Fiorilla (admitted *pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

Ben Steinberg (admitted *pro hac vice*)
Kellie Lerner (*pro hac vice* forthcoming)
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas
New York, NY 10019
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
bsteinberg@robinskaplan.com
klerner@robinskaplan.com

Anthony M. Christina (admitted *pro hac vice*)
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: (215) 399-4770
Facsimile: (914) 997-0035
achristina@lowey.com

*[additional counsel listed on signature block]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CLARK ET AL., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>YODLEE, INC., a Delaware corporation,<br><br>Defendant. | Civil Case No. 3:20-cv-05991-SK<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASSES**<br><br>Hon. Sallie Kim<br>Hearing Date: July 22, 2024<br>Hearing Time: 9:00 a.m.<br>Courtroom: C, 15th Floor |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ..................................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................................... 2

   A.   Yodlee and IAV ............................................................................................... 2

   B.   Yodlee's Collection of Plaintiffs' and Class Members' Data ........................... 6

   C.   Yodlee's Storage of Class Members' Data ....................................................... 9

   D.   Yodlee's Use of Class Members' Data ........................................................... 13

   E.   Yodlee's Conduct Emanated from California ................................................. 14

III. ARGUMENT ......................................................................................................... 15

   A.   Plaintiffs Satisfy the Rule 23(a) Requirements ............................................. 15

   B.   Plaintiffs Satisfy the Rule 23(b)(3) Predominance Requirement .................... 16

      1.   All Class Members Have Standing ......................................................... 16

      2.   California Law Applies Classwide .......................................................... 16

      3.   Common Issues Predominate for Plaintiffs' Privacy Claims ................... 17

      4.   Common Issues Predominate for Plaintiffs' CAPA Claim ...................... 19

      5.   Common Issues Predo\minate for Plaintiffs' Unjust Enrichment Claim ..... 20

      6.   Common Issues Predominate Regarding the Relief Plaintiffs Seek ........... 20

   C.   A Class Action is the Superior Method of Adjudicating this Dispute. ............. 24

   D.   The Requirements of Rule 23(b)(2) Are Satisfied .......................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

**Cases**

*Allen v. Hyland's Inc.*,
   300 F.R.D. 643 (C.D. Cal. Aug. 1, 2014) ............................................................ 17

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ........................................................................... 25

*Brooks v. Thomson Reuters Corp.*,
   No. 21-CV-01418-EMC, 2023 WL 9316647 (N.D. Cal. Aug. 10, 2023) ............. 15, 19, 20, 24

*Bruno v. Quten Research Inst., LLC*,
   280 F.R.D. 524 (C.D. Cal. 2011) ....................................................................... 17

*Clay v. CytoSport, Inc.*,
   No. 3:15-CV-00165-L-AGS, 2018 WL 4283032 (S.D. Cal. Sept. 7, 2018) ......................... 17

*DZ Rsrv. v. Meta Platforms, Inc.*,
   96 F.4th 1223 (9th Cir. 2024) ........................................................................... 20

*DZ Rsrv. v. Meta Platforms, Inc.*,
   No. 3:18-cv-04978-JD, 2022 WL 912890 (N.D. Cal. Mar. 29, 2022) ................................... 24

*Ellis v. Costco Corp.*,
   285 F.R.D. 492 (N.D. Cal. 2012) ....................................................................... 23

*Ellsworth v. U.S. Bank, N.A.*,
   No. C 12-02506 LB, 2014 WL 2734953 (N.D. Cal. June 13, 2014) .................................... 19

*In re Facebook, Inc. Internet Tracking*,
   956 F.3d 589 (9th Cir. 2020) ........................................................................ 18, 19, 23

*Jackson v. First Nat'l Bank of Omaha*,
   No. CV 20-1295 DSF (JCX), 2022 WL 423440 (C.D. Cal. Jan. 18, 2022) .......................... 23

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017) ........................................................................ 21, 24

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*,
   609 F. Supp. 3d 942 (N.D. Cal. 2022) ................................................................ 20

*Kang v. Credit Bureau Connection, Inc.*,
   No. 118CV01359AWISKO, 2022 WL 658105 (E.D. Cal. Mar. 4, 2022) ............................ 22

*Keilholtz v. Lennox Hearth Products, Inc.*,
   268 F.R.D 330 (N.D. Cal. Feb. 16, 2020) ............................................................ 17

*McMillion v. Rash Curtis & Assocs.*,
   No. 16-CV-03396-YGR, 2017 WL 3895764 (N.D. Cal. Sept. 6, 2017).................................. 23

*Meister v. Mensinger*,
   230 Cal. App. 4th 381 (2014)................................................................................................ 23

*Nitsch v. Dreamworks Animation SKG Inc.*,
   315 F.R.D. 270 (N.D. Cal. 2016) .......................................................................................... 16

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022).................................................................................................. 16

*Opperman v. Path, Inc.*,
   No. 13-CV-00453-JST, 2016 WL 3844326 (N.D. Cal. July 15, 2016) ........................... 17, 18

*Parra v. Bashas', Inc.*,
   536 F.3d 975 (9th Cir. 2008).................................................................................................. 15

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014).................................................................................................. 25

*Pecover v. Elec. Arts Inc.*,
   No. C 08-2820 VRW, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010).................................... 17

*PeopleConnect, Inc.*, No. 20-CV-09203-EMC, 2023 WL 9423286 (N.D. Cal. Dec.
   14, 2023) .............................................................................................................................. 22

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015).................................................................................................. 21

*Rodriguez v. Google LLC*,
   No. 20-CV-04688-RS, 2024 WL 38302 (N.D. Cal. Jan. 3, 2024)
   ...................................................................................................................................... 18, 22, 23

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010)................................................................................................ 25

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal 2009) ........................................................................................... 15

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ......................................................................................................... 16

*Ward v. United Airlines, Inc.*,
   2021 WL 534364 (N.D. Cal. Feb. 12, 2021)........................................................................... 25

*West v. California Servs. Bureau, Inc.*,
   323 F.R.D. 295 (N.D. Cal. 2017) .......................................................................................... 16

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) ............................................................................................. 15

*In re Yahoo Mail Litig.*,
    308 F.R.D. 577 (N.D. Cal. May 26, 2015) .......................................................................... 25

**Constitutions**

Cal. Const. art. I § I .................................................................................................................. 18

**Statutes**

Cal. Bus. & Prof. Code § 22948 *et seq.* ........................................................................... passim

**Court Rules**

Fed. R. Civ. P. 23 ................................................................................................................ passim

**NOTICE OF MOTION AND MOTION TO CERTIFY CLASSES**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on July 22, 2024 at 9:30 AM, or soon thereafter as available, in the courtroom of the Honorable Sallie Kim, located at 450 Golden Gate Avenue, Courtroom C, 15th Floor, San Francisco, California 94102, Plaintiffs will and hereby move the Court for an order certifying the following proposed classes:[1]

| Under Fed. R. Civ. P. 23(b)(3) | | |
|---|---|---|
| **Class** | **Class Representatives** | **Claims** |
| Nationwide Damages Class: All natural persons in the United States who linked financial accounts to PayPal using Yodlee, Inc.'s ("Yodlee") Instant Account Verification ("IAV") service during the period of January 1, 2014 to August 24, 2020 (the "Class Period"). | Plaintiffs John H. Cottrell, Kyla Rollier, Jenny Szeto.[2] | (1) California common law invasion of privacy (intrusion upon seclusion); (2) unjust enrichment; (3) violation of California's Anti-Phishing Act of 2005 ("CAPA"); and (4) violation of Article I, Section I of the California Constitution. |
| California Subclass: All California residents who linked financial accounts to PayPal using Yodlee's IAV service during the Class Period. | Plaintiff Jenny Szeto. | (1) California common law invasion of privacy (intrusion upon seclusion); (2) unjust enrichment; (3) violation of CAPA; and (4) violation of Article I, Section I of the California Constitution. |
| **Under Fed. R. Civ. P. 23(b)(2)** | | |
| **Class** | **Class Representatives** | **Claims** |
| Injunctive Relief Class: All natural persons in the United States who linked financial accounts to PayPal using Yodlee's IAV service during the Class Period. | Plaintiffs John H. Cottrell, Kyla Rollier, Jenny Szeto. | (1) California common law invasion of privacy (intrusion upon seclusion); and (2) violation of Article I, Section I of the California Constitution. |
| California Subclass: All California residents who linked financial accounts to PayPal using Yodlee's IAV | Plaintiff Jenny Szeto. | (1) California common law invasion of privacy (intrusion upon seclusion); and |

---

[1] The term "Class Members" refers to members of both the Nationwide Damages Class and Injunctive Relief Class, as well as their respective sub classes.

[2] Plaintiffs Clark and Lumb are not being proposed as Class Representatives because, although they linked accounts to PayPal, those linkages occurred after the proposed Class Period.

| service during the Class Period. | | (2) violation of Article I, Section I of the California Constitution. |
|---|---|---|

## Common Questions and Issues to Be Decided

1. Whether Yodlee induced Class Members to provide their bank username and password ("Bank Credentials"), or other identifying information, by mimicking a bank login portal in violation of the CAPA;

2. Whether Yodlee disclosed that it would store, and indefinitely retain for its own commercial purposes, the Bank Credentials that Class Members entered when linking a bank account to PayPal through Yodlee's Instant Account Verification ("IAV") software;

3. Whether Yodlee disclosed that it would store, and indefinitely retain for its own commercial purposes, the bank data it collected when Class Members linked a bank account to PayPal through IAV;

4. Whether Yodlee violated objectively reasonable expectations of privacy by retaining Class Members' Bank Credentials for its own commercial purposes indefinitely;

5. Whether Yodlee violated objectively reasonable expectations of privacy by retaining Class Members' bank data for Yodlee's own commercial purposes indefinitely;

6. Whether a reasonable person would find Yodlee's storage and use of Class Members' Bank Credentials and bank data highly offensive;

7. Whether Yodlee retained an unjust benefit from its storage and use of Class Members' Bank Credentials and bank data;

8. Whether Plaintiffs have shown that the proposed Classes are so numerous that joinder is impractical, that their claims are typical of the Classes; their claims present at least one common question of law or fact classwide, and they will adequately represent the interests of the Classes if appointed as Class Representatives;

9. Whether Plaintiffs have shown that common questions of law or fact predominate over questions affecting only individual Class Members such that a class action is superior to other methods of adjudication; and

10. Whether Yodlee's ongoing retention of Class Members' Bank Credentials and bank data makes injunctive relief appropriate on a classwide basis.

1

## I.   **INTRODUCTION**

2      This case concerns one of the largest misappropriations of consumer banking data in history

3   by one of the largest financial data brokers in the world, Yodlee. Yodlee collects consumer financial

4   data through a software tool called IAV, which enables users to verify and link bank accounts to

5   third-party apps. The IAV process works the same for each user; users are told to "log in" to their

6   online bank accounts by entering their Bank Credentials into a screen that mimics a direct login

7   portal to their bank's website. In reality, the login portal is not connected to any bank but rather to

8   Yodlee, which saves each user's Bank Credentials, covertly logs-in to their online bank accounts,

9   and collects and stores their highly sensitive financial data for Yodlee's own commercial use.

10      Yodlee used this deceptive IAV process to collect and store banking data from roughly 44

11   million PayPal users and 122 million bank accounts during the Class Period. PayPal users were

12   never informed that by linking their bank accounts to PayPal, Yodlee would collect and retain their

13   Bank Credentials and data for Yodlee's own purposes. In fact, PayPal users were told the opposite:

14   where Yodlee was mentioned, its role was described as merely helping "confirm your bank details"

15   or "verify your bank" or "manage risk and fraud." At no point were Class Members told that Yodlee

16   would store and exploit their data after account verification.

17      Yodlee knew retaining PayPal users' data was improper and lied to keep it a secret. Yodlee's

18   employees privately admitted it was not authorized to retain PayPal user data, calling it a

19   "compliance risk," "a huge concern," a "contractual breach," a "can of worms," "extremely

20   damaging" and a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" Yodlee thus took extraordinary

21   steps to cover it up. Yodlee lied that it did not store PayPal data for longer than "24 hours" and

22   falsely claimed PayPal users' ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Yodlee also

23   forbid employees from discussing its data-storage externally, requiring all communications to be

24   run through Yodlee's management. When a mid-level employee proposed deleting PayPal user

25   data, the Yodlee executive in charge of Yodlee's data monetization refused, exclaiming, "Why

26   would we do that!" Only after Plaintiffs filed this lawsuit in September 2020 did Yodlee begin

27   deleting Class Members' data in earnest. Plaintiffs' expert, Dr. Serge Egelman, describes Yodlee's

28

1   retention and use of Class Members' data as "among the largest mishandlings of consumer banking

2   data of which I am aware" across more than two decades of data-privacy scholarship.[3]

3           To ensure Class Members can seek redress, Plaintiffs seek to certify a Nationwide Damages

4   Class under Federal Rule of Civil Procedure 23 ("Rule 23") (b)(3) and a Nationwide Injunctive

5   Relief Class under Rule 23(b)(2) consisting of all natural persons in the United States who linked

6   financial accounts to PayPal using Yodlee's IAV service during the period of January 1, 2014 to

7   August 24, 2020. *Supra* at vi–vii . Plaintiffs also seek to certify corresponding California subclasses.

8   *Id.* Plaintiffs' privacy, phishing, and unjust enrichment claims each satisfy Rule 23(b)(3) because

9   they target standardized data practices by Yodlee that can be proven through common proof and

10  analysis. Plaintiffs' injunctive claims similarly target Yodlee's classwide data practices, like its

11  ongoing retention and use of Class Members' financial data. The Court should certify the Classes

12  under Rule 23(b)(3) and (b)(2), appoint Plaintiffs as class representatives, and appoint Robins

13  Kaplan, LLP and Lowey Dannenberg, P.C. as class counsel.

14  **II.     FACTUAL BACKGROUND**

15          **A.     Yodlee and IAV**

16          Yodlee is one of the largest financial data companies in the world.[4] Yodlee's primary

17  business is selling consumer financial data and products built upon it. Yodlee acquires consumers'

18  data through data harvesting software like IAV, which it embeds in third-party apps like PayPal.[5]

19

20

21

22

---

23  [3] Ex. 63, Serge Egelman Expert Report ("Egelman Report") at 68.

24  [4] *See* Ex. 1 at '0072111 ("Yodlee is arguably one of the largest, if not *the* largest financial data
    aggregators on the planet" and applies its "proprietary data intelligence technology to go beyond
    the obvious and get more out of aggregated financial data.").

25  [5] Ex. 70 at '0000723 (explaining ████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████████████

27  ████████ ; Ex. 59, V. Raj Dep. Tr. at 29:10–12 (explaining the ████████████████

28  ████████████ .

1  The consumer data Yodlee collects is fed into its data aggregation platform,[6] which fuels the data
2  products and services Yodlee sells.[7] Acquiring consumer financial data is thus "[t]he core to
3  [Yodlee's] business model."[8]
4      Yodlee nonetheless conceals its data-acquisition strategy by marketing itself as a data-
5  privacy steward. Yodlee's public "[C]ommitment to Clients & Consumers" claims it "adheres to
6  leading industry practices for data security, regulatory compliance, and privacy," including
7  principles published by the Consumer Financial Protection Bureau and the Center for Financial
8  Services Innovation.[9] Yodlee claims it does not collect, store, or use consumers' financial data

---

[6] *See* Ex. 57, N. Nadkarni 30(b)(1) Dep. Tr. at 61:20-25 ("█████████████████████████
██████████████); *id.* at 24:24-26:7 (explaining that █████████████████████████████
███████████████████████████████████████████████ *id.* at 78:5-12 (explaining that █████
██████████████████ *id.* at 62:18–63:19 (testifying that ██████████████████████████████
██████████████████████████████

[7] *Id.* at 25:24-26:7 (explaining that ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████ *id.* at 49:8-14 (explaining █████████████████████████████████████████████ *id.*
at 78:13-16 (acknowledging that ████████████████████); *id.* at 48:9-49:1 (testifying
that ██████████████████████████████████████████████████████████████████████████████████
██████████████████████ *id.* at 68:1-19 (testifying that ████████████████████████████
████████████████████████████████████

[8] Ex. 2 at '0051164 (in an email about obtaining more data, stating "[t]he core to our business
model is the 'data' element.").

[9] Ex. 3 at '0001275; Yodlee, Envestnet | Yodlee's commitment to its clients and to
consumers, available at https://www.yodlee.com/company/clients-consumers (last accessed April
10, 2024); Ex. 62, B. Buan Dep. Tr. at 106:21–107:4 ("█████████████████████████████████
████████████████████████████████████████████

---

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASSES – Case No. 3:20-cv-05991-SK

1    unless consumers provide "explicit consent" based on "clear and conspicuous" disclosures.[10]

2    Yodlee also claims to practice "data minimization;" *i.e.*, it purportedly collects "the minimum

3    amount of data required" and stores data for "the minimum amount of time needed."[11]

4          Each of these claims are false. At no point during the Class Period did Yodlee obtain PayPal

5    users' consent to store and use their sensitive financial data after account verification. Indeed,

6    Yodlee's former executives ████████████████████████████████████████████[12]

7

8

9

10   [10] Ex. 69 at '0556897–'899 (████████████████████████████████████████

11   ████████████████████████████████████████████████ Ex. 3 at

12   '0001275 (claiming that Yodlee "support[s] and endorse[s]" "CFPB" and "CFSI Principles"); Ex.
     62, B. Buan Dep. Tr. at 105:6-106:4 (confirming that Yodlee ████████████████████

13   ████████████); Ex. 90 at 3 (requiring "terms of access, storage, use and disposal [be] fully and
     effectively disclosed to the consumer" and "understood by the consumer[.]" ); Ex. 91 at 6-7

14   (recommending "[c]onsumers provide explicit consent for access to and use of their data" and
     have "[t]he ability to clearly view and revoke previously-permissioned data access[.]"); Ex. 89 at

15   11 ("Banks, aggregators, and PFMs should also require explicit and informed consent for third
     party access to ensure that consumers understand and wish to authorize access to their account

16   information."); Ex. 69 at '0556856 ("████████████████████████████████████████

17   ████████████); Ex. 92 at 1 ("Consumers must provide affirmative consent on the
     basis of clear and conspicuous disclosure regarding the use of their data."). Ex. 69 at '0556856

18   (stating Yodlee adheres to the Secure Open Data Exchange ("SODA") principles including
     "Consumers must provide affirmative consent based on clear and conspicuous disclosure

19   regarding the use of their data."); *id.* (Yodlee recognizes it "[m]ust agree to ask the consumer for
     clear and conspicuous consent to provide access to the data required to fuel the use case(s) they

20   are providing, and use the data in a manner consistent with such consent.").
     [11] Ex. 62, B. Buan Dep. Tr. 131:7-15 ████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████ *see* Ex. 3

23   (stating ████████████████████████████████████████████████████
     ████████████████████████████████████); Ex. 91 at 1 ("Minimization"

24   occurs when "the minimum amount of data required for application functionality are collected,
     and the data are stored for the minimum amount of time needed).

25   [12] *See* Ex. 61, B. Costello Dep. Tr. 238:16–19: ("████████████████████████

26   ████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASSES – Case No. 3:20-cv-05991-SK

█████████████████████████████████. [13] As Yodlee's executives put it, "if data is the 'new oil' . . . our crude oil is the consumer transaction data. *How do we get continued access to crude oil?*"[14] Yodlee's answer: through IAV and its other data-harvesting software.

On the surface, IAV allows consumers to link bank accounts to third-party apps so they can send or receive funds.[15] To link accounts via IAV, each consumer is routed through a user interface designed by Yodlee that mimics the login portal of a bank website.[16] Users are prompted to choose their bank, enter their Bank Credentials into the false login portal, and select the bank accounts they wish to link.[17] Outside consumers' view, Yodlee then uses their Bank Credentials to covertly collect sensitive financial data from their bank accounts, purportedly to verify account ownership.[18] ██

████████████████████████████████████████████████████████████████████████████

---

[13] *See* Ex. 57, N. Nadkarni 30(b)(1) Dep. Tr. at 122:1–16 (testifying ████████████

████████████████████████████); Ex. 58, P. Singh Dep. Tr. at 68:19–69:1 (testifying ████

█████████████████████████████████████████████████████████); *id.* at 69:2–11 (testifying that ███████

[14] Ex. 2 at '0051164.

[15] Ex. 45 at '0009020 (explaining ███████████████████

███████████████████; Ex. 59, V. Raj Dep. Tr. at 40:3–7 (explaining ████████████

████████).

[16] Ex. 74 (████████████); Ex. 77 at '0413676–681 (2016 "IAV Template (███████

███)); Ex. 83 █████████████████████████████████████); Ex. 82 at '0758785, '0758794, '0758799 (template Account-Linking Flow in effect in 2018); Ex. 73 (███████████████████████████████████████████████████████████ Ex. 75 at '0085577 (███████████████████████████████; Ex. 81 (IAV flow for FastLink 2.0); Ex. 80 (███████████████████████████████████); Ex. 76 █████████████████████████████████; Ex. 72 at slides 9–24 (presentation from November 2019 providing updates on new releases to the template Account-Linking Flow).

[17] Ex. 39 at '0366642–648 (account linking flow for PayPal from 2014); PP_00011850 (same for 2016 through 2020); Ex. 68 (same); Ex. 40 (account linking flow for PayPal from 2018).

[18] Ex. 54, Yodlee's Second Supplemental Responses and Objections to Plaintiffs' Interrogatories, Set One (Amended) at 5.

1      ████████[19]████████████████████████████████████████████[20]

2      **B.   Yodlee's Collection of Plaintiffs' and Class Members' Data**

3      Plaintiffs seek to certify two classes of PayPal users who linked bank accounts to PayPal

4      using IAV between January 1, 2014 and August 24, 2020. *See supra* at vi–vii .  PayPal is Yodlee's

5      ██████████████████████████████████.[21] During the Class Period, ████████████████

6      ██████████████████████████████████,[22] ██████████████████████████████

7      ████████████████████████████████████████████████████████████████

8      ████████████████████████████████████████████████████████████████

9      ██████████████████████████████[25]

10     For each account linkage, ████████████████████████████████████████████

11     ████████████████████████████████████████████████████████████████

12     ████████████████████████████████████████████████████████████████

13     ████████████████████████████████████████████████████████████████[26]

---

[19] Ex. 46 at '0032046 ("████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

[20] Ex. 4 at '0378623 (stating ████████████████████████████████████████████
████████████████████Ex. 5 at '0101992 (Yodlee's best practices ██████████████
██████████; Ex. 6 at '0756259 (same); Ex. 37 at '0087451 (same); Ex. 7 at '0107577 (same).

[21] Ex. 8 at 0005164 (████████████████████████████████████████████████████
████); Ex. 9 at '0388027 (████████████████████████████████).

[22] Ex. 88, Supplemental Declaration of Gary Olsen, Schedule 17 – Revised ████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████,

Plaintiffs are not attaching these voluminous data files as exhibits but will provide them upon the
Court's request.

[23] Ex. 43 (████████████████████████████████████████).

[24] *Id.*

[25] *Id.*

[26] Ex. 87, Yodlee's Supplemental Responses to Plaintiffs' Interrogatories, Set Two at 7 (stating
████████████████████████████████████████████████████████████████████████
████████████████████████████████████

---

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASSES – Case No. 3:20-cv-05991-SK



1  Yodlee ███████████████████████████████████████████████████████

2  ████████████[27]████████████████████████████████████████████████

3  ████████████████████████████████████[28] Yodlee ██████████████████

4  ██████████████████████████████████████████████████████████████████

5  ████████████████████████████████████[29] Yodlee then ████████████████

6  ████████████████████████████████████. *See infra* Section II.B–D.

7      Yodlee both failed to disclose these data practices to Class Members and took affirmative

8  steps to hide them. Yodlee ██████████████████████████████████████

9  █████████████████████████████████[31] Yodlee thus devised two deceptive tactics to

10  bypass these hurdles and access Class Members' data without their consent.

11      First, throughout the Class Period, Yodlee made it appear as if Class Members were

12  providing their Bank Credentials directly to their bank, not to Yodlee.[32] After selecting their bank,

13  Class Members were told they could link their accounts to PayPal by "logging into" their online

14  banking accounts through a purported bank login portal. As shown in Figures 1-3 below,[33] the login

15  portal was falsely described as "*your [bank name] login*" or a "*login to your online banking*" even

16  though it was actually a data collection tool for Yodlee that was not connected to, nor authorized

17

18  ─────────────

18  [27] *See* Ex. 88, Supplemental Olsen Declaration at Schedule 17 ███████████████████

19  █████████████████████████████████████████████).

19  [28] *Id.*

20  [29] Ex. 56, Yodlee's Objections and Responses to Plaintiffs' Interrogatories, Set Three at 9 ██████

21  ██████████████████████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████████████

24  [30] Ex. 6 at '0756259 (██████████████████████████████████████████

25  [31] Ex. 5 at '0101992 ████████████████████████████████████████████

26  ██████████████████████████████████████████████████████████████████

27  [32] Ex. 65, Nathan Good Expert Report ("Good Report") at 58–65; *see, e.g.*, Ex. 41 at '00011875;
Ex. 67 at '00011880; Ex. 40; Ex. 66 at '00011862.

28  [33] *Id.*

1   by, any bank.[34]



**Figure 1**                    **Figure 2**                    **Figure 3**

11      Yodlee also surrounded the false login portal with banks' names, along with logos or URLs,

12  to reinforce the perception that users were connecting directly to their banks.[35] Yodlee hoped this

13  would make users "feel more secure moving forward"[36] ███████████████████████████

14  ████████████████████████████.[37] To make matters worse, Yodlee ███████████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████.[38]

17  ████████████████████████████████ Yodlee acquired Class Members' data by

18  concealing its true data practices from them. Within the user interface, it was never disclosed that

19  Yodlee collected and stored Class Members' Bank Credentials, nor that Yodlee stored and used

20  Class Members' data indefinitely after their accounts were verified. █████████████████

21

22

23  ---
    [34] *See, e.g.*, Ex. 39 at '0366644; Ex. 47 at '00011853; Ex. 65, Good Report at 60.
    [35] *Id.* at 60-62; *see, e.g.*, Ex. 39 at '0366643; Ex. 71 at '0002508.
24  [36] Ex. 38 at '0026100 ██████████████████████████████████████
25  ████████████████████████
26  [37] Ex. 37 at '0087450 (Yodlee's ████████████████████████████
27  █████████████).
    [38] Ex. 5 at '0101992 ██████████████████████████████████████
28  ███████████).

8

1 ███████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 ███████████████████████████████████[40]

4    Outside the user interface, PayPal's terms and conditions and privacy polices similarly did

5 not disclose that Yodlee would store and use Class Members' data after account verification. At

6 most, ███████████████████████████████████████████

7 ███████████████████████████████████████████████

8 ███████████████████████████████████████████████

9 ███████████████████████████████████████████████

10 ████████████████[42] At no point were Class Members informed that Yodlee would store their

11 Bank Credentials, nor that Yodlee would store and use their bank transaction data for its own

12 purposes after verification. To the contrary, Class Members were told their data would *not* be

13 stored. The user interface ████████████████████████████████████████

14 ████████████████████████████████████████████"[43]

15    **C.    Yodlee's Storage of Class Members' Data**

16 ████████████████████████████████████████████████

17 ███████████████████████████████████████[44]

18 ████████████████████████████████████████████████

19 ██████████████████████████████[45] Even then, Yodlee ███████████

[39] Ex. 60, J. Solomon Dep. Tr. 265:1–266:4 █████████████████████████
████████████████████"); Ex. 11 at
'0374307–309 ("Please look into this right away . . . it appears that in ML's IAV flow we have
'Yodlee' mentioned . . . Please look into and rectify immediately").
[40] For that reason, ████████████████████████████████████████████
████████████ Ex. 6 at '0756260.
[41] Ex. 12 at '00011848; Ex. 13 at '000118857; Ex. 14 at '00011865.
[42] Ex. 15 at '00011876; Ex. 16 '00011878.
[43] Ex. 39 at '0366644; Ex. 40 (figure 4); Ex. 48 at '0022513.
[44] Ex. 55, Yodlee's Second Supplemental Responses to Plaintiffs' Interrogatories, Set Two at 4
████████████████████████████████████████████████████
[45] Ex. 64, Gary Olsen Expert Report ("Olsen Report") at 22; *id.* at Schedule 17; *id.* at 32-33; *id.* at
Schedule 24.

9



1 ████████████████████████████████████.[46] Yodlee ████████████

2 █████████████████████████████████████████████████████.[47]

3     Yodlee not only hid this data storage from Class Members; it also hid it from PayPal.

4 ███████████████████████████████████████████████████████████

5 ███████████████████████████████████████████████████████████

6 ████████████.&rdquo;[48] Yodlee's ████████████████████████████████

7 ████████████████████.[49] PayPal believed there ███████████████

8 ████████████████████████████████&rdquo; whereas ████████████████

9 ███████████████████████████████████████[50] Yodlee ██████████

10 ███████████████████████████████████████████████████████████

---

[46] Yodlee only "soft-deleted" this data, meaning a copy was still stored on Yodlee's systems. *See* Ex. 55, Yodlee's Second Supplemental Responses to Plaintiffs' Interrogatories (Set Two) at 4 ████████████████████████████████████████████████████████████████ ██████████████████████████████Ex. 85 at '0031301 (stating the ████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████. ████████████████████████

[47] Ex. 64, Olsen Report at 32-33; *id.* Schedule 24.

[48] Ex. 17 at '0001435. ████████████████████████████████████ ████████████████████████████████████████████████ *Id.* Section 5.1 states, ████████████████████████████████████ ████████████████████████████ *Id.*

[49] Ex. 49 at '0020470 (Yodlee email to PayPal in 2015 showing that Yodlee and PayPal specifically contemplated that "[a]t the end of the IAV flow, Yodlee will return the account data and the encrypted credentials to PayPal and delete credentials and data from Yodlee systems"); Ex. 28 at '00007306 (PayPal internal email in 2018 stating Yodlee was "the clear winner [on data security] since they do not store bank credentials"); Ex. 28 at '00007306 (PayPal's internal email in 2018 stating Yodlee was "the clear winner [on data security] since they do not store bank credentials").

[50] Ex. 18 at '00007325 ; *id.* at '00007324 (In comparing security between Yodlee and Yodlee's competitor, Plaid, PayPal determined "Yodlee is the clear winner since they do not store bank credentials for PayPal.").

1    ███████████████████████████████████.[51]

2        In March 2015, PayPal asked Yodlee to "confirm the user deletion process" and whether

3    any data "should have been deleted but [was] not." Thereafter, mid-level Yodlee employees began

4    raising internal alarms that Yodlee was improperly storing PayPal users' financial data.[52] These

5    warnings mounted over the Class Period.[53] Employees warned that Yodlee's secret storage of

6    PayPal users' data "will pose [] a compliance risk";[54] "will be a huge concern to [PayPal's] app

7    security team";[55] "has the potential to blow up if not communicated properly;[56] and was an "MSA

8    contractual breach that needs to be fixed."[57] Other employees warned Yodlee was █████████

9    ████████████████████████"[58] and that its data retention "can be extremely damaging."[59]

10       Yodlee's management suppressed these concerns and lied to cover-up its secret data

11

12

13

14

15   [51] Ex. 19 at '0099802–803 (noting that Yodlee was "not deleting the credentials/accounts" of
16   PayPal users with a screenshot of the 2006 IAV MSA requiring the "purging of the data" PayPal
     user data).
17   [52] Ex. 20 at '0195973 (Yodlee's previous Director of Application Security, Dheeraj Baht
18   recognizing that "[t]here seems to be a discrepancy between PayPal's [] belief and reality. PayPal
     doesn't seem to be calling a Delete account API, and neither do we seem to be running a purge
19   script").
     [53] Ex. 21 at '0081629 (Yodlee employees internally corresponding stating that Yodlee could not
20   "request [] PayPal to delete as it is a contractual need that [Yodlee] perform[s] the purge" and that
     it would "lead to escalation and opening up a can of worms[.]"); *id.* at '0081627 ████████████
21   ████████████████████████████████████████████████████████████████████
22   ███████████████████████████████████████████; Ex. 51 at '0094606 (stating ████
     ████████████████████████████████████████████████████████████
23   ████████████████████████; Ex. 52 at '0003542 (Yodlee employee circulating a
     screenshot of a database query showing that Yodlee was still maintaining data collected from
24   more than 67 million PayPal accounts from 2014 to 2018 and warning that "we have data since
     2014 for PAYPAL IAV+ cobrand").
25   [54] Ex. 21 at '0081627.
     [55] Ex. 22 at '0439906.
26   [56] Ex. 23 at '0065654.
     [57] Ex. 21 at '0081628.
27   [58] Ex. 50 at '0739903.
     [59] Ex. 19 at '0099803.
28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASSES – Case No. 3:20-cv-05991-SK



storage. Employees were told not to disclose Yodlee's data-storage externally[60] and to discuss it orally within Yodlee to avoid a written record.[61] When Yodlee's IAV contract was up for renewal in 2016, PayPal asked Yodlee to confirm that its "data retention today is only 24 hours."[62] After Yodlee falsely claimed it stored data for just "24 hours,"[63] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .[64] In October 2018, PayPal again asked Yodlee ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[65] In response, Yodlee ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮"[66] ▮▮▮▮▮▮▮▮▮▮▮,[67] and bragged it had successfully "danced around" ▮▮▮▮▮▮▮▮▮▮.[68]
Consequently, PayPal ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[69] While Yodlee claims ▮▮▮

---

[60] Ex. 20 at '0195973 ("Let's be careful about what we say to PayPal about this. (Whether we have / haven't been deleting)"); Ex. 19 at '0099803 ("Let's be clear on one thing . . . we have to be VERY careful about our messaging re: credentials. It was a PayPal InfoSec requirement that we did. The fact that we did not can be extremely damaging. I don't want anything going out without me seeing / approving it first"); Ex. 23 at '0065655 ("I haven't had any conversations with [PayPal] on [Yodlee not purging the data] so far as guided by YSO earlier"); Ex. 21 at '0081629 ("This is not the right time unfortunately to ask [PayPal] to implement purge API's as it will lead to escalation and opening up a can of worms which we should avoid.").

[61] Ex. 20 at '0195973 (Yodlee employee urging others to "move [the discussion regarding not purging PayPal data] to a f2f or phone call interaction").

[62] Ex. 24 at '0022108.

[63] Id. (stating that Yodlee would respond to PayPal that "[the data retention period] would be 24 hours.").

[64] Ex. 25 at '0001651 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[65] Ex. 26 at '0063401 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[66] Ex. 27 at '0063127 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

[67] Ex. 51 at '0094606 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ; Ex. 52 at '0003541 (Yodlee's internal email from October 2018 stating: "I don't think we are running [purging PayPal data]. Sometime back when we started having incidents because of these purging jobs and daily statistics, we had stopped all these daily jobs...."); Ex. 64, Olsen Report, Schedule 24.

[68] Ex. 27 at '0063127 (Vinay Raj telling Brian Buan, Yodlee's Senior Director of Client Partnerships, that he spoke with PayPal regarding "credential purging" and that he "basically...danced around it and told him...the credentials purging is an internal activity on our side which is a batch purge and we have it taken care of..."; Buan replies "ugh...nicely done!").

[69] Ex. 28 at '00007306.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASSES – Case No. 3:20-cv-05991-SK

1 ███████████████████████████████████████████████████

2 ████████████████████████████████████████████ .[70]

3    **D.    Yodlee's Use of Class Members' Data**

4         After collecting Class Members' data, Yodlee used it to drive revenue and fuel its

5 commercial offerings. Because ███████████████████████████

6 ████████████████████████████████████████████████████

7 ████████████████████████████████████ [71] Yodlee also

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████ .[72]

10 ████████████████████████████████████████████████████

11 ████████████████████████████████ .[73] Thus,

12 ████████████████████████████████████████████████████

13 ██████████████ .[74]

14 ███████████████████████████████████ valuable. [75] When a Yodlee

---

[70] Ex. 42 (████████████████

██████████ ).

[71] Ex. 53 at '0213051-052.

[72] *See* Ex. 57, N. Nadkarni 30(b)(1) Dep. Tr. at 78:13-16 (acknowledging that ████████

████████ ); *id.* at 14:7–24 (testifying that ███████

████████████████████ *id.* at 48:6–49:14 (███████████

[73] *See* Ex. 57, N. Nadkarni 30(b)(1) Dep. Tr. at 48:6–49:14 (███████████

█████████████████ ); *id.* at 54:12–25 ███████████ *id.* at 78:13-16

(acknowledging that IAV data is "in the data warehouse"); *id.* at 61:5–11 ('█

*id.* at 61:12-25 ('███████████████

[74] Ex. 57, N. Nadkarni 30(b)(1) Dep. Tr. 110:6–9 (testifying ████████

████████████ ); Ex. 58, P. Singh Dep. Tr. 130:25–131:8 (testifying ████████

████████ ); *id.* at 124:16–25 (explaining that ███████████

██████ ; *id.* at 32:16-17 ███████████

[75] Ex. 84 at '0051809–810 ██████████████████████

██████████████████

---

13

employee proposed "purg[ing] the [PayPal] data due to contractual requirements" in 2016, the head

of Yodlee's data sales business, Nikhil Nadkarni, objected, exclaiming "Why would we agree to

that!"[76] ████████████████████████████████████████████████████████

████████████████████████████████.[77]

**E.    Yodlee's Conduct Emanated from California**

While Yodlee's data harvesting affected Class Members nationwide, its conduct emanated

overwhelmingly from California, where both Yodlee and PayPal were headquartered throughout

the Class Period.[78] Yodlee's ████████████████████████████████████████████

████████████████████████.[79] Yodlee ████████████████████████

---

[76] Ex. 29 at '0071610 (████████████████████████████████████████████████

████.

[77] Ex. 64, Olsen Report, Schedule 24 (████████████████████████████████████

████).

[78] *See, e.g.*, Ex. 33 (████████████████████████

████████████); Ex. 44 at '0000821 (showing that ████████

████████████████████); Ex. 86 at '0054653 (████████████████

████████████

[79] *See, e.g.*, Ex. 31 at '0114258 (████████████████████████████████

████████████); Ex. 58, P. Singh Dep. Tr. 27:7–11, 29:24-30:8 (explaining

████████████████████████████); Ex. 32 at '0430990

(Yodlee's "Info Sec team" is based in California); Ex. 79 at '0709647 ████████

████████████████████████████████████████████

████████ Ex. 33 at '0300864 ████████████████

████████████████████████████████████████

████████████████████ Ex. 34 at '0727397–398

(explaining Yodlee's ████████████████████████████████████ Ex.

35 at '0376077 (████████████████████████████████████████

████████████████████████████; Ex. 30 at '0087651–652

████████).

14

1   ████████ 80 ████████████████████████████████████████████ 81

2   **III.   ARGUMENT**

3        **A.   Plaintiffs Satisfy the Rule 23(a) Requirements**

4        Numerosity. Rule 23(a)(1) is satisfied when the "class is so numerous the joinder of all

5   members is impracticable." Fed. R. Civ. P. 23(a)(1). The Classes here consist of tens of millions of

6   individuals and thus easily satisfy numerosity.[82] *See In re Static Random Access memory (SRAM)*

7   *Antitrust Litig.*, 264 F.R.D. 603, 608 (N.D. Cal 2009) (numerosity satisfied where "general

8   knowledge and common sense indicate that [the class] is large.") (internal citation omitted).

9        Commonality. Rule 23(a)(2) is satisfied when there are "questions of law or fact common

10  to the class." Fed. R. Civ. P. 23(a)(2). All that is necessary is "one or more common questions."

11  *Brooks v. Thomson Reuters Corp.*, No. 21-CV-01418-EMC, 2023 WL 9316647, at *10 (N.D. Cal.

12  Aug. 10, 2023).

13       As outlined above, *supra* Section II, Plaintiffs' claims implicate numerous common

14  questions, such as whether Class Members had a reasonable expectation of privacy in the common

15  types of bank data Yodlee acquired, and whether Yodlee's collection and retention of that data was

16  highly offensive. These objective, class-wide questions satisfy Rule 23(a)(2), which is "construed

17  permissively." *See Parra v. Bashas', Inc.*, 536 F.3d 975, 978 (9th Cir. 2008).

18       Typicality. Rule 23(a)(3) evaluates "whether other members have the same or similar injury,

19  whether the action is based on conduct which is not unique to the named plaintiffs, and whether

20  other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover*

21  *N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (internal citation omitted). As described above,

22  *supra* Section II, each Plaintiff, and all Class Members, had their financial data and Bank

23  _____

24  [80] Ex. 36 at '0072953 (Yodlee's invoice for PayPal IAV showing it is "Ship[ped] To" PayPal's
    office in "San Jose CA").

25  [81] Ex. 57, N. Nadkarni 30(b)(1) Dep. Tr. 14: 7–24 (testifying that ████████████████████

26  ██████████████████████████████████ ; Ex. 31 at '0114258

27  ████████████████████████████ ); Ex. 58, P. Singh Dep. Tr.
    27:7–11, 29:24-30:8 (██████████████████████████████████

28  ██████████ .

    [82] Ex. 88, Supplemental Declaration of Gary Olsen ¶ 7.

Credentials collected by Yodlee and stored indefinitely after they entered their credentials into a false login portal. Plaintiffs' claims are therefore typical of the Classes.

Adequacy. The adequacy requirement of Rule 23(a) demands that class representatives and their counsel have no conflicts of interest with other Class Members and will vigorously prosecute the litigation on behalf of the class. *West v. California Servs. Bureau, Inc.*, 323 F.R.D. 295, 306 (N.D. Cal. 2017) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003)). Plaintiffs have no conflicts of interest, and both they and class counsel have vigorously pursued this action for the last three years. They will adequately represent the Classes.

### B.   Plaintiffs Satisfy the Rule 23(b)(3) Predominance Requirement

Rule 23(b)(3) tests whether "the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Olean*, 31 F.4th at 664 (citing *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 453 (2016). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even [if] . . . other important matters will have to be tried separately[.]" *Id.* at 668. The predominance inquiry begins with the elements of each claim, which are addressed below. *See Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 288 (N.D. Cal. 2016).

### 1.   All Class Members Have Standing

Article III standing requires Plaintiffs to show that they suffered an injury-in-fact that is traceable to the conduct underlying their claims. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203-04 (2021). All Plaintiffs and Class Members have Article III standing because they suffered a similar injury-in-fact when Yodlee invaded their privacy by collecting and storing their data. *Id.* at 2204 (holding "intrusion upon seclusion" constitutes concrete injury-in-fact). Class Members also have standing because they retain a "stake" in Yodlee's "profits from [their] personal data," which "confer[s] Article III standing." *In re Facebook, Inc. Internet Tracking*, 956 F.3d 589, 601 (9th Cir. 2020).

1

### 2.  California Law Applies Classwide

2        Plaintiffs and Class Members' claims all arise under California law.  Non-resident Class

3    Members may assert claims under California law when "California has sufficiently significant

4    contacts with the plaintiff's claims." *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1040 (N.D. Cal.

5    2014); *Clay v. CytoSport, Inc.*, No. 3:15-CV-00165-L-AGS, 2018 WL 4283032, at *14 (S.D. Cal.

6    Sept. 7, 2018) (evaluating whether "California has 'significant contact or significant aggregation

7    of contacts' to the claims of each class member") (citing *Mazza v. Am. Honda Motor Co.*, 666 F.3d

8    581, 589 (9th Cir. 2012)). This requirement is met here. Yodlee was headquartered in California

9    throughout the Class Period. *See Pecover v. Elec. Arts Inc.*, No. C 08-2820 VRW, 2010 WL

10   8742757, at *19 (N.D. Cal. Dec. 21, 2010) (holding "defendant's [California] headquarters"

11   supported certifying nationwide class based on California law); *Clay*, 2018 WL 4283032, at *14

12   (explaining being "incorporated and headquartered in California" supported applying California

13   law to nationwide class). Additionally, the acts giving rise to Plaintiffs' and Class Members' claims

14   occurred overwhelmingly in California, ██████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████.

16   *See* Section II.E; *see also Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 540 (C.D. Cal.

17   2011) (applying California law to nationwide class where defendant was headquartered in

18   California and sold products in California); *Opperman v. Path, Inc.*, No. 13-CV-00453-JST, 2016

19   WL 3844326, at *8 (N.D. Cal. July 15, 2016) (certifying nationwide class based on California law

20   where product was "principally researched, designed or developed" in California); *Allen v.

21   Hyland's Inc.*, 300 F.R.D. 643, 658 (C.D. Cal. 2014)   300 F.R.D. at 656 (certifying nationwide

22   class based on California law where defendant's "[product] decisions occurred in California");

23   *Keilholtz v. Lennox Hearth Products, Inc.*, 268 F.R.D 330, 339-342 (N.D. Cal. Feb. 16, 2020)

24   (certifying nationwide class based on California law where defendant "maintained a [partial]

25   production connection to California"). Yodlee's substantial California contacts permit non-resident

26   Class Members to seek relief under California law.

27

28

### 3. Common Issues Predominate for Plaintiffs' Privacy Claims

Plaintiffs' California privacy claims require them to show: (1) they possessed a "reasonable expectation of privacy," and (2) Yodlee violated that expectation in a way that was "highly offensive" to a reasonable person. ECF No. 266 at 16; *In re Facebook, Inc. Internet Tracking*, 956 F.3d at 601.[83] Both elements are evaluated under an objective standard that applies classwide and thus can be established using common evidence. *See Opperman v. Path, Inc.*, 2016 WL 3844326, at *11 (certifying nationwide class on California privacy claims because objective privacy tests "can be proven on a common basis" and "will not require individualized determinations of class members' subjective expectations"); *Rodriguez v. Google LLC*, No. 20-CV-04688-RS, 2024 WL 38302, at *6 (N.D. Cal. Jan. 3, 2024) (certifying nationwide class on California privacy claims because "the test under [plaintiffs'] . . . privacy claims is an objective one, capable of resolution class-wide").

Here, common evidence will show that Yodlee violated Class Members' reasonable expectation of privacy when it "obtained unwanted access to data' . . . in violation of the law or social norms." *See Opperman v. Path, Inc.*, 2016 WL 3844326, at *11 . Specifically, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See supra* Section II.C. Yodlee also acquired Class Members' data through a common, deceptive tactic: mimicking a bank login portal. *See supra* Section II.B. The common application of these objective, reasonable-person standards will predominate over any purported variations in PayPal's terms, none of which disclosed Yodlee's data-storage and use. *See Rodriguez,* No. 20-CV-04688-RS, 2024 WL 38302, at *9 (holding "dozens [or] perhaps hundreds" of variations in third-party disclosures do "not overwhelm predominating questions as to [defendant's] privacy disclosures" and conduct).

The same common evidence will also show that Yodlee's conduct is highly offensive because Yodlee's deceptive tactics, like its storage and use of sensitive bank data without consent,

---

[83] Courts apply the same test to both common law privacy claims and privacy claims under Article I, Section 1 of the California Constitution. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 601 .

violates common public policy. *See Opperman*, 2016 WL 3844326, at \*11 (holding offensiveness is a "classwide" "'policy' determination" that "will not require individualized determinations"); *see also Brooks v. Thomson Reuters Corp.*, 2023 WL 9316647, at \*9 (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606 ("Whether a challenged practice contravenes public policy inherently entails an aggregative judgement")).

### 4. Common Issues Predominate for Plaintiffs' CAPA Claim

Plaintiffs' California Anti-Phishing Act ("CAPA") claims similarly arise out of a standardized, classwide practice: Yodlee's collection of identifying bank data through a fake bank-login portal. *See Ellsworth v. U.S. Bank, N.A.*, No. C 12-02506 LB, 2014 WL 2734953, at \*20 (N.D. Cal. June 13, 2014) (certifying class where "standardized policies and practices applied on a routine basis to all customers"). CAPA prohibits inducing another person via the Internet to provide "identifying information by representing itself to be a business without [its] authority or approval." Cal. Bus. & Prof. Code § 22948.2. "Identifying information" includes the banking data and Bank Credentials that Yodlee collected from Class Members. *See* Cal. Bus. & Prof. Code § 22948.1(b) (defining "Identifying information" to include "Account password[s]," "Bank Account Number[s]" and any other "information that can be used to access an individual's financial accounts."). Individuals "adversely affected" by a CAPA violation may recover statutory damages of "five thousand dollars ($5,000) per violation." *Id.* at § 22948.3.

Yodlee violated CAPA when it collected Class Members' data by mimicking a direct login portal to their banks. The Court rejected Yodlee's challenge to these allegations at summary judgment, holding that "a reasonable person could interpret the [false login portal], to be a direct link to their bank's website," and Plaintiffs were "adversely affected because their financial data was taken when Yodlee allegedly mimicked their banks' websites." ECF No. 266 at 17, 26. This same analysis applies to all Class Members. Like Plaintiffs, all Class Members had their identifying bank data taken by Yodlee after they entered their Bank Credentials into a false bank-login portal,

1   the core features of which were consistent for all Class Members.[84]

2        Common questions thus predominate for Class Members' CAPA claims, including: (1)

3   whether Yodlee obtained "identifying information" from Class Members; (2) whether Yodlee

4   "represented itself" to be a bank by mimicking a bank-login portal; and (3) whether Class Members

5   were adversely affected. These common questions predominate over any minor textual and

6   graphical differences in the false login portal. *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223,

7   1236–38 (9th Cir. 2024) ("[S]light variations in the other information available on the [user

8   interface] do not defeat the commonality" or predominance).

9        **5.  Common Issues Predominate for Plaintiffs' Unjust Enrichment Claim**

10       Unjust enrichment requires showing that the "defendant received and unjustly retained a

11  benefit at the plaintiff's expense." *Brooks v. Thomson Reuters Corp.*, 2023 WL 9316647, at *13.

12  Unjust enrichment is particularly well-suited for class certification because it typically only

13  "require[s] common proof of the defendant's conduct and raise[s] the same legal issues for all class

14  members." *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942,

15  997 (N.D. Cal. 2022).

16       Here, Class Members' unjust enrichment claims can be proven through the same common

17  evidence: that Yodlee

18

19  . *See supra* Section II.D. Common issues thus predominate based on "the common

20  inquiry of whether [Yodlee]'s uniform business practice of maintaining [data] unjustly resulted in

21  . . . a financial benefit." *See Brooks,* 2023 WL 9316647, at *13 (certifying unjust enrichment class

22  based on the defendant's use of class members' personal data).

23       **6.  Common Issues Predominate Regarding the Relief Plaintiffs Seek**

24       Common evidence will also establish the monetary relief owed to Class Members. Rule

25

26  [84] All Class Members were shown the same core features of the false login portal: (1) a login
    screen with a space to enter a username and password; (2) prominent text describing the login

27  portal as your "bank" login or a login "to your online banking"; and (3) bank names, symbols,
    and/or URLs surrounding the login portal. *See* Ex. 65, Good Report at 58-65, Attachment 3

28  (indexing images of the false login portal).

23(b)(3) requires that damages be "capable of measurement on a classwide basis." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017) (quoting *Comcast Corp. v Behrend*, 569 U.S. 27, 34-35 (2013)). Nonetheless, damages calculations alone "cannot defeat certification." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) (citing *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)).

Plaintiffs here seek five types of monetary relief on behalf of the Damages Class: compensatory privacy damages, nominal damages, statutory damages, punitive damages, and disgorgement. Each theory can be measured on a classwide basis.

***Privacy Damages.*** Plaintiffs' expert, Gary Olsen, offers a classwide methodology for measuring privacy damages based on the objective market value of the data Yodlee took from Class Members.[85] For bank transaction data, Olsen calculated what consumers are paid for similar transaction data on the open market across 15 rebate sites and receipt apps.[86] Olsen determined that consumers are paid an average of $7.74 per month of transaction data from rebate sites and $4.05 per month of transaction data from receipt apps. Olsen then applied these benchmarks to value the transaction data Yodlee collected from Class Members while adjusting for the number of transactions in their bank accounts. Olsen calculated that Yodlee collected $224.9 million worth of transaction data from Class Members using the rebate-site benchmark, and $117.7 million worth of transaction data using the receipt-app benchmark. This methodology can be used to calculate damages both classwide and for specific Class Members.[87]

Olsen used a similar methodology to calculate damages resulting from Yodlee's retention and use of Class Members' Bank Credentials.[88] Because Bank Credentials are the means by which Yodlee obtains Class Members' bank transaction data, Olsen estimated the value of Bank Credentials based on the amount of bank transaction data they would allow Yodlee to collect.[89]

---

[85] *See* Ex. 64, Olsen Report at 30-38.

[86] *Id.* at 26-27, 29. Receipt apps allow users to share their purchase history in exchange for monetary compensation. Rebate sites similarly compensate individuals for sharing their purchase history.

[87] Ex. 64, Olsen Report at 35.

[88] *Id.* at 36–38.

[89] *Id.* at 37.

1   Using this approach, Olsen calculated damages of $402.7 million using the rebate-site benchmark,

2   and $210.9 million using the receipt-app benchmark.[90]

3           Judge Seeborg recently endorsed a similar market-based damages model in certifying a

4   damages class in *Rodriguez v. Google LLC*, 2024 WL 38302, at *1. There, the plaintiffs' expert

5   estimated damages from Google's unauthorized collection of third-party app data to be $3 per

6   device based on a monthly compensation program that paid participants $3 each month for

7   comparable data (there, browsing data). *Id.* Google argued the $3 benchmark should be rejected

8   because it was cherry-picked, overgeneralized, and based on a single source. *Id.* at *12. Judge

9   Seeborg disagreed, crediting the expert's use of an objective benchmark based on "actual, baseline"

10  payments for similar data. *Id.* (emphasis removed) Here, Olsen's model uses an even stronger

11  market-based approach, averaging 15 sources of real-world payments (not just one) to value Class

12  Members' data. Olsen's model provides a reliable methodology to measure damages on a classwide

13  basis.

14          ***Nominal Damages.*** Plaintiffs also seek nominal damages for Yodlee's invasion of their

15  privacy.[91] Because nominal damages are evenly applied, they do not require any individualized

16  inquiry. *See Opperman,* 2016 WL 3844326, at *15 (certifying privacy class based on nominal

17  damages and collecting Ninth Circuit cases certifying nominal-damages classes). To facilitate a

18  nominal damages award, Olsen has estimated there are

19                                                                    .[92]

20          ***Statutory Damages.*** The statutory damages Plaintiffs seek under CAPA are based on a

21  common statutory award of $5,000 that "disposes of any commonality [or] predominance

22  concerns." *See PeopleConnect, Inc.*, No. 20-CV-09203-EMC, 2023 WL 9423286, at *21 (N.D.

23  Cal. Dec. 14, 2023). Under CAPA, Plaintiffs may choose between "the greater of three times the

24  amount of actual damages or five thousand dollars ($5,000) per violation." Cal. Bus. & Prof. Code

25  § 22948.3. This does not require proof of actual harm. *See Kang v. Credit Bureau Connection, Inc.,*

26  ────────────
    [90] *Id.* at 38.

27  [91] *See* Ex. 64, Olsen Report at 40–42 (
    ).

28  [92] Ex. 88, Supplemental Declaration of Gary Olsen ¶ 7.

No. 118CV01359AWISKO, 2022 WL 658105, at *6–7 (E.D. Cal. Mar. 4, 2022) ("[T]he Ninth Circuit has interpreted this [election of actual vs. statutory remedies] to mean that the consumer may recover statutory damages without demonstrating actual harm."). Thus, classwide damages can be calculated formulaically by multiplying the statutory penalty by the number of violations proven at trial. *McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2017 WL 3895764, at *5 (N.D. Cal. Sept. 6, 2017) (finding predominance where the statutory "damages calculation will depend only upon the number of [violations]" and potential trebling).

       **Punitive Damages.** Punitive damages also may be awarded for Plaintiffs' privacy claims. *See Jackson v. First Nat'l Bank of Omaha*, No. CV 20-1295 DSF (JCX), 2022 WL 423440, at *9 (C.D. Cal. Jan. 18, 2022) ("California courts and district courts in the Ninth Circuit have recognized punitive damages may be appropriate for common law invasion of privacy claims."). Because punitive damages focus on the "the defendant's conduct" rather than "facts unique to each class member" they are readily determined by common proof on a classwide basis. *See Ellis v. Costco Corp.*, 285 F.R.D. 492, 542-43 (N.D. Cal. 2012) (certifying Rule 23(b)(3) class for punitive damages). The same common proof underlying Class Members' privacy claims support an award of punitive damages given the severity of Yodlee's conduct. *See* Section III.B.3.

       **Disgorgement.** California law "recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 600 (explaining disgorgement does not require plaintiffs to "expend his or her own financial resources" or lose property value). To obtain disgorgement, Plaintiffs and the Class must show that they retain "a stake in the profits garnered from their personal data and that it is unjust for the defendant to retain those profits." *Rodriguez v. Google LLC*, 2024 WL 38302, at *11. Plaintiffs need only evidence "a reasonable approximation of the amount of the wrongful gain"; the "[r]esidual risk of uncertainty in calculating net profit is assigned to the wrongdoer." *Meister v. Mensinger*, 178 Cal. Rptr. 3d 604, 618 (Cal. App. 6th Dist. 2014) (internal citation and quotation marks omitted).

       As described above, *supra* Section II, common evidence shows that Yodlee wrongfully

1   collected, stored, and used their Bank Credentials and transaction data for commercial purposes,

2   ████████████████████████████ Olsen offers a common methodology for calculating

3   disgorgement █████████████████████████████████████████████████████

4   ███.[93] This methodology will also account for any evidence of costs or revenue adjustments that

5   Yodlee chooses to submit in response.[94] These calculations do not require any individualized

6   analysis because they focus on Yodlee's conduct. *See Brooks*, 2023 WL 9316647, at *13 (certifying

7   class because "unjust enrichment theory can be determined on a class-wide basis" through expert's

8   methodology "without delving into the specific facts surrounding any one individual class

9   member"); *Rodriguez*, 2024 WL 38302, at *11 (accepting disgorgement model that "attribute[d]

10  damages" to wrongful collection of data).

11          **C.      A Class Action Is the Superior Method of Adjudicating this Dispute.**

12          Rule 23(b)(3)'s superiority requirement turns on "whether the ends of justice and efficiency

13  are served by certification." *DZ Rsrv. v. Meta Platforms, Inc.*, No. 3:18-cv-04978-JD, 2022 WL

14  912890, at *9 (N.D. Cal. Mar. 29, 2022), *vacated in part on other grounds*, *DZ Rsrv. v. Meta

15  Platforms, Inc.*, 96 F.4th 1223, 1241 (9th Cir. 2024). Superiority exists where the "'risks, small

16  recovery, and relatively high costs of litigation' make it unlikely that plaintiffs would individually

17  pursue their claims." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1123 (9th Cir. 2017) (internal citation

18  omitted); *see also DZ Rsrv.*, 2022 WL 912890 at *9 ("[I]t is not likely for class members to recover

19  large amounts individually if they prevailed. No reasonable person is likely to pursue these claims

20  on his or her own."). A class action is the superior method of adjudicating Class Members' claims

21  because their individual damages would pale in comparison to the costs of litigating individual

22  lawsuits.[95]

23          The remaining Rule 23(b)(3) factors also support certification. There is no separate

24  litigation involving Class Members' claims, concentration in Yodlee's home District is desirable,

25  and managing this case as a class action is feasible given the "variety of procedural tools courts can

26

27  [93] *See* Ex. 64, Olsen Report at 42-44.
    [94] *Id*.
28  [95] *See Id.* at 4-6 (████████████████████████████████████).

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASSES – Case No. 3:20-cv-05991-SK

1  use to manage the administrative burdens of class litigation." *See Briseno v. ConAgra Foods, Inc.*,

2  844 F.3d 1121, 1131 (9th Cir. 2017).

3       **D.    The Requirements of Rule 23(b)(2) Are Satisfied**

4       Plaintiffs also seek to certify an identical Injunctive Relief Class under Rule 23(b)(2). Rule

5  23(b)(2) is satisfied when "the party opposing the class has acted or refused to act on grounds that

6  apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

7  appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). A Rule 23(b)(2) class does

8  not require a showing of predominance or superiority. *See In re Yahoo Mail Litig.*, 308 F.R.D. 577,

9  598 (N.D. Cal. May 26, 2015); *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014). Rather, an

10  injunctive relief class may be certified so long as Class Members "complain of a pattern or practice

11  that is generally applicable to the class as a whole." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th

12  Cir. 2010) (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)).

13       Here, Plaintiffs seek injunctive relief to stop Yodlee's retention and use of Class Members'

14  banking data, ███████████████████████.[96] Courts have noted the importance

15  of certifying injunctive classes that seek to enjoin widespread consumer-data violations like

16  Yodlee's. *See, e.g.*, *Rodriguez,* No. 20-CV-04688-RS, 2024 WL 38302, at *10 (certifying

17  injunctive relief class seeking to preclude Google's collection and storage of consumer data). The

18  Court should certify the Injunctive Relief Class here, "which seek[s] uniform relief from a practice

19  applicable to all" by requiring Yodlee to permanently delete all copies of Class Members' data

20  from its systems. *See Ward v. United Airlines, Inc.*, No. 19-CV-03423-LB, 2021 WL 534364, at *7

21  (N.D. Cal. Feb. 12, 2021) (citation omitted).

22

23  _____

24  [96] *See* Section II.D; *see also* Ex. 64, Good Report at 27–28 (explaining ████████████████

25  ███████████████████); Ex. 57, N. Nadkarni 30(b)(1) Dep. Tr. 49:17–18 █████████);

26  Ex. 53 at '0213051 (Yodlee's internal emails in April 2020 showing that its employees can at any
time request and receive access to "decrypted" PayPal data for its own use such as "data quality

27  projects," and the data would contain "account holder name, Email Id, Phone number &
Address); Ex. 64, Olsen Report, Schedule 24 (████████████████████████████████

28  ██████████).

| | | |
|---|---|---|
| 1 | Dated: May 22, 2024 | /s/ Benjamin D. Steinberg |

Benjamin D. Steinberg (admitted *pro hac vice*)
Kellie Lerner (*pro hac vice* forthcoming)
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas, Suite 2601
New York, New York 10019
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
bsteinberg@robinskaplan.com
klerner@robinskaplan.com

Christian Levis (admitted *pro hac vice*)

Amanda Fiorilla (admitted *pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

Li Zhu (SBN 302210)
**ROBINS KAPLAN LLP**
55 Twin Dolphin Drive, Suite 310
Redwood City, CA 94065-2133
Telephone: (605) 784-4013
Facsimile: (605) 784-4041
lzhu@robinskaplan.com

Anthony M. Christina (admitted *pro hac vice*)
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, Pennsylvania 19428
Telephone: (215) 399-4770
Facsimile: (914) 997-0035
achristina@lowey.com

John Emerson (admitted *pro hac vice*)
**EMERSON FIRM, PLLC**
2500 Wilcrest Drive, Suite 300
Houston, TX 77042
Telephone: (800) 551-8649
Facsimile: (501) 286-4659
jemerson@emersonfirm.com

Robert Kitchenoff (admitted *pro hac vice*)
**WEINSTEIN KITCHENOFF & ASHER LLC**
150 Monument Road, Suite 107
Bala Cynwyd, PA 19004
Telephone: (215) 545-7200

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

kitchenoff@wka-law.com

Michele Carino (*pro hac vice* forthcoming)
**GREENWICH LEGAL ASSOCIATES LLC**
881 Lake Avenue
Greenwich, CT 06831
Telephone: (203) 622-6001
Mcarino@grwlegal.com

*Attorneys for Plaintiffs and the Proposed Classes*

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASSES – Case No. 3:20-cv-05991-SK