MEGAN L. RODGERS (SBN 310344)
**COVINGTON & BURLING LLP**
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: (650) 632-4700
Email: mrodgers@cov.com

ZIWEI SONG (SBN 313842)
DANIEL RIOS (SBN 326919)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: (415) 591-6000
Email: ksong@cov.com
Email: drios@cov.com

ERIC C. BOSSET (*pro hac vice*)
TARA SUMMERVILLE (*pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Email: ebosset@cov.com
Email: tsummerville@cov.com

ANDREW LEFF (*pro hac vice*)
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
Email: aleff@cov.com

*Attorneys for Defendant Yodlee, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DARIUS CLARK, JOHN H. COTTRELL, DAVID LUMB, KYLA ROLLIER, and JENNY SZETO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YODLEE, INC.,<br><br>Defendant. | Case No. 3:20-cv-05991-SK<br><br>Honorable Sallie Kim<br><br>**YODLEE, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASSES**<br><br>Date:   July 22, 2024<br>Time:  9:00 a.m.<br>Courtroom:  C, 15th Floor |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ....................................................................................................2

       A.    Yodlee Provides an "Instant Account Verification" Service for PayPal. ..........................2

       B.    PayPal's Implementation of IAV Changed Throughout the Putative Class Period............2

       C.    Yodlee Cannot Identify Individual Users from PayPal's IAV Data....................................5

       D.    Yodlee's Storage and Deletion of PayPal IAV Data. ........................................................5

       E.    Yodlee Does Not Sell the IAV Data at Issue.....................................................................6

       F.    Each Plaintiff's Use of IAV Varied in Material Ways. ......................................................6

III.   ARGUMENT...........................................................................................................7

       A.    Plaintiffs Lack Standing...................................................................................................7

       B.    Plaintiffs Fail to Satisfy Rule 23.....................................................................................8

             1.    Plaintiffs' Claims Cannot Support a Nationwide Class.......................................9

             2.    Plaintiffs Fail to Satisfy the Prerequisites of Rule 23(a)....................................11

             3.    A Multitude of Individualized Issues Predominate as to Every Claim.................13

                   a)    CAPA..............................................................................................13

                   b)    Invasion of Privacy. ......................................................................16

                   c)    Unjust Enrichment. ........................................................................22

                   d)    Statutes of Limitations....................................................................23

             4.    A Class Action Is Not a Superior Method for Adjudicating Plaintiffs' Claims. .............................................................................................................23

             5.    The Proposed Rule 23(b)(2) Class Cannot Be Certified.....................................24

IV.    CONCLUSION.....................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ahringer v. LoanDepot, Inc.,*
    2024 WL 1135683 (C.D. Cal. Feb. 6, 2024)..................................................................11

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)..........................................................................................................11

*Andren v. Alere, Inc.,*
    2017 WL 6509550 (S.D. Cal. Dec. 20, 2017)...............................................................10

*Anti Police-Terror Project v. City of Oakland,*
    2021 WL 4846958 (N.D. Cal. Oct. 18, 2021)...............................................................16

*Beaver v. Omni Hotels Mgmt. Corp.,*
    2023 WL 6120685 (S.D. Cal. Sept. 18, 2023)..............................................................22

*Bias v. Wells Fargo & Co.,*
    312 F.R.D. 528 (N.D. Cal. 2015).....................................................................................10

*Bobo v. Optimum Nutrition, Inc.,*
    2015 WL 13102417 (S.D. Cal. Sept. 11, 2015)............................................................15

*C.R. Educ. & Enf't Ctr. v. Hosp. Properties Tr.,*
    317 F.R.D. 91 (N.D. Cal. 2016)......................................................................................20

*Campbell v. Facebook Inc.,*
    315 F.R.D. 250 (N.D. Cal. 2016)....................................................................................16

*Cimoli v. Alacer Corp.,*
    587 F. Supp. 3d 978 (N.D. Cal. 2022).......................................................................10, 11

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013).................................................................................................*passim*

*Corvello v. Wells Fargo Bank N.A.,*
    2016 WL 3995909 (N.D. Cal. Jan. 29, 2016)...............................................................13

*Cunningham v. Pro. Educ. Inst., Inc.,*
    2018 WL 6709515 (E.D. Tex. Nov. 5, 2018)..............................................................9, 10

*Delgado v. Meta Platforms, Inc.,*
    2024 WL 818344 (N.D. Cal. Feb. 27, 2024)................................................................22

*DZ Rsrv. v. Meta Platforms, Inc.,*
    96 F.4th 1223 (9th Cir. 2024).................................................................................7, 8, 15

*Ellis v. Costco Wholesale*,
  285 F.R.D. 492 (N.D. Cal. 2012)...................................................................22

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ........................................................................25

*Ellsworth v. U.S. Bank*,
  2014 WL 2734953 (N.D. Cal. June 13, 2014)..............................................15

*Gianino v. Alacer Corp.*,
  846 F. Supp. 2d 1096 (C.D. Cal. 2012) ........................................................10

*In re Google Inc. Gmail Litig.*,
  2014 WL 1102660 (N.D. Cal. Mar. 18, 2014)..............................................23

*In re Google RTB Consumer Priv. Litig.*,
  2024 WL 2242690 (N.D. Cal. Apr. 4, 2024).................................................19

*In re Google, Inc. Privacy Policy Litig.*,
  58 F. Supp. 3d 968 (N.D. Cal. 2014).............................................................19

*Haley v. Medtronic, Inc.*,
  169 F.R.D. 643 (C.D. Cal. 1996)..................................................................23

*Hammerling v. Google LLC*,
  615 F. Supp. 3d 1069 (N.D. Cal. 2022).........................................................16

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ...................................................................12, 13

*Hart v. TWC Prod. & Tech. LLC*,
  2023 WL 3568078 (N.D. Cal. Mar. 30, 2023)......................................*passim*

*Hernandez v. Hillsides, Inc.*,
  47 Cal. 4th 272 (2009) ..................................................................................16

*Herskowitz v. Apple, Inc.*,
  301 F.R.D. 460 (N.D. Cal. 2014)..................................................................25

*Kang v. Credit Bureau Connection*,
  2022 WL 658105 (E.D. Cal. Mar. 4, 2022) ..................................................16

*Katz-Lacabe v. Oracle Am., Inc.*,
  668 F. Supp. 3d 928 (N.D. Cal. 2023).........................................................9, 10

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) ......................................................................15

*Kumandan v. Google LLC*,
  2023 WL 8587625 (N.D. Cal. Dec. 11, 2023)..............................................18

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
  350 F.3d 1018 (9th Cir. 2003) ...................................................................................7, 12

*Markels v. AARP*,
  689 F. Supp. 3d 722 (N.D. Cal. Aug. 29, 2023) ......................................................22, 23

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ......................................................................................9, 10

*McMillion v. Rash Curtis & Associates*,
  2017 WL 3895764 (N.D. Cal. Sept. 6, 2017) .................................................................16

*Medina v. Cnty. of Riverside*,
  308 F. App'x 118 (9th Cir. 2009) ..................................................................................24

*Moreno v. AutoZone, Inc.*,
  410 F. App'x 24 (9th Cir. 2010) ....................................................................................12

*In re Netflix, Inc., Sec. Litig.*,
  2012 WL 1496171 (N.D. Cal. Apr. 27, 2012) ................................................................12

*Nguyen v. Nissan N. Am., Inc.*,
  487 F. Supp. 3d 845 (N.D. Cal. 2020) ......................................................................13, 23

*Nolen v. PeopleConnect*,
  2023 WL 9423286 (N.D. Cal. Dec. 14, 2023) ................................................................16

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) .........................................................................................8, 24

*Opperman v. Path, Inc.*,
  2016 WL 3844326 (N.D. Cal. July 15, 2016)........................................................10, 20, 24

*Perkins v. LinkedIn Corp.*,
  53 F. Supp. 3d 1190 (N.D. Cal. 2014) ............................................................................19

*Phillips v. U.S. Customs & Border Protection*,
  74 F.4th 986 (9th Cir. 2023) ............................................................................................7, 8

*Pollack v. Foto Fantasy, Inc.*,
  2010 WL 11595486 (C.D. Cal. July 15, 2010).............................................................20, 21

*Robbins v. Phillips 66 Co.*,
  343 F.R.D. 126 (N.D. Cal. 2022).....................................................................................20

*Rodriguez v. Google*,
  2024 WL 38302 (N.D. Cal. Jan. 3, 2024).....................................................................20, 21

*Sarmiento v. Sealy, Inc.*,
  2020 WL 4458915 (N.D. Cal. May 27, 2020) .................................................................13

*Saulsberry v. Meridian Fin. Servs., Inc.*,
  2016 WL 3456939 (C.D. Cal. Apr. 14, 2016) ...........................................................18, 20

*Shuman v. SquareTrade Inc.*,
  2020 WL 7458001 (N.D. Cal. Dec. 18, 2020) ....................................................................11

*Siino v. Foresters Life Ins. & Annuity Co.*,
  340 F.R.D. 157 (N.D. Cal. 2022)........................................................................................25

*Smith v. Facebook, Inc.*,
  262 F. Supp. 3d 943 (N.D. Cal. 2017)................................................................................19

*Smith v. First Nat. Bank of Atlanta*,
  837 F.2d 1575 (11th Cir. 1988) .............................................................................................9

*Sullivan v. Oracle Corp.*,
  51 Cal. 4th 1191 (2011) ......................................................................................................11

*Svenson v. Google Inc.*,
  2016 WL 8943301 (N.D. Cal. Dec. 21, 2016) ....................................................................12

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*,
  308 F.R.D. 630 (N.D. Cal. 2015)........................................................................................11

*In re Toll Roads Litig.*,
  2018 WL 4952594 (C.D. Cal. July 31, 2018)......................................................................18

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).....................................................................................................*passim*

*Walker v. Life Ins. Co. of the Sw.*,
  953 F.3d 624 (9th Cir. 2020) ..............................................................................................24

*Warner v. Toyota Motor Sales, U.S.A., Inc.*,
  2016 WL 11770360 (C.D. Cal. Mar. 8, 2016).....................................................................10

*Williams v. Apple, Inc.*,
  338 F.R.D. 629 (N.D. Cal. 2021)........................................................................................18

*Withers v. eHarmony, Inc.*,
  2010 WL 11520198 (C.D. Cal. June 2, 2010) .....................................................................12

*Wu v. Sunrider Corp.*,
  793 F. App'x 507 (9th Cir. 2019) ........................................................................................13

*In re Yahoo Mail Litig.*,
  308 F.R.D. 577 (N.D. Cal. 2015)...................................................................................10, 11

*Zinser v. Accufix Rsch. Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) .......................................................................................23, 24

1

**Statutes and Rules**

2

Cal. Bus. & Prof. Code § 22948.2 ............................................................................................11, 13

3

Cal. Bus. & Prof. Code § 22948.3 ...................................................................................................16

4

Cal. Civ. Code § 340.......................................................................................................................13

5

Cal. Civ. Code § 3515.....................................................................................................................19

6

Fed. R. Civ. P. 23 ..................................................................................................... *passim*

7

Fed. R. Evid. 702 ...........................................................................................................................21

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.      **INTRODUCTION**

Plaintiffs must prove by a preponderance of the evidence that they have standing, satisfy every prerequisite of Rule 23(a), and at least one prong of Rule 23(b).  Despite having had nearly four years to build their case, Plaintiffs' motion fails this test many times over.

*First*, Plaintiffs lack standing to pursue their claims.  Undisputed record evidence confirms that Yodlee never "monetized" the data retrieved for PayPal's Instant Account Verification ("IAV") service, Plaintiffs have provided no evidence of concrete injury resulting from Yodlee's conduct, and their theories about improper data retrieval and storage are squarely foreclosed by the Ninth Circuit's recent holding that unlawful collection and retention of identifying information, without more, does not confer standing.

*Second*, Plaintiffs' proposed nationwide classes are barred as a matter of law.  As courts in this circuit have repeatedly recognized, California's choice-of-law rules prohibit certification of a nationwide class where, as here, the claims are based on alleged representations that users viewed in different states, assert invasion-of-privacy and unjust enrichment theories that are subject to material variances in state law, and invoke California statutes that have no extraterritorial application.

*Third*, Plaintiffs have failed to identify a single viable class representative.  In addition to having no proof of injury, each of the three proposed representatives is atypical and inadequate because they all used PayPal's IAV service from outside of California; Yodlee did not collect transaction data for any of them (and has no data at all in its systems for one); they all are differently situated with respect to their expectations of privacy and how they acted (or failed to act) consistently with those expectations; and each of them is subject to unique defenses that would overshadow this litigation.

*Fourth*, what Plaintiffs characterize as "common questions" cannot be answered without a host of individualized inquiries as to each element of their claims, damages theories, and Yodlee's defenses, all of which overwhelmingly predominate over any common issues.  A class action is not superior because adjudicating these issues for tens of millions of PayPal users would be unmanageable, if not impossible.  Nor can Plaintiffs fall back on Rule 23(b)(2) given their focus on damages and failure to show that every putative class member would be entitled to – or even want – the same injunctive or declaratory relief.

After over two years of discovery, Plaintiff can no longer rely on inflammatory rhetoric and baseless allegations at this stage.  Contrary to their narrative of an illicit scheme to "misappropriate" and

"monetize" PayPal IAV data, the evidence shows only that PayPal licensed from Yodlee various IAV services over the two decades of their relationship, involving different configurations, user interfaces, and technical capabilities that changed during the putative class period, and for tens of millions of PayPal users who voluntarily chose to use IAV under highly individualized circumstances, as Plaintiffs themselves aptly demonstrate. For these reasons and others explained below, Plaintiffs' motion must be denied.

## II.   BACKGROUND

### A.   Yodlee Provides an "Instant Account Verification" Service for PayPal.

Yodlee is a technology company that provides business-to-business services to financial institutions and fintech companies like PayPal. (Ex. 20 at 35:6-10.) PayPal licenses Yodlee's IAV service to facilitate convenient money transfers for PayPal users. (Dkt. No. 178-5 at 3.) During the putative class period, PayPal users who wished to link bank accounts to their PayPal profiles could either provide bank login credentials to enable "instant" verification through IAV or choose an alternative (slower) method to enable PayPal to verify that the accounts were legitimate, adequately funded, and the user had the required privileges. (Dkt. No. 108-1 ¶¶ 3-5; Dkt. No. 178-46 at 10-11; Dkt. No. 493-25 at 13; Ex. 19 at 38:3-4.)

Yodlee attempts to retrieve the data requested by PayPal from the user's bank using the provided credentials. (Dkt. No. 178-46 at 10-11.) Not every attempt is successful; Yodlee may retrieve only a portion of the requested data, or no data at all, depending on various factors, such as whether the bank makes the data available. (Dkt. No. 492-41 at 3-4; Ex. 4 at 3, 5.) PayPal uses the data Yodlee retrieves to determine whether to allow the user to link the bank account to their PayPal profile.[1] The data Yodlee retrieved varied over time and depending on the user and bank involved.

### B.   PayPal's Implementation of IAV Changed Throughout the Putative Class Period.

PayPal decides how to configure its IAV service and controls how the service is presented to its users, including the terms and disclosures that govern use of the service. Both the configuration and presentation of PayPal's IAV service changed throughout the putative class period.

<u>PayPal's IAV Configurations</u>. PayPal decides what data fields to retrieve and for which users. (Dkt. No. 492-42 at 2-3.) From January 2014 to June 2016, PayPal configured IAV to collect only what

---

[1] Ex. 26 ¶ 29. Yodlee contacts only the bank chosen by the user and attempts to retrieve data requested by PayPal from all linkable accounts. (Dkt. No. 492-43 at 9.) The accounts and balances are displayed in PayPal's IAV flow to the user, who can choose to link any or all of those accounts. (Exs. 11, 12.)

Yodlee refers to as "basic" data fields: bank account number, routing number, account holder name, account name, account type, account balance, and date of last account update. (*Id.*)

Beginning in June 2016, PayPal began using what Yodlee refers to as "IAV+" to collect, on a one-time basis and for only some users selected by PayPal, up to 90 days of recent transaction history for fraud detection and prevention purposes. (*Id.*; *see, e.g.*, Ex. 26 ¶ 29 (Yodlee retrieved "user transaction data" only "if requested" by PayPal); Ex. 13 ("[F]or select number of users [PayPal] may collect transaction information."); Dkt. No. 178-81 (PayPal pulls transactions only "for a very small part of their target segment (the high risk segment)"); Dkt. No. 411-27 (Yodlee pulled transactions at PayPal's request for only a fraction of all successful IAV attempts); Ex. 27 (Egelman Dep.) at 97:23-98:13 (Plaintiffs' expert recognizing "legitimate business interest" in pulling transactions to "[c]ut[] down on fraud").)

In January 2019, PayPal contracted to add to its IAV service a "balance refresh" feature that, at PayPal's request, uses login credentials stored in Yodlee's system to verify that linked accounts have sufficient balance for ⟨         ⟩ use. (Dkt. No. 178-17.) That service launched in 2020. (Dkt. No. 411-27.) PayPal decides when to request a balance refresh. (Dkt. No. 189-5 at 225:4-8, 228:13-22.) If the user has changed their login credentials since the last request, Yodlee cannot perform a balance refresh.

PayPal's IAV Flows. For nearly the entire putative class period, PayPal designed and hosted every part of its IAV flow (*i.e.*, the multiple screens that users must navigate to use IAV). (*See* Ex. 18 at 1; Ex. 20 at 52:16-54:13.) In late 2019, PayPal began incorporating at the step where users enter their bank login credentials a "FastLink" interface hosted by Yodlee, which PayPal customized according to its own preferences. (Ex. 18 at 1; Dkt. No. 178-17 at 4-6 (PayPal's requirements for "images and styles," the phrase "Link Your Bank," the name and logo of the user's bank, the hyperlinked Terms and Conditions, and more).) PayPal completed this transition in 2020. (Ex. 18 at 1.) Yodlee hosted for PayPal only the "FastLink" interface, while PayPal continued to design and host every other part of its IAV flow. (*Id.*)

During the putative class period, PayPal's IAV flow went through many iterations that overlapped as they were "implemented on a rolling basis." (Ex. 26 ¶¶ 10, 14-16.) On any given day the credential screen presented to one PayPal user could have differed from the screen presented to another user depending on various factors, including the bank to be linked (*Id.*) Non-exhaustive examples are shown in **Figure 1** below, and others are shown in Exhibit 2. (More may have existed that are not in the record.)

1

**Figure 1**

2

| Before July 2016* | 2016 - 2018 | 2018 - 2020 | 2019 - 2020 |

*The extent (if any) to which this image is representative of screens shown before July 2016 is unknown.*

16    As shown in **Figure 1,** the specific presentation of PayPal's Terms of Service, Privacy Statement,

17   and other disclosures also changed over time, though PayPal's IAV flow at all times included hyperlinks

18   to the then-effective Terms of Service or Privacy Statement and expressly disclosed Yodlee's role in the

19   hyperlinked terms or credentials screen (or both).[2]  Other versions of the hyperlinked terms that governed

20   PayPal's IAV service during the putative class period are appended hereto as Exhibit 63.

21    The functionality of PayPal's IAV flow also changed over time.  For instance, ▉▉▉▉▉▉▉▉▉

22   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (Ex. 10.)  From

23   approximately October 2019 through November 2020, PayPal users who used its older IAV flow

24   continued to provide credentials to PayPal, but PayPal users who used its newer IAV flow provided

25   credentials to Yodlee through the "FastLink" interface.  (Ex. 18 at 2-3.)

26

27   [2] Ex. 26 ¶¶ 17-26; *see, e.g.*, Ex. 13 (2018 IAV terms stating, "you authorize PayPal and its supplier Yodlee,
Inc. ('Yodlee') to access third party sites designated by you, on your behalf, to retrieve information
28   requested by you, or as required by PayPal such as bank account, balance, and transaction history").

### C.     Yodlee Cannot Identify Individual Users from PayPal's IAV Data.

Yodlee does not know the identities of PayPal users who use IAV.  Yodlee does not receive from PayPal or otherwise collect users' names, addresses, phone numbers, or emails. (Ex. 22 ¶ 4; Dkt. No. 492-41 at 3-4.)  Instead, PayPal provides Yodlee with an anonymous identifier (a "GUID," or Globally Unique Identifier) that PayPal associates with each user-level IAV event. (Ex. 22 ¶¶ 2-3.) Yodlee cannot identify the user behind the IAV event unless PayPal unmasks, or de-anonymizes, the GUID. (*Id.* ¶ 4.)

For the vast majority of IAV events before late 2019, PayPal did ***not*** use unique GUIDs but instead assigned a common GUID to tens of millions of users, making it impossible to identify those users without more information, such as their name, account number, the date of the IAV attempt, and the bank linked. (*Id.* ¶¶ 4-7.)  Even then, it might not be possible to identify specific PayPal users' data in Yodlee's systems – for example, because multiple account holders may share the same name. (*Id.* ¶¶ 3-4.)[3]

### D.     Yodlee's Storage and Deletion of PayPal IAV Data.

Yodlee stores PayPal IAV data on secure servers, with credentials and other sensitive data encrypted and subject to strict controls and monitoring. (*See, e.g.*, Ex. 6 at '677 (stored credentials "are hardware encrypted" and the keys "cannot be accessed by anyone"); Ex. 14 (same); Ex. 17 at 5 ("only a limited number of employees," with authorization and "under strict controls," can access retrieved data, and "user passwords are never allowed to be decrypted").)  Credentials are used only to fulfill PayPal's requests and become obsolete once changed by the user. (Dkt. No. 492-41 at 2-4.)  There is no indication that any PayPal IAV data stored in Yodlee's systems has ever been compromised.

PayPal calls a Yodlee API to delete account-level IAV data in Yodlee's systems within seconds. (Dkt. No. 492-42 at 5.)  When an account is deleted, login credentials are removed "completely from the database [and] never accessible or recoverable post deletion." (*Id.* at 8.)  Other data is "mark[ed] as deleted so that it is no longer accessible via API's or shown on the application" until it can be removed permanently consistent with operational capacity and performance needs. (*Id.*)  Records produced last year show PayPal had deleted over 42 million accounts from Yodlee's systems. (*See id.* at 13.)  PayPal users can ███████████████████████████████████████████ (Ex. 11.)

---

[3] To search for PayPal IAV data associated with Plaintiffs in its systems, Yodlee had to use information obtained through discovery from the Plaintiffs and PayPal, and even then was not able to find any IAV data for Plaintiff Szeto; her data may have been deleted or never stored at all. (*See* Ex. 22 ¶¶ 6-8.)

**E.      Yodlee Does Not Sell the IAV Data at Issue.**

Yodlee does not sell PayPal IAV data and considers IAV data to be irrelevant because, unlike other transaction data that Yodlee uses to create its research and analytics products for fintech clients, IAV transactions are collected on a one-time basis and then become stale.  (Dkt. No. 238 ¶¶ 11-12; Ex. 24 at 78:17-79:11; Ex. 25 at 31:3-6.)  Yodlee's system is designed to filter transactions by cobrand (*i.e.*, client) IDs so that only data from cobrands deemed suitable for research and analytics purposes are included in Yodlee's data panels or used to train Transaction Data Enrichment models ("TDE").  (Dkt. No. 238 ¶ 7; Dkt. No. 385-2 ¶¶ 2-3; Ex. 21 ¶¶ 3-4; Ex. 25 at 30:9-31:6, 143:8-144:11.)  Transactions from cobrands *not* selected for inclusion – such as PayPal – are programmatically filtered out at the code level before they can be used for data panels or TDE.  (Dkt. No. 385-2 ¶¶ 1-6; Ex. 32 (Porter Rpt.) ¶¶ 15, 19-41, 49.)[4]

**F.      Each Plaintiff's Use of IAV Varied in Material Ways.**

Even among the Plaintiffs in this case, material differences cast into sharp relief how the individualized circumstances of tens of millions of PayPal users over the six-plus years of the putative class period preclude any conceivable classwide resolution of liability or damages.  As reflected in the chart appended hereto as Exhibit 1, Plaintiffs differ significantly in how they used PayPal's IAV service – including, for example, in (i) the IAV flows they interacted with; (ii) the disclosures PayPal presented to them; (iii) the data PayPal asked Yodlee to retrieve; (iv) the extent (if any) to which Yodlee successfully retrieved, stored, or deleted that data; (v) available records evidencing the permissions Plaintiffs granted for the conduct at issue; (vi) the extent to which they changed their credentials after learning about Yodlee's alleged conduct ▮▮▮▮▮▮▮▮▮ or allowed other companies to store their credentials ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ and (vii) the extent to which they continued using IAV after joining this lawsuit.

---

[4] In asserting otherwise (Mot. at 13-15), Plaintiffs mischaracterize documents and testimony that do not in fact support their theories, as the record confirms and as this Court and two different experts – including one retained by Plaintiffs – have recognized.  *See, e.g.*, Dkt. No. 388 (order rejecting Plaintiffs' arguments in Dkt. No. 384 that "Yodlee sells the IAV data at issue," including "downstream copies"); Ex. 21 ¶¶ 5-9 (refuting Plaintiffs' misstatements about TDE); Ex. 32 ¶¶ 16-18, 47-48, 51 (same); Ex. 34 at 126:9-18, 128:7-12, 129:3-5, 133:9-14, 135:9-14, 137:6-10, 138:11-18, 140:9-16, 141:25-142:6, 143:7-23, 148:13-21, 150:3-9, 152:2-8, 155:5-10, 157:10-16, 169:6-15, 170:1-9, 183:7-10, 188:14-23, 189:17-24 (Plaintiffs' expert admitting that their characterizations (reprised in the instant motion) of the testimony of Nikhil Nadkarni, Pramod Singh, and other materials do not in fact show use of PayPal IAV data to create data panel products or to train TDE).

1    For example, Yodlee did not design or host any part of the IAV flows used by Rollier and Szeto;

2    in contrast, Cottrell used the PayPal-customized credential screen that Yodlee hosted. (*Id.*) The IAV flow

3    that Rollier used did not display a bank logo because her local bank was not among the banks listed by

4    PayPal.[5] Yodlee did ***not*** collect or store bank transaction data for Cottrell, Rollier, or Szeto – the ***only***

5    three Plaintiffs purporting to represent classes based on this data. (Ex. 1; Mot. at vi.) Cottrell and Szeto

6    produced documents showing that they ███████████████████████████████████████████

7    ████████████████████████████████████████████████████████████ (Ex. 1.)

8    And Yodlee had no IAV data for Szeto, indicating that any such data was never stored or has since been

9    deleted. (*Id.*) There are many other examples of such differences among just the five named Plaintiffs

10   (including Lumb and Clark). The variations would be orders of magnitude greater for the tens of millions

11   of PayPal users included in Plaintiffs' proposed classes.

12   **III.   ARGUMENT**

13        **A.    Plaintiffs Lack Standing.**

14        "[S]tanding is the threshold issue in any suit" and a prerequisite to class certification. *Lierboe v.*

15   *State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003). Plaintiffs' "standing at the time of

16   class certification must be established by a preponderance of the evidence." *DZ Rsrv. v. Meta Platforms,*

17   *Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024). Here, no class can be certified because Plaintiffs have submitted

18   no evidence of concrete injury resulting from Yodlee's collection, storage, or use of their IAV data.[6]

19        Just last year, the Ninth Circuit held in *Phillips v. U.S. Customs & Border Protection* that the

20   allegedly unlawful collection and retention of records – even records with detailed personally identifying

21   information – "without more, does not give rise to a concrete injury necessary for standing." 74 F.4th

22   986, 988-89, 995-96 (9th Cir. 2023). In that case, as here, the plaintiffs argued that retained records "'may'

23   have some effect [on them] in the future" but provided no evidence that the defendant was "using or will

24   use the records in the future . . . or that a third party will obtain the records and use them to plaintiffs'

25   detriment." *Id.* at 995. The Ninth Circuit distinguished this scenario from cases with "a straightforward

---

[5] Ex. 1. There are over 4,000 insured commercial banks in the United States (Ex. 35 ¶ 49), most of which did not have their logos displayed in PayPal's IAV flows. (*See* Ex. 2.)

[6] Indeed, Plaintiffs testified that they have not suffered any monetary losses or damages. (*See, e.g.*, Ex. 42 at 335:11-23 (Cottrell); Ex. 43 at. 229:24-230:3 (Szeto); *accord* Ex. 29 ¶ 35; Ex. 31 at 23:1-5.)

---

analogue" to the traditional common law tort of intrusion – for example, where the defendants used "intimate medical information" for unauthorized testing purposes, seized confidential documents from the plaintiff's home, read and used information in private social media messages, compiled and used biometric information, or sought disclosures that would jeopardize the efficacy of religious practices – and concluded "there [was] no support for plaintiffs' claim that the [defendant's] unlawful collection and retention of records alone gives rise to a concrete injury for purposes of standing." *Id.* at 993-95.

Plaintiffs here lack standing for the same reasons under *Phillips    First*, there is no evidence that Plaintiffs have been injured by Yodlee's collection or storage of PayPal IAV data. Indeed, undisputed record evidence shows that PayPal IAV data in Yodlee's systems is securely stored, and there has been no indication that it has ever been compromised. (*Supra*, Part II(C)-(D).) Yodlee's IAV service also does not prevent Plaintiffs from using their own data however they wish. (*See* Ex. 29 (Hitt Rpt.) at ¶ 35.)

*Second*, undisputed record evidence confirms Yodlee did not use PayPal's IAV data for any commercial purpose of its own. Throughout the putative class period, Yodlee used a code-based filtration process that programmatically ***excluded*** PayPal IAV data from the dataset used to create data panels and train TDE. (*Supra*, Part II(E).) This programmatic filtration was verified by two different source code experts – including one retained by Plaintiffs, who admitted there is no evidence of PayPal IAV data being used for data panels or TDE. (*Id.*; Ex. 34 (Rattenbury Dep.) at 25:1-6, 45:19-25, 47:23-48:4, 100:4-9, 101:13-23, 115:1-10, 118:12-17, 196:24-197:4, 197:23-198:3.) Because Plaintiffs cannot refute this evidence, they ignore it and instead continue to assert without factual support that Yodlee "monetized" or "profit[ed] from" their IAV data. (*See* Mot. at 15-16.) These baseless assertions can no longer be credited at this stage, either to establish standing or to certify a class. *See DZ Rsrv.*, 96 F.4th at 1240.

## B.    Plaintiffs Fail to Satisfy Rule 23.

Even if Plaintiffs had standing, a class cannot be certified unless the Court determines based on "a rigorous analysis" that each requirement of Rule 23 has been satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). This "rigorous analysis" requires the Court to "probe behind the pleadings" and consider "the merits of [the] underlying claim[s]." *Id.* at 33-34. This is more than a pleading standard; at this stage, Plaintiffs "must actually *prove* – not simply plead – that their proposed class[es] satisf[y] each requirement." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663-65

(9th Cir. 2022) (en banc).  Plaintiffs have the burden to prove by a preponderance of the evidence that their proposed classes satisfy every prerequisite of Rule 23(a) and at least one prong of Rule 23(b).  *Id.*

## 1.    Plaintiffs' Claims Cannot Support a Nationwide Class.

Rule 23 does not permit certification of nationwide classes subject to "the law of multiple jurisdictions" because "variances in state law overwhelm common issues and preclude predominance." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012), *overruled on other grounds by Olean*, 31 F.4th 651.  Plaintiffs nevertheless seek to certify nationwide classes, arguing that California law should apply classwide because (1) Yodlee allegedly "monetized" PayPal IAV data from California; (2) Yodlee's headquarters, operations, and personnel were located in California during the putative class period; and (3) Yodlee contracted with PayPal in California.  (Mot. at 14-15.)

As explained, Plaintiffs' first argument fails because unrefuted evidence shows that Yodlee has not "monetized" PayPal IAV data – in California or otherwise (*supra*, Part II(E)) – and a theory with no factual basis cannot support class certification.  *See, e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (plaintiffs who "provide[d] no convincing proof" of wrongdoing "[had] not established the existence of any common question" to certify a class).  All of Plaintiffs' arguments for a nationwide class also must be rejected for the separate reason that "California law may only be used on a classwide basis if 'the interests of other states are not found to outweigh California's interest in having its law applied.'" *See Mazza*, 666 F.3d at 590.  This test includes (1) determining whether the relevant laws differ between jurisdictions, (2) determining whether each jurisdiction has an interest in having its own law applied, and (3) comparing the relative interests of each jurisdiction.  *Id.*  Importantly for this analysis, "California recognizes that . . . the place of the wrong has the predominant interest" and "considers the 'place of the wrong' to be the state where the last event necessary to make the actor liable occurred."  *Id.* at 593.

As courts applying this test have repeatedly recognized, privacy and unjust enrichment laws vary significantly between states.[7]  "And those states have a compelling interest in protecting their consumers

---

[7] For example, what constitutes invasion of privacy differs between California law and the laws of Florida, Georgia, and Texas (which govern the claims of Rollier, Szeto, and Cottrell, respectively (*see infra* p. 12)). *See, e.g.*, *Smith v. First Nat. Bank of Atlanta*, 837 F.2d 1575, 1580 (11th Cir. 1988) (Georgia requires "a physical intrusion" or "bad faith"); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 947 (N.D. Cal. 2023) ("The requirement of a private quarter is an element of the [intrusion] claim in Florida that is not an explicit requirement in California."); *Cunningham v. Pro. Educ. Inst., Inc.*, 2018 WL 6709515, at *6 (continued…)

1   from in-state injuries caused by a California corporation doing business within their borders and in

2   delineating the scope of recovery for the consumers under their own laws." *Gianino v. Alacer Corp.*, 846

3   F. Supp. 2d 1096, 1103 (C.D. Cal. 2012). California law therefore cannot apply to nationwide classes for

4   Plaintiffs' invasion-of-privacy and unjust enrichment claims given that the "last events necessary for

5   liability" involved user interactions with PayPal's IAV flow and representations made in that context,

6   which "[did] not necessarily take place in California." *See, e.g., Katz-Lacabe*, 668 F. Supp. 3d at 948

7   ("even if some of the challenged conduct allegedly emanated from California," California law cannot

8   apply nationwide to privacy claims "requiring courts to assess whether expectations about privacy are

9   reasonable or data collection is egregious" that are "inherently tied to community standards" and to

10  "differences in the legal framework among states"); *see also Bias v. Wells Fargo & Co.*, 312 F.R.D. 528,

11  540 (N.D. Cal. 2015) (after *Mazza*'s "unequivocal statement that unjust enrichment laws vary materially

12  from state to state . . . certification of a nationwide unjust enrichment class is improper").[8]

13          Plaintiffs also cannot certify a nationwide class for their CAPA claim. Less than half of the 50

14  states have anti-phishing statutes, and those vary significantly – for example, in how they define

15  "phishing," whether they provide a private right of action, or whether they permit class actions. (Ex. 3.)

16  "The Court may not second guess the decisions of other states that choose to strike a different balance in

17  (E.D. Tex. Nov. 5, 2018), *R. & R. adopted*, 2018 WL 6701277 (E.D. Tex. Dec. 20, 2018) ("Texas courts

18  'have consistently held that an intrusion upon seclusion claim fails without evidence of a physical intrusion
    or eavesdropping on another's conversation with the aid of wiretaps, microphones, or spying.'"). The

19  elements of unjust enrichment "also vary materially from state to state." *Mazza*, 666 F.3d at 591. A survey
    of variations between the invasion-of-privacy and unjust enrichment laws of the fifty states, including

20  Florida, Georgia, and Texas, is included in <u>Exhibit 3</u>.

21  [8] Plaintiffs' citations (Mot. at 17) do not reflect current law and are also inapposite. *See, e.g., Cimoli v.
    Alacer Corp.*, 587 F. Supp. 3d 978, 992-95 (N.D. Cal. 2022) ("*Clay* fundamentally misunderstood *Mazza*

22  by assuming that the alleged misconduct occurs entirely in the state from which an alleged
    misrepresentation is disseminated."); *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 604 (N.D. Cal. 2015)

23  ("Even assuming [*Pecover*] remain[s] good law after *Mazza*, [it] do[es] not address whether [laws
    protecting "privacy rights of Californians," as opposed to laws broadly preserving "fair business

24  competition,"] should be applied extraterritorially."); *Andren v. Alere, Inc.*, 2017 WL 6509550, at *17
    (S.D. Cal. Dec. 20, 2017) (distinguishing *Bruno* and *Allen* because defendants in those cases "did not

25  conduct their own analysis" "to demonstrate the differences in the other state laws"); *Opperman v. Path,
    Inc.*, 2016 WL 3844326, at *10 (N.D. Cal. July 15, 2016) (defendants did not "show[] how the application

26  of California state law would frustrate the interests of any foreign state"); *Warner v. Toyota Motor Sales,
    U.S.A., Inc.*, 2016 WL 11770360, at *6 n.2 (C.D. Cal. Mar. 8, 2016) (noting that *Keilholtz*, which predated

27  *Mazza*, "applied California law to a nationwide class," which "appears to be inconsistent with *Mazza*");
    *id.* (noting that defendants in *Bruno* "provided no law from any jurisdiction for the Court to consider.

28  Thus, even if *Bruno* is still good law after *Mazza*, it is inapposite" (cleaned up)).

1   deciding how to best protect the privacy rights of their residents while balancing the desire to attract
2   businesses that provide valuable services to their residents." *In re Yahoo*, 308 F.R.D. at 605. And because
3   CAPA concerns unlawful ***representations***, Cal. Bus. & Prof. Code § 22948.2, the "place of the wrong" is
4   in the state where each putative class member used IAV. *See, e.g., Cimoli v. Alacer Corp.*, 587 F. Supp.
5   3d 978, 989 (N.D. Cal. 2022) ("Under California choice of law rules, the place of the wrong is where the
6   transaction related to the misrepresentation occurred and not where the intention to misrepresent was
7   formed."); *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 635 (N.D. Cal. 2015)
8   ("[T]he place of the wrong was the state where the misrepresentations were communicated . . . not the
9   state where the intention to misrepresent was formed or where the misrepresented acts took place.");
10  *Shuman v. SquareTrade Inc.*, 2020 WL 7458001, at *6 (N.D. Cal. Dec. 18, 2020) (collecting cases).

11      Additionally, California has no competing interest given that statutes like CAPA presumptively
12  do ***not*** operate extraterritorially "with respect to occurrences [*i.e.*, representations] outside the state." *See*
13  *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011). Plaintiffs cannot rebut this presumption by
14  relying on the location of Yodlee's general business operations or its contract with PayPal, neither of
15  which is "unlawful in the abstract" or sufficient, "standing alone," to create liability. *See id.* at 1208
16  (California law did not apply extraterritorially to claims for overtime wages even though "[t]he
17  decision-making process" to not pay the wages "occurred primarily from within [the defendant's]
18  headquarters [in] California"); *see also infra*, Part III(B)(3)(b) (Plaintiffs have no claim under PayPal-
19  Yodlee contracts that expressly disclaim third-party rights and were not disclosed to PayPal users).

20      Finally, it is well-established that a nationwide class cannot be certified for a California
21  Constitution claim. *See, e.g., Ahringer v. LoanDepot, Inc.*, 2024 WL 1135683, at *5 (C.D. Cal. Feb. 6,
22  2024) (striking nationwide class allegations because "[t]he [privacy] right the California Constitution
23  provides does not apply to people lacking a connection to California"). Plaintiffs previously conceded as
24  much by asserting this claim only on behalf of "Szeto and the California Class." (Dkt. No. 359 at 43.)

25          **2.    Plaintiffs Fail to Satisfy the Prerequisites of Rule 23(a).**

26      A named plaintiff who did not suffer the same injury as other putative class members is not typical
27  or adequate under Rules 23(a)(3) & (a)(4). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).
28  Moreover, "[c]lass certification is inappropriate where a putative class representative is subject to unique

defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *Withers v. eHarmony, Inc.*, 2010 WL 11520198, at *2 (C.D. Cal. June 2, 2010). Here, all three proposed class representatives (Rollier, Szeto, and Cottrell) are subject to unique defenses that render them atypical and inadequate under Rule 23(a)(3) and (4).

*First*, none of the three proposed class representatives can demonstrate concrete injury. (*Supra*, Part III(A).) Yodlee also has no IAV data for Szeto in the PayPal database, indicating that any such data was never stored or has since been deleted. (Ex. 1.)

*Second*, while Yodlee cannot identify a user's location from IAV data in its systems, Rollier, Szeto, and Cottrell each testified under oath that they ███████████████████████████████████████████████████████████████████████████ (*Id.*). Under California's choice-of-law rules, the laws of Florida, Georgia, and Texas therefore govern their respective claims. (*Supra*, Part III(B)(1).) Proposed class representatives are neither typical nor adequate where, as here, their claims are – or even arguably may be – governed by the laws of different states than the claims of other putative class members. *See, e.g.*, *In re Netflix, Inc., Sec. Litig.*, 2012 WL 1496171, at *5 (N.D. Cal. Apr. 27, 2012) ("There is no requirement at this early stage to prove a defense, only to show a degree of likelihood that a unique defense might play a significant role at trial.").

*Third*, Yodlee did ***not*** collect transaction data for Rollier, Szeto, or Cottrell. (Ex. 1.) Plaintiffs therefore cannot represent a class based on Yodlee's collection, storage, or use of such data. *See Lierboe*, 350 F.3d at 1022; *Moreno v. AutoZone, Inc.*, 410 F. App'x 24, 25 (9th Cir. 2010). This failure to proffer a viable representative precludes class certification as to Plaintiffs' unjust enrichment claim, which rests entirely on (unfounded) allegations concerning IAV transaction data, and their invasion-of-privacy claims based on transactions data. (*See* Dkt. No. 266 at 18, 25.)

*Fourth*, Szeto and Cottrell further granted express permissions to store their credentials, never de-linked their accounts or revoked Yodlee's access, and Cottrell continued using IAV even ***after*** joining this lawsuit. (Ex. 1.) Each of these facts separately defeats typicality and adequacy as to any claim that Yodlee stored credentials or otherwise provided IAV services to PayPal in a highly offensive manner or contrary to reasonable expectations. *See, e.g.*, *Svenson v. Google Inc.*, 2016 WL 8943301, at *17 (N.D.

1  Cal. Dec. 21, 2016) (denying class certification "for failure to establish typicality and adequacy" where

2  plaintiff purchased product "a second time . . . *after* discovering [defendant's challenged] practice").

3        *Fifth*, Rollier and Szeto used IAV in 2017 and 2018, respectively (Ex. 1), so their claims would be

4  time-barred even if California law applied.[9]  Even if each argues that an exception applies, the fact that

5  their claims implicate timeliness issues is enough to render them atypical and inadequate given that other

6  putative class members may not be subject to the same defense.  *See, e.g.*, *Nguyen v. Nissan N. Am., Inc.*,

7  487 F. Supp. 3d 845, 858-60 (N.D. Cal. 2020) ("Numerous courts within the Ninth Circuit have applied

8  *Hanon* to hold that statutes of limitations issues can preclude a finding of typicality . . . even [where] the

9  plaintiffs argued that their claims should be equitably tolled.").

10        **3.**      **A Multitude of Individualized Issues Predominate as to Every Claim.**

11        Class certification is also improper because what Plaintiffs characterize as "common" questions

12  (Mot. at vii) are posed "at an exceedingly high level of generality" and ignore ample record evidence

13  confirming that "too many individual questions remain, and those questions would predominate."  *See*

14  *Corvello v. Wells Fargo Bank N.A.*, 2016 WL 3995909, at *6 (N.D. Cal. Jan. 29, 2016).  "In determining

15  whether common questions predominate, the Court [must identify] the substantive issues related to the

16  plaintiffs' claims (both the causes of action and affirmative defenses), and then consider[] the proof

17  necessary to establish each element of the claim or defense, and how these issues would be tried."

18  *Sarmiento v. Sealy, Inc.*, 2020 WL 4458915, at *5 (N.D. Cal. May 27, 2020), *aff'd*, 2022 WL 4008004

19  (9th Cir. Sept. 2, 2022).  Here, that analysis confirms that individualized inquiries "predominate as to each

20  cause of action for which [Plaintiffs] seek class certification" under Rule 23(b)(3).  *See id.*

21        **a)**      **CAPA.**

22        CAPA prohibits using the Internet "to solicit, request, or take any action to induce another person

23  to provide identifying information by representing itself to be a business without the authority or approval

24  of the business." Cal. Bus. & Prof. Code § 22948.2.  Individuals may bring an action only if they were

25  "adversely affected," and only "against a person who has directly violated [CAPA]." *Id.* § 22948.3(a)(2).

26

---

27  [9] *See, e.g.*, Civ. Code § 340(a) (setting one-year limitations period for an "action upon a statute for a

28  penalty" like CAPA); *Hart*, 526 F. Supp. 3d 592, 599 (two years for invasion of privacy); *Wu v. Sunrider Corp.*, 793 F. App'x 507, 510 (9th Cir. 2019) (two years for unjust enrichment).

At minimum, adjudication of this claim would require case-by-case evaluation of every IAV flow PayPal used during the putative class period.  This includes determining,  for each and every putative class member, at least: (i) which PayPal IAV flow the user saw; (ii) what that flow looked like at the time (including, *e.g.*, whether it displayed the user's bank logo and said "Bank Login" or "Confirm Instantly"); (iii) what that flow or PayPal's hyperlinked terms disclosed about PayPal or Yodlee; (iv) whether, notwithstanding the disclosures, the IAV flow somehow led the user to believe they were dealing with their bank; (v) what role, if any, Yodlee had in designing or hosting the screen with the complained-of representation; (vi) whether that representation actually induced the user to provide their login credentials; (vii) whether the credentials were sent to PayPal or to Yodlee; and (viii) how, if at all, the user was "adversely affected" as a result.  As illustrated by the non-exhaustive examples in **Figure 2** below, these questions cannot be answered on a classwide basis, and some – like which specific IAV flow PayPal presented to a specific user – may not be answerable at all.  (*See supra*, Part II(B), (F).)

**Figure 2**



Plaintiffs cite nothing to suggest these issues can be resolved with common proof. Unlike in *Ellsworth v. U.S. Bank*, 2014 WL 2734953 (N.D. Cal. June 13, 2014), which "involve[d] form contracts and standardized policies and practices applied on a routine basis to all customers by a bank," *id.* at *20, what Plaintiffs here characterize as a single "fake bank-login portal" is actually many different IAV flows containing multiple screens that must be considered holistically and that evolved throughout the putative class period with different appearances, language, logos, and disclosures presented to different users in different ways. (*Supra*, Part II(B), (F).) Unlike in *DZ Reserve*, where "slight variations in the other information available" did not defeat commonality because a single statement viewed by all users was the "nucleus of the fraud," 96 F.4th at 1237, resolution of Plaintiffs' CAPA claim requires consideration of the entire PayPal IAV flow, including materially different credential screens, hyperlinked terms, and other disclosures during the putative class period. (Exs. 1, 2.) Plaintiffs cannot manufacture a common question by cherry-picking what they assert (without basis) to be "core features" of the PayPal IAV flow while ignoring others (*see* Mot. at 20 n.84), as their claims require the Court to consider all relevant context in analyzing the complained-of representation and its effect on individual users. *See, e.g., Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (a court evaluating a statement "must take into account 'all parts of the communication that are ordinarily heard or read with it'"); *Bobo v. Optimum Nutrition, Inc.*, 2015 WL 13102417, at *4 (S.D. Cal. Sept. 11, 2015) ("A plaintiff cannot pursue a claim based on a statement that can only be misleading when the information surrounding it is ignored.").

Contrary to Plaintiffs' suggestion, the availability of statutory *damages* under CAPA (Mot. at 22-23) does not obviate the need for individualized inquiries to determine *liability*. (*See also* Ex. 29

¶¶ 107-08 (Plaintiffs' statutory damages model does not differentiate between PayPal's many different IAV flows).)  Plaintiffs' argument also elides the nexus between statutory damages and actual harm; where, as here, "many [putative] class members appear to have suffered little, if any, harm, such that a statutory damages award would be a disproportionate penalty . . . sorting out these disproportionate damages awards would require individualized analyses that would predominate over common ones." *Campbell v. Facebook Inc.*, 315 F.R.D. 250, 269 (N.D. Cal. 2016).[10]

### b)      Invasion of Privacy.

Claims for invasion of privacy under California common law and the California Constitution generally are analyzed together and require (1) violation of a reasonable expectation of privacy (2) in a manner highly offensive to a reasonable person.  *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286-87 (2009); *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1088 (N.D. Cal. 2022)**,** *aff'd*, 2024 WL 937247 (9th Cir. Mar. 5, 2024)**.**  As to the first element, each plaintiff "must have conducted himself or herself in a manner consistent with an actual expectation of privacy."  *Hart v. TWC Prod. & Tech. LLC*, 2023 WL 3568078, at *9 (N.D. Cal. Mar. 30, 2023); *see also Hammerling*, 2024 WL 937247, at *3 (plaintiffs "have no reasonable expectation of privacy" against data practices disclosed in terms or policies).  As to the second element, California law "provides no bright line on offensiveness; each case must be taken on its facts."  *Hernandez*, 47 Cal. 4th at 287 (cleaned up).  "This District sets a high bar when assessing the 'highly offensive' requirement"; data practices constituting "routine commercial behavior" do not qualify. *Hammerling*, 615 F. Supp. 3d at 1088, 1090.  Further, an intrusion may not be actionable if it is "justified by one or more competing interests," if "alternative means were not reasonably available," *Hernandez*, 47

---

[10] Plaintiffs' citations are inapposite.  (*See* Mot. at 22-23.)  In *Nolen v. PeopleConnect*, statutory damages "dispose[d] of any commonality/predominance concerns" as to *damages*, not *liability*, and only where the plaintiff had "common proof" of actual injury.  2023 WL 9423286, at *21 (N.D. Cal. Dec. 14, 2023); *see also, e.g.*, *Anti Police-Terror Project v. City of Oakland*, 2021 WL 4846958, at *8 (N.D. Cal. Oct. 18, 2021) ("The predominance requirement must be satisfied as to *all the elements* of the claims Plaintiffs seek to certify." (italics added)).  *Kang v. Credit Bureau Connection* allowed plaintiffs to seek "statutory damages without demonstrating actual harm" under the Fair Credit Reporting Act only because a violation of that statute is sufficient to establish a right of action.  *See* 2022 WL 658105, at *6 (E.D. Cal. Mar. 4, 2022) (citing 15 U.S.C. § 1681n(a)).  That reasoning is irrelevant to CAPA, which expressly limits its private right of action to "adversely affected" individuals.  *See* Cal. Bus. & Prof. Code § 22948.3(a)(2).  Similarly, *McMillion v. Rash Curtis & Associates* concerned Telephone Consumer Protection Act claims that did not require a separate showing of harm where – unlike in this case – the plaintiffs had otherwise satisfied every element of Rule 23.  *See* 2017 WL 3895764, at *5 (N.D. Cal. Sept. 6, 2017).

1   Cal. 4th at 287-88, or if a plaintiff consented to the complained-of conduct.  *See Hart*, 2023 WL 3568078,

2   at *9-10   These issues raise a host of individualized inquiries as to each of Plaintiffs' theories that Yodlee

3   collected, stored, or used PayPal's IAV data, precluding certification of any class under Rule 23(b)(3).

4   　　　　Collection theory.  As explained, determining whether Yodlee engaged in "deceptive tactic[s]" by

5   "mimicking a bank login portal" (Mot. at 18) cannot be answered without many individualized inquiries.

6   (*Supra*, Part III(B)(3)(a).)  Similarly, whether Yodlee "obtained unwanted access to data" (Mot. at 18)

7   requires asking, as to each putative class member, at least: (i) what access each user understood they were

8   providing; (ii) what expectations (if any), each user had about that access; (iii) whether each user acted

9   consistently with those expectations; (iv) whether Yodlee's access exceeded any reasonable expectations;

10  and (v) whether any "unwanted access" was highly offensive.  (Ex. 35 (Wilcox Rpt.) ¶¶ 75-79; Ex. 28

11  (Good Dep.) at 129:16-20.)  These issues cannot be resolved on a classwide basis because – as Plaintiffs'

12  and Yodlee's experts both agree – they turn on each putative class member's individual circumstances.

13  (*See* Ex. 35 ¶ 78; Ex. 36 at 117:20-118:21; Ex. 28 at 129:16-20, 197:25-198:10, 202:14-203:8.)

14  　　　　Plaintiffs' own circumstances again prove the point.  For example, whether Yodlee had "unwanted

15  access" to bank transaction data cannot be answered "in one stroke" (*Dukes*, 564 U.S. at 350), since

16  Yodlee did not collect such data for every putative class member, or for any of the proposed class

17  representatives.  (*See supra*, Part II(F).)  Other individualized facts inconsistent with Plaintiffs' alleged

18  expectation of privacy include evidence that, for example, Rollier ███████████████████████████

19  ███████████████████████████████; Szeto and Cottrell ██████████████████████████████

20  ████████████████████████████████████████████████ and Cottrell ████████████

21  ████████████████████████ (Ex. 1.)  These (and other) individual circumstances are directly

22  relevant to the reasonableness of Plaintiffs' asserted expectations and the purported offensiveness of any

23  intrusion.  *See, e.g.*, *Hart*, 2023 WL 3568078, at *10 (the purportedly "common question of whether users

24  maintained a reasonable expectation of privacy . . . necessitates an individualized factual inquiry into

25  [what] individual users understood" and whether their conduct was "consistent with an actual expectation

26  of privacy").  These individualized issues would predominate as to each and every putative class member.

27  　　　　Storage theory.  Determining whether Yodlee stored IAV data "without consent" (Mot. at 18)

28  requires asking, as to each putative class member, at least (i) whether the user granted permission to store

their data ███████████████ (Ex. 1); (ii) what expectations (if any) the user had about that storage; (iii) whether the user acted consistently with those expectations, including by de-linking their accounts or revoking Yodlee's access ██████████████████ (Ex. 1)); (iv) whether Yodlee stored their data in a manner contrary to any reasonable expectations; (v) whether and when Yodlee deleted the user's data; (vi) why Yodlee stored or deleted that data; (vii) whether the reason related to Yodlee's services for PayPal (*e.g.*, the need to store credentials for "balance refresh" (*see* Dkt. No. 178-17)) or to Yodlee's system requirements; and (viii) whether any specific instances of storage occurred in a highly offensive manner.  These and other individualized questions cannot be answered "in one stroke" (*Dukes*, 564 U.S. at 350), and some – like whether Yodlee collected and stored a specific user's IAV data – may not be answerable at all (*see supra*, Part II(C)).  *See, e.g.*, *Williams v. Apple, Inc.*, 338 F.R.D. 629, 642 (N.D. Cal. 2021) (denying class certification where plaintiffs "fail[ed] to show [by a preponderance of the evidence] that they could determine – on a classwide basis – which class members in fact had their data stored").[11]

Plaintiffs try to gloss over these individualized issues by arguing, based on a 2006 agreement between Yodlee and PayPal and a few emails exchanged between non-legal Yodlee personnel, that "Yodlee knew retaining PayPal users' data was improper and lied to keep it a secret."  (*See* Mot. at 1-2, 10-13.)  This argument ignores important context and evidence relating to the PayPal-Yodlee relationship spanning two decades and forty-plus contract documents – including, for example, a SOW that required Yodlee to store credentials (Dkt. No. 178-17) and emails showing that PayPal knew by at least November 2015 that Yodlee would store transactions to enable IAV+ for PayPal.  (*See* Ex. 5 ("PayPal [asked] re: storage of 90 days of transactions (does Yodlee store?)  [A:] Yodlee does store those transactions.").)[12]

---

[11] *See also, e.g.*, *Kumandan v. Google LLC*, 2023 WL 8587625, at *13 (N.D. Cal. Dec. 11, 2023) ("[C]ourts in this Circuit have denied class certification in cases involving [privacy] claims . . . because 'the individual nature of the objective expectations inquiry' raised issues that defeated commonality or predominance."); *Hart*, 2023 WL 3568078, at *9 (because "California law . . . contemplates that certain factors personal to an individual may affect whether that individual maintained a reasonable expectation of privacy," "courts have found individualized issues to overwhelm common issues at class certification"); *In re Toll Roads Litig.*, 2018 WL 4952594, at *7 (C.D. Cal. July 31, 2018) (denying class certification where "[t]he reasonable expectation of privacy of class members . . . would turn on a slew of potential factors affecting their understanding of [relevant facts]"); *Saulsberry v. Meridian Fin. Servs., Inc.*, 2016 WL 3456939, at *15 (C.D. Cal. Apr. 14, 2016) (denying class certification where "[w]hether a consumer[] [had an] objectively reasonable expectation . . . depends on a great variety of individual circumstances, such as the individual's knowledge of . . . or prior consent" to the challenged practices).

[12] Plaintiffs' expert ignored this and other record evidence in his opinion.  (Ex. 27 at 139:19-142:19.)

The 2006 agreement between Yodlee and PayPal is also ***irrelevant*** because Plaintiffs do not (and cannot) claim to have any rights under that contract. (Dkt. No. 178-68 § 16.8 (disclaiming "any rights, remedies, obligations or liabilities whatsoever" in favor of third parties).) Moreover, Plaintiffs and putative class members could not have known about, let alone reasonably relied on, any specific terms of confidential agreements between Yodlee and PayPal *See, e.g.*, *In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 982 (N.D. Cal. 2014) (users "could not have relied on any representation" they "did not see, read, hear or consider . . . before creating their account"); *see also Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1213 (N.D. Cal. 2014) ("[W]hether [a defendant] disclosed the duration for which it would store [data] is not relevant to the issue of consent.").

Use theory. As explained, undisputed evidence establishes that Yodlee's system was designed to programmatically filter out PayPal IAV data before it could be used in data panels or to train TDE (*supra*, Part II(E)), and class certification must be denied where the facts fail to support the claim or theory at issue. *See Comcast,* 569 U.S. at 33-34*; Dukes*, 564 U.S. at 350.

Consent. In addition, consent is a defense to invasion of privacy claims. *See* Civ. Code § 3515; *e.g.*, *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017). Evaluating this defense requires asking, as to each putative class member, at least (i) which specific PayPal IAV flow the user "accepted and agreed" to (*see* Ex. 2); (ii) what disclosures, terms, and privacy statements were included in that IAV flow; (iii) whether the user expressly granted permission to check their bank transactions and store their credentials, ████████████████████ (iv) what other information the user knew or should have known from other sources;[13] and (v) whether the user took other actions manifesting consent to the challenged conduct, such as continuing to use IAV after joining the lawsuit or learning of the claims ███████████ (*See* Ex. 1.) These issues turn on facts specific to each user and cannot be adjudicated on a classwide basis. *See, e.g.*, *In re Google RTB Consumer Priv. Litig.*, 2024 WL 2242690, at *14 (N.D. Cal. Apr. 4, 2024) (denying class certification where "individualized issues [would] predominate" as to consent due to "each account holder's individual, and subjective, understanding of [the defendant's] and third parties'

---

[13] *See, e.g.*, Dkt. No. 359 ¶¶ 92-95 (operative complaint alleging that multiple public sources disclosed the complained-of conduct in 2016 and 2017); Ex. 15 (Yodlee explaining in a 2015 post that it may retrieve "[u]p to 90 days of Transactions" for IAV); Ex. 16 (2017 article explaining "it's Yodlee that stores [your credentials], accesses your account, reads your balance and then provides . . . aggregators with your data").

1    disclosures"); *Saulsberry*, 2016 WL 3456939, at *15 (denying class certification where "[w]hether a

2    consumer[] [had an] objectively reasonable expectation . . . depends on a great variety of individual

3    circumstances, such as the individual's knowledge of . . . or prior consent" to the challenged practices).

4         In sum, Plaintiffs' invasion-of-privacy claims raise a multitude of individualized questions that

5    predominate over any arguably common questions, precluding class certification under Rule 23(a)(2) and

6    23(b)(3).  Courts in this circuit have reached the same conclusion based on issues far less individualized

7    than those that would have to be resolved to determine any liability in this case.  *See, e.g.*, *C.R. Educ. &*

8    *Enf't Ctr. v. Hosp. Properties Tr.*, 317 F.R.D. 91, 101 (N.D. Cal. 2016), *aff'd*, 867 F.3d 1093 (9th Cir.

9    2017) ("[P]roving that each of the 142 hotels violated the ADA would require 142 trials within a trial . . .

10   strongly counsel[ing] against a finding of commonality."); *Robbins v. Phillips 66 Co.*, 343 F.R.D. 126,

11   131 (N.D. Cal. 2022) ("Even a uniform policy on paper is not sufficient for class certification if there is

12   evidence behavior would need to be extensively addressed individually. . . .  Although there is a common

13   question, there are not common answers."); *Pollack v. Foto Fantasy, Inc.*, 2010 WL 11595486, at *3 (C.D.

14   Cal. July 15, 2010) (four "individual, fact-specific questions" bearing on "[t]he reasonableness of each

15   customer's expectation of privacy" made it "illogical to conclude that common questions predominate").

16        The case law cited by Plaintiffs is distinguishable.  *Opperman v. Path* challenged software that

17   operated the same way as to all class members such that the "highly offensive" standard would "not require

18   individualized determinations of class members' subjective expectations." 2016 WL 3844326, at *11,

19   *17 (N.D. Cal. July 15, 2016).  Similarly, in *Rodriguez v. Google*, individualized inquiries did not

20   predominate because the defendant made a "common representation" to all users.  2024 WL 38302, at *5

21   (N.D. Cal. Jan. 3, 2024).  In contrast to those straightforward cases, Yodlee has identified many potential

22   differentiating factors that would require individual proof as to tens of millions of putative class members,

23   including as to what IAV flows and disclosures each user viewed, what data (if any) Yodlee collected and

24   stored for each user, whether Yodlee deleted the data or retained it to provide services to PayPal, and

25   whether each putative class member acted consistently with an alleged "reasonable expectation of

26   privacy" as to any of their data provided to Yodlee.  *See, e.g.*, *Hart*, 2023 WL 3568078, at *9 ("[C]ertain

27   factors personal to an individual may affect whether that individual maintained a reasonable expectation

28   of privacy . . . [a]ccordingly, courts have found individualized issues to overwhelm common issues at

class certification for such claims."); *Pollack*, 2010 WL 11595486, at *3 ("[t]hough 'objectively reasonable' is not a subjective standard," Rule 23(b)(3) is not satisfied where "the inquiry requires deposing each customer and posing individual, fact-specific questions"); *accord Rodriguez*, 2024 WL 38302, at *6 (while "the test under the state intrusion upon seclusion and invasion of privacy claims is an objective one . . . analysis of surrounding circumstances may sometimes be necessary to determine whether a user *maintained* their reasonable expectation of privacy").

<u>Damages</u>.  Plaintiffs also have not proffered any "classwide methodology for measuring privacy [*i.e.*, compensatory] damages." (*See* Mot. at 21.)  "[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35.  As explained by Lorin Hitt, Yodlee's damages expert, any attempt to model compensatory damages for Plaintiffs' claims in this case must account for the wide heterogeneity of relevant individual circumstances – including, for example, unique factors affecting each user's privacy tradeoff or cost-benefit analysis in weighing the convenience of using IAV against the perceived cost of providing personal information to do so. (Ex. 29 ¶¶ 38-65.)

Plaintiffs, however, performed no such analysis.  Their damages expert, Gary Olsen, purports to calculate compensatory damages based on the value of bank transaction data that Yodlee retrieved for PayPal's IAV service, but none of his calculations pass muster under *Comcast* or Rule 702.[14]  Unlike the damages model in *Rodriguez*, which used as its input the amount the defendant *actually* paid consumers for the exact data at issue in that case, *see* 2024 WL 38302, at *12, Mr. Olsen improperly based his calculations on unreliable Internet sources with no relation to the PayPal IAV data at issue. (*See* Ex. 29 ¶¶ 73-87.)  Mr. Olsen also purported to calculate purported damages for storing login credentials based on the counterfactual that Yodlee "could" use credentials to collect more transaction data than what PayPal requested, though there is no evidence that Yodlee has ever done so. (Ex. 29 ¶¶ 102-06.)  Further, Mr. Olsen's model impermissibly assigns damages to individuals for whom Yodlee collected no transaction data – including the proposed class representatives. (*Id.* ¶ 112.)  In short, the only conclusions that can be drawn from Mr. Olsen's opinions are (1) that Plaintiffs have no damages theory at all based

---

[14] For these and other reasons, Yodlee is concurrently moving to exclude Mr. Olsen's opinions.

on mere collection or storage of their data (*see id.* ¶¶ 102, 106), and (2) even as to transaction data, Plaintiffs have identified no way of proving "privacy damages" on a classwide basis.[15]

### c) Unjust Enrichment.

"The elements of an unjust enrichment claim are 'the receipt of a benefit and the unjust retention of the benefit at the expense of another.'" *Markels v. AARP*, 689 F. Supp. 3d 722 (N.D. Cal. Aug. 29, 2023). As explained, there is no such benefit here because undisputed evidence shows that Yodlee did not use PayPal IAV data for its own "commercial purposes, like developing the data models used for TDE and Yodlee's Data Panels businesses." (*See* Mot. at 20, 23; *supra*, Part II(E).)

Plaintiffs also have not proffered a viable classwide model of any disgorgement damages based on "a stake in the profits garnered from their personal data." (*See* Mot. at 23-24.) There can be no "reasonable approximation of the amount of [Yodlee's] wrongful gain" (*id.* at 23), let alone on a classwide basis, when Plaintiffs have not identified even a single instance of PayPal IAV data being used for data panels or TDE. (*See supra*, Part II(E).) But even if they had, their purported disgorgement model does not identify what portion of Yodlee's revenues would be attributable to that hypothetical occurrence. Ex. 31 (Olsen Dep.) at 158:25-159:23, 173:6-15.)[16] Plaintiffs' purported damages model "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)" when it does not attempt to "measure only those damages attributable to [their] theory." *Comcast*, 569 U.S. at 35.

Nor can damages be measured on a classwide basis without accounting for any benefit received by putative class members, including the convenience of linking bank accounts with IAV, which Plaintiffs' expert fails to do (*see* Ex. 31 at 173:6-15). *See, e.g., Beaver v. Omni Hotels Mgmt. Corp.*, 2023 WL 6120685, at *21 (S.D. Cal. Sept. 18, 2023) ("Because the model fails to account for value class members may have received . . . the Court does not find the profit disgorgement damages model an

---

[15] Plaintiffs' punitive damages claim makes no difference. *Ellis v. Costco Wholesale*, cited by Plaintiffs (Mot. at 23), explained that punitive damages must be "both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages," and found class treatment appropriate only where all requirements of Rule 23 had been satisfied. *See* 285 F.R.D. 492, 540 (N.D. Cal. 2012). Here, determining the reasonableness and proportionality of punitive damages, if any, will require individualized inquiries as to tens of millions of putative class members. (*See* Mot. at vi.)

[16] "It is insufficient to allege, without more, that a company used . . . data to improve its technologies, which improved the effectiveness of its products and made them more commercially valuable." *Delgado v. Meta Platforms, Inc.*, 2024 WL 818344, at *9 (N.D. Cal. Feb. 27, 2024).

---

appropriate measure of damages here."). Here, Plaintiffs and putative class members benefited from being able to link bank accounts to PayPal for immediate use; "there is no equitable reason for invoking restitution when the plaintiff gets the exchange he expected." *See Markels*, 689 F. Supp. 3d at 722

### d)    Statutes of Limitations.

Plaintiffs' claims all have a one- or two-year statute of limitations. (*Supra*, n.9.) Plaintiffs Rollier and Szeto, however, used IAV to link accounts to PayPal more than two years before this lawsuit. (Ex. 1.) The proposed class period, moreover, begins over *six years* before the lawsuit was filed, necessitating individualized inquiries to determine, as to each putative class member, at least (i) for accrual purposes, when the user used PayPal's IAV service; and (ii) for tolling purposes, what information they knew or should have known before this lawsuit was filed (*see supra*, n.13)  *See also Nguyen*, 487 F. Supp. 3d at 858-60.  This further confirms that individualized issues predominate in this case.

### 4.    A Class Action Is Not a Superior Method for Adjudicating Plaintiffs' Claims.

Part of the "rigorous analysis" required by Rule 23 is careful consideration of "how a trial on the merits would be conducted if a class were certified." *See Comcast*, 569 U.S. at 33; *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *12 (N.D. Cal. Mar. 18, 2014). This requires the Court to "formulate some prediction as to how specific issues will play out." *In re Google*, 2014 WL 1102660, at *12. "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001).  This is an independent reason to deny certification; managing a class action involving predominantly individualized inquiries as to tens of millions of putative class members over six-plus years (*see* Mot. at vi) would be prohibitively difficult, if not impossible.  *See* Fed. R. Civ. P. 23(b)(3)(D); *see, e.g.*, *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 652 (C.D. Cal. 1996) (predominance aside, "so many individual issues might also exist that class action treatment would not be appropriate").

Plaintiffs assert without explanation or support that "managing this case as a class action is feasible given the 'variety of procedural tools courts can use to manage the administrative burdens of class litigation." (Mot. at 24-25.)  Plaintiffs make no attempt to show what "procedural tools" are relevant or feasible to manage *this case* as a class action.  (*See id.*)  The record shows no class could be identified or managed, including because Yodlee does not typically know PayPal users' identities or the states where

they reside or used IAV.  (Ex. 22 ¶ 5; *see also* Ex. 29 ¶ 109 (Plaintiffs' damages expert proffered no way to identify a California subclass).)  Even attempting to identify a single IAV user and locate what, if any, IAV data is stored in Yodlee's system would require user-specific information from both the individual user and PayPal, and even then there is no guarantee of success because PayPal did not use unique GUIDs for most of the putative class members.[17]  Such a process would have to be replicated ***tens of millions*** of times just to try to determine who the putative class members even are.  (*See* Mot. at vi.)  Plaintiffs do not explain how these threshold issues or the legion of other individualized questions that must be resolved to determine any liability would be managed in a classwide proceeding.  *See, e.g.*, *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 632 (9th Cir. 2020) (explaining that "the superiority prong might best lend itself to considering [the] issue" of "logistical difficulties attendant to identifying plaintiffs").[18]

Plaintiffs' failure to show superiority by a preponderance of evidence is fatal.  *See Olean*, 31 F.4th at 664-65.  Courts have denied class certification based on far fewer (and less complicated) individualized issues than here.  *See, e.g.*, *Zinser*, 253 F.3d at 1192 (tens of thousands of individuals presented "too many individual issues for the Court to manage for class adjudication to be deemed superior" where "the causes of plaintiffs' injuries [were] not entirely the same, since the injuries did not occur at the same time, place or under the same conditions"); *Medina v. Cnty. of Riverside*, 308 F. App'x 118, 120 (9th Cir. 2009) ("intense individual examinations" were required to determine wiretapping liability as to inmates of one prison who may or may not have made privileged calls).  This Court should reach the same conclusion.

### 5.    The Proposed Rule 23(b)(2) Class Cannot Be Certified.

Plaintiffs also propose an injunctive relief class "to stop Yodlee's retention and use of Class Members' banking data, which remains in Yodlee's systems to this day." (Mot. at 25.)  But as Plaintiffs admit, what they characterize as a Rule 23(b)(2) class is "identical" to their proposed Rule 23(b)(3) class (Mot. at vi, 25.)  In other words, Plaintiffs effectively seek to certify the same class for both damages and injunctive relief.  (*See id.*)  Rule 23(b)(2), however, permits class certification "only where the *primary*

---

[17] Even with the benefit of discovery, this process took months for just five Plaintiffs.  (Ex. 22 ¶¶ 4-8.)

[18] Plaintiffs' alternative request for nominal damages, which Mr. Olsen purports to calculate by multiplying the number of "unique Class Members" by $1 (Mot. at 22), flunks Rule 23 for the same reasons.  Unlike *Opperman*, cited by Plaintiffs (Mot. at 22), where "problems of proof" did not bar classwide determination of nominal damages, *see* 2016 WL 3844326, at *16, it is not possible to determine the number of "unique Class Members" in this case.

---

relief sought is declaratory or injunctive." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011) (italics added).  And there can be no question that the focus of this action is monetary relief.  (*See, e.g.*, Mot. at 21-24 (arguing for "five types of monetary relief" and estimating $200–$400 million in damages for invasion of privacy).)  Under these circumstances, Plaintiffs' "claims for monetary damages prevent the Court from certifying this putative class under Rule 23(b)(2)." *Siino v. Foresters Life Ins. & Annuity Co.*, 340 F.R.D. 157, 161 (N.D. Cal. 2022); *see also Dukes*, 564 U.S. at 360-64 (Rule 23(b)(2) should not be read "to nullify [Rule 23(b)(3)'s procedural] protections whenever a plaintiff class, at its option, combines its monetary claims with a request . . . for an injunction"); *Ellis*, 657 F.3d at 987 ("The absence of these protections in a class action predominantly for monetary damages violates due process.").

Moreover, "Rule 23(b)(2) does not authorize class certification 'when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.'" *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 481 (N.D. Cal. 2014) (citing *Dukes*, 564 U.S. at 360).  There is no evidence that IAV data for all putative class members "remains in Yodlee's systems to this day." (*See* Mot. at 25.)  And many putative class members – not to mention PayPal itself – will ***want*** Yodlee to store data to enable continued IAV functionality for new purchases and account-linkages.  (*See* Dkt. No. 178-17 (Yodlee is required to store login credentials to perform balance refreshes for PayPal).)

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion to certify classes should be denied in its entirety.


Dated:  June 12, 2024                                 Respectfully submitted,


                                                      /S/ Megan L. Rodgers
                                                      Megan L. Rodgers

                                                      MEGAN L. RODGERS (SBN 310344)
                                                      **COVINGTON & BURLING LLP**
                                                      3000 El Camino Real
                                                      5 Palo Alto Square, 10th Floor
                                                      Palo Alto, CA 94306-2112
                                                      Telephone: (650) 632-4700
                                                      Email: mrodgers@cov.com

                                                      ZIWEI SONG (SBN 313842)
                                                      DANIEL RIOS (SBN 326919)
                                                      **COVINGTON & BURLING LLP**

Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: (415) 591-6000
Email: ksong@cov.com
Email: drios@cov.com

ERIC C. BOSSET (*pro hac vice*)
TARA SUMMERVILLE (*pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Email: ebosset@cov.com
Email: tsummerville@cov.com

ANDREW LEFF (*pro hac vice*)
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
Email: aleff@cov.com

*Attorneys for Defendant Yodlee, Inc.*