# EXHIBIT 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

DARIUS CLARK, JOHN H. COTTRELL, DAVID LUMB, KYLA ROLLIER, and JENNY SZETO, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

YODLEE, INC.,

Defendant.

Case No. 3:20-cv-05991-SK

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF SERGE EGELMAN, Ph.D.

San Francisco, California

Friday, May 10, 2024

REPORTED BY:

Derek L. Hoagland, CSR No. 13445

Job No. 98187

LLP in New York on behalf of Defendant Yodlee, Inc.

THE VIDEOGRAPHER: Thank you.

Will the court reporter please swear in the doctor.

(Whereupon, the deponent is duly sworn by the court reporter.)

MR. BOSSET: Good morning, Dr. Egelman.

THE DEPONENT: Good morning.

MR. BOSSET: Thank you for being here for your deposition.

SERGE EGELMAN, Ph.D.,
having first been duly sworn,
was examined and testified as follows:

EXAMINATION

BY MR. BOSSET:

Q. Have you been deposed before?

**A. I have.**

Q. How many times?

**A. I couldn't tell you off the top of my head. Four, maybe. It's on my CV.**

Q. Okay. Have you ever given trial testimony before?

**A. I have not.**

A. Mm-hmm.
Q. What's that case about?
A. Oh, it was a -- during the pandemic, a sports club that had closed its doors but was continuing to charge members, you know, their membership fee despite not providing the service, and then refusing to offer refunds.
Q. What was -- did you offer an expert opinion in that case?
A. I did.
Q. On -- what was the subject matter?
A. The defense offered a survey that they claimed showed that consumers were totally okay with this, and as someone who has administered hundreds of surveys throughout my career, I was asked to opine on the quality of the survey that was used by the defense to -- to reach that conclusion.
Q. And, again, you were retained by the plaintiff in that case, right?
A. By the government, yes.
Q. The government was the plaintiff in that case?
A. Yeah.
Q. You also identify having worked on the In re Vizio Consumer Privacy Litigation. Is that correct?
A. Yeah.

BY MR. BOSSET:
Q. It's possible?
**A. It's possible. I mean, I -- as an academic, I tend to write at length. And so usually I try and be verbose, and then remove stuff throughout the editing process.**
Q. Okay. Were there any sections of your report that were actually provided to you by Plaintiffs' counsel?
**A. No.**
Q. How many drafts did you --
**A. Actually, that's not true.**
Q. Okay.
**A. They -- the Appendix 2 that you alluded to earlier, based on my footnotes that I had added, they compiled, you know, that full list of citations that appeared as Appendix 2.**
Q. Okay. And Appendix 2 are the materials that you reviewed in connection with your work in the case?
**A. Right, which are all cited throughout the report. But then they took the extra step of compiling them into one list of all the sources.**
Q. Mm-hmm. Who provided you with those materials?
MR. STEINBERG: Objection.
THE DEPONENT: What do you mean? I mean,

throughout this process, you know, Plaintiffs' counsel gave me documents that they had received from discovery.
BY MR. BOSSET:
Q. Okay. There are also some documents that are titled "publicly available documents"?
**A. Sure.**
Q. Did you have all of those in your possession before this matter began?
MR. STEINBERG: Objection.
THE DEPONENT: I'm not sure what you mean.
BY MR. BOSSET:
Q. What part of what I said is not --
**A. Define possession. I mean, so if it's a website that I'm citing, how do I possess the website.**
Q. Did Plaintiffs' counsel provide to you any of the documents that you list under publicly available documents in Appendix 2?
**A. I would -- let me -- let's look through Appendix 2.**
**So, like, the first one, the CFPB guidelines, those were cited in several of the discovery materials, and so that was given to me as part of most of the discovery materials because I think that was an included exhibit.**
Q. So you'd never seen that before?

Q. Okay. And what do you mean by the phrase "standards, best practices, and norms" as used in paragraph 7?

**A. I'm not sure which of those words are confusing.**

Q. Well, what do they mean to you? Are they -- are they interchangeable? Are they conveying the same point?

**A. Well, that's the topic I hit on in this report, which is that many of these industry standards and norms and best practices are related and come from the same place.**

Q. Okay. So they don't have different meanings to you as you use them here. They're meant to be different ways of saying the same point?

MR. STEINBERG: Objection.

BY MR. BOSSET:

Q. Is that fair?

**A. I'm not sure I would say that.**

Q. Well, then what's the different meaning?

MR. STEINBERG: Objection.

THE DEPONENT: I mean, industry standards, you can understand how might -- that might be different than a norm.

BY MR. BOSSET:

Q. How?

**A. Different things. I mean, same thing with, you know, best practices. So, you know, some -- some standards might not adhere to best practices or some norms might not -- some norms might not appear in industry standards. I mean, these are all -- these are different terms. They're related, certainly. And, again, like if you read the report, I explain how -- you know, the concepts that I'm referring to.**

Q. Well, you don't define the word "norm," so I'm asking you to define the word "norm," which you used in your report.

**A. Norm is the, you know, accepted -- accepted -- you know, commonly accepted practices.**

Q. Okay. And what is a standard as you used it in the report?

**A. It's sort of a bit more formal than the commonly accepted norm -- you know, norm. Industry standards are usually, you know, codified in some way. So, you know, industry groups will put together a list of -- of, you know, standards that they believe that their industry should adhere to.**

Q. And what are best practices as you used it in your report?

**A. Recommendations for the best way of doing something.**

**PayPal user, I'm not sure that's accurate.**

Q. What part is inaccurate, that they've ever offered it or that they've offered it for the entire period?

**A. Oh, that's an easy alternative to IAV.**

Q. Is it an alternative offered by PayPal to link accounts to the PayPal?

**A. I am not aware of the -- I'm not aware of during the time period of when it was and wasn't offered, so I'm not sure I can comment on that. But I am aware as a PayPal -- having used PayPal, that it is very difficult to figure out how to do the manual option instead of the IAV, at least certain versions of it.**

Q. When did you begin using PayPal?

**A. I couldn't tell you off the top of my head.**

Q. Did you link any of your accounts to your PayPal account?

**A. I mean, probably.**

Q. How?

**A. I -- probably -- I don't remember, honestly.**

Q. You don't remember if you used IAV?

**A. I do not. I recall -- I honestly don't know.**

Q. Did you become a PayPal member during what you call the relevant period?

**A. No. It would have been before.**

Q. You didn't interview any of the plaintiffs?

**A. No.**

Q. Did you read any of the deposition testimony from the plaintiffs in the case?

**A. I don't believe so. I read the depositions that are listed in the report.**

Q. Okay. Did you speak with any other PayPal users in connection with your work in the case?

**A. I mean, I -- I don't know which of Plaintiffs' counsel are PayPal users. Beyond that, no.**

Q. Okay. Did you perform any surveys as part of your work in the case?

**A. No.**

Q. Why not?

**A. Because I wasn't asked to.**

Q. Did you see any survey results relating to PayPal users --

**A. No.**

Q. -- in connection with this case?

**A. Not in connection with this case, no.**

Q. Okay. In connection with any other work that you've done, did you see any surveys relating to PayPal users?

**A. Maybe. I mean, none that come to mind that are relevant to this case.**

Q. Okay. Okay. Did you review the data handling practices of any of Yodlee's competitors?

**A. No.**

Q. Do you have any knowledge concerning the data handling practices of any of Yodlee's competitors?

**A. I mean, yeah, I think that, you know, the companies that are storing users banking passwords without adequate informed consent and using them for secondary purposes shouldn't be occurring, and certainly Yodlee has competitors that are doing that same thing.**

Q. Okay. Did you review the (data handling practices of any other company that offers instant account verification service?

A. No.

Q. So tell me what your understanding is of Yodlee's business.

MR. STEINBERG: Objection.

THE DEPONENT: I mean, it's in the report. So they have multiple businesses, so one is offering this verification product where instead of doing the challenge deposit method, you just give your banking credentials to Yodlee, and then Yodlee accesses your account and then reports back to PayPal that, yes, in fact the account can be accessed, here is the routing number and account number. And that can happen quickly

But we'll agree to disagree.

**A. I mean, as a non-lawyer --**

Q. Yodlee's don't pay -- Yodlee -- PayPal users don't pay Yodlee any money to receive the IAV service.

**A. Okay. I mean, my understanding is --**

Q. Do you agree?

**A. Any money?**

Q. Yes.

**A. No, they do not pay money.**

Q. Okay.

**A. But, I mean, under -- CCPA defines -- would still define that as a sale because they're paying with their data.**

Q. So are you a lawyer, Dr. Egelman?

**A. I am not.**

Q. So how can you render an opinion on what the CCPA defines as a sale, which is a California statute?

MR. STEINBERG: Objection.

THE DEPONENT: As someone who researches online privacy for a living, I am aware of what is in CCPA. I'm not drawing a legal conclusion. I am just saying that a sale, generally speaking, isn't limited to necessarily a monetary transaction.

BY MR. BOSSET:

Q. It certainly sounded like a legal conclusion to

**of interest to PayPal is getting back an account number so that they know how to link that user's bank accounts.**

Q. Is it your -- do you know whether as part of the basic IAV service Yodlee also provided PayPal with the account balance?

**A. That was provided at one point. I don't know if that's -- that was in the basic service or if the IAV+ service added that. But yes, that was certainly within the time period, that was a thing.**

Q. Okay. And then you write in paragraph 25 that in 2016 PayPal added an IAV service called IAV+?

**A. Yep.**

Q. Is that right?

And what is your understanding of IAV+?

**A. Where -- that's where they got permission to pull the transaction data for the last, I guess, 90 -- 90 days, up to a year or so, when the user did the account verification. So in addition to doing an account verification, PayPal got a snapshot of the user's previous transactions.**

Q. Okay. And do you agree that it was PayPal that would determine for which of its users it wanted Yodlee to retrieve account transaction history?

**A. That's complicated the evidence suggests Yodlee did it for just as many people as possible.**

**have set up for receiving data and how it goes to the data warehouse and there -- and the fact that there are no controls that prevent the data from going into the warehouse. So the -- the evidence seems to suggest that they are doing this systematically for all PayPal users.**

Q. Okay. That's your interpretation of what -- of the evidence?

MR. STEINBERG: Objection. Objection.

THE DEPONENT: As -- as -- yes, as a literate person, that's, yes, my interpretation.

BY MR. BOSSET:

Q. All right. You read deposition testimony that refutes what you just said, didn't you, that --

**A. Not that I recall.**

Q. Okay.

**A. I recall reading deposition testimony that supports what I just said.**

Q. What testimony was that?

**A. I mean, we can go back through those depositions, but it was some of the later ones. Again, without having the depositions in front of me, I don't want to guess.**

Q. Mm-hmm. Okay. Do you agree that PayPal has a legitimate business interest in reviewing a user's account transaction history in connection with the

verification process?

MR. STEINBERG: Objection.

THE DEPONENT: If it's done with that consumer's consent, sure.

BY MR. BOSSET:

Q. And what is that interest that PayPal would have with consumer's consent?

**A. Cutting down on fraud.**

Q. Mm-hmm.

**A. That might be one.**

Q. What do you mean by that?

**A. Someone who is connecting a bank account to PayPal that they don't actually own.**

Q. Mm-hmm. Okay. Continuing with paragraph 25, you note that in 2019 PayPal added another IAV option called account Balance Refresh.

Do you see that?

**A. Yep.**

Q. Okay. And among the materials you reviewed was a statement of work, specifically No. 8, that related to the addition of the account Balance Refresh feature, correct? Do you remember that?

**A. Do I remember the specific document?**

Q. Mm-hmm.

**A. No. Again, I was shown many documents. I've**

**A. I think that's a legal question that I'm not here to answer.**

Q. So you don't know?

MR. STEINBERG: Objection. Asked and answered.

THE DEPONENT: I'm not a lawyer.

BY MR. BOSSET:

Q. Okay. So you don't know?

MR. STEINBERG: Objection. Asked and answered.

THE DEPONENT: For the purpose of -- of this matter, I -- I am not a legal expert, and my opinion on that just doesn't matter.

BY MR. BOSSET:

Q. Okay. Let's take look at paragraph 73 of your report, which begins with section Roman III called "Best Practices For Handling Consumer Data."

Do you see that?

**A. Yep.**

Q. And in 73, you refer to what you call Fair Information Practice Principles, or FIPPs is the acronym, F-I-P-P-s.

Do you see that?

**A. Yeah. It's not just me referring to that. That's a well-accepted term.**

Q. Okay. And you assert that they provide the foundation for what you call best practices for handling

very first page.

Do you see that transmittal --

**A. Mm-hmm.**

Q. -- letter to the secretary?

And in the very first paragraph of that first page of this report reads:

"Our recommendations provide the framework for general solutions, and also specify actions to be taken both within HEW and by the Federal Government as a whole."

Did I read that correctly?

**A. You did.**

Q. So by its own terms, the report is making recommendations only.

Do you agree with that?

**A. Yep.**

Q. Okay. And by its own terms, the report is only specifying actions to be taken by the Federal Government, correct?

**A. Yeah. But if you read the history in my report, this was a very influential report, which then paved the way for FTC rulemaking around this and -- and even industry. So I mean, as I document, these principles have been adopted across sectors.**

Q. And the HEW report that we've marked as an

exhibit here has no legal effect. Is that correct?

MR. STEINBERG: Objection. Legal conclusion.

BY MR. BOSSET:

Q. There's no force of --

**A. I would say indirectly, it had a very strong legal effect.**

Q. Really? Okay.

Is this document binding on Yodlee?

**A. No.**

Q. All right. In fact, if you can look on page 11.

MR. STEINBERG: Are the pages numbered?

MR. BOSSET: They are not numbered. So you will just have to manually get to page 11.

THE DEPONENT: Oh, of this. Okay.

Okay.

BY MR. BOSSET:

Q. So this was a -- again, this was a report to Congress. Do you agree with that?

**A. Mm-hmm.**

Q. All right. And at the top of page 11, this advisory committee recommend -- says:

"We recommend the enactment of legislation establishing a code of fair information practice for all automated personal data systems."

Do you see that?

**A. Yep.**

Q. Are you aware of any federal legislation that was ever enacted establishing a code of fair information practice?

MR. STEINBERG: Objection.

THE DEPONENT: There are certainly sectoral ones federally that stem from this.

BY MR. BOSSET:

Q. What are those?

**A. Gramm-Leach-Bliley. HIPAA. COPPA covers children. Many of those principles and all those privacy laws, those are federal privacy laws that cover different sectors. The principles stem from this.**

Q. None of those laws cover Yodlee, right?

**A. I --**

MR. STEINBERG: Objection. Legal conclusion.

THE DEPONENT: I honestly don't know, as a nonlawyer.

MR. BOSSET: Okay.

THE DEPONENT: But I also never written -- wrote in the report that this document is binding upon Yodlee either, so.

BY MR. BOSSET:

Q. Okay. You can put that aside. I told you I didn't have a lot to ask you about it.

paragraph, beginning with the word "moreover"?

**A. "Moreover, the trade association guidelines submitted to the commission do not reflect industry acceptance of the Fair Information Practice Principles."**

Q. Is the 1998 FTC report to Congress binding on Yodlee?

MR. STEINBERG: Objection. Legal conclusion.

THE DEPONENT: I -- I don't really know the answer to that. The FTC, you know, releases policy documents, which frame their thinking and how they bring enforcement actions. Those don't necessarily have the force of law in my understanding. However, it does usually foreshadow future rulemaking and the types of cases that they do plan to bring. So indirectly, these types of policy statements do have effects on -- on enforcement.

BY MR. BOSSET:

Q. Okay. But the report is not binding on Yodlee, right?

MR. STEINBERG: Objection. Asked and answered. Legal conclusion.

MR. BOSSET: No, he didn't answer it. That's why I'm asking.

THE DEPONENT: I did already answer that.

///

BY MR. BOSSET:
Q. The answer is no, right?
**A. This isn't -- this isn't a statute.**
Q. Okay.
MR. STEINBERG: Objection.
BY MR. BOSSET:
Q. So the answer is no?
MR. STEINBERG: Objection. Asked and answered. Asks for a legal conclusion.
THE DEPONENT: This is not a -- this is -- this isn't a law, correct.
MR. BOSSET: Okay. Thank you.
BY MR. BOSSET:
Q. And then I think the next resource that you cite for FIPPs is a memorandum in 2008 from the Department of Homeland Security. Is that correct?
**A. Sounds right.**
MR. BOSSET: Let's mark that next exhibit.
(Exhibit No. 181 marked for identification.)
BY MR. BOSSET:
Q. That's Exhibit 181. So do you know what the Department of Homeland Security is?
**A. Yes.**
Q. What is it?
**A. It was created in the wake of 9/11 to -- it's**

**hard to give one concrete thing that they do. It's kind of an amalgamation of several different things. So they do everything from, like, the TSA is under DHS. They also do basic research funding. So I've gotten funding from them in the past through the Science and Technology Directorate. They also do -- basically, they do some domestic security stuff that is sort of parallel to -- there's a lot of different things that they do.**

Q. The Department of Homeland Security does not regulate businesses handling consumer data, does it?

MR. STEINBERG: Objection.

THE DEPONENT: I'm actually not sure of the answer to that.

BY MR. BOSSET:

Q. Okay. Take a look at the very first sentence from page 1, under "Purpose."

**A. Okay.**

Q. It reads:

"This memorandum memorializes the Fair Information Practice Principles, FIPPs, as the foundational privacies for -- principles for privacy policy and implementation at the Department of Homeland Security, DHS."

**A. Yep.**

Q. Have I read that correctly?

**A. Yep.**

Q. So this memorandum was written to apply to DHS alone, correct?

**A. That's correct.**

Q. And the DHS report has no effect on Yodlee, correct?

MR. STEINBERG: Objection.

THE DEPONENT: Not --

BY MR. BOSSET:

Q. No legal effect on Yodlee?

**A. Not that I'm aware, no.**

Q. Okay. And then I think in your report, the next source you cite for the FIPPs comes from the OECD?

**A. Mm-hmm.**

Q. Is that correct?

And what is the OECD?

**A. The Organisation For Economic Co-Operation and Development is a multi -- I'm not even sure how to describe it. It's a -- you know, non-governments participate to make recommendations for economic policy and trade and stuff like that.**

Q. And indeed the resource you cite is actually called a recommendation, correct?

**A. Yep.**

Q. In footnote 170 of your report?

**A. Uh-huh. The point of making all these recommendations was to just demonstrate how widespread and -- you know, the impact that the -- the FIPPs have and how they're pervasive across sectors and industry, and substantially similar when you get down to the specific principles.**

Q. And the OECD has no role in regulating businesses within the United States, correct?

MR. STEINBERG: Objection.

THE DEPONENT: I'm not aware.

MR. BOSSET: Okay.

THE DEPONENT: I don't know. I -- I don't know. I don't think so, but I'm not -- again, not an expert on that.

BY MR. BOSSET:

Q. And the OECD's recommendations are not legally binding, correct?

MR. STEINBERG: Objection.

THE DEPONENT: Correct. I don't say that they are.

BY MR. BOSSET:

Q. Okay. And the OECD's recommendations are not binding on Yodlee, correct?

**A. I'm not aware of that, no.**

Q. Okay. The next document you refer to is a

Q. Thank you.

And the CFPB release that you just read from has no legal effect, right?

**A. I'm not sure.**

MR. STEINBERG: Objection.

THE DEPONENT: I -- I don't agree with that.

BY MR. BOSSET:

Q. Well, it doesn't establish any binding requirements or obligations. Do you agree with that, since you just read it?

**A. By itself, no. But if an organization says that it follows these guidelines and publicly say that, then I would expect they follow the guidelines and there are to be legal ramifications if, in fact, they don't.**

Q. Are you aware of any investigation by the CFPB of Yodlee?

**A. I have no involvement with CFPB. I don't know why I would know the status of any of their investigations.**

Q. So you're not aware of any, is the answer to my question, right?

**A. No, I'm not.**

Q. Okay. You also refer to industry group resources as supporting your opinions concerning best practices of -- using FIPPs. One of them is the 2020

Network Advertising Initiative Code of Conduct, correct?

**A. Mm-hmm.**

Q. And that has nothing to do with Yodlee. Do you agree with that?

MR. STEINBERG: Objection.

THE DEPONENT: Oh. Well, I mean, it does in that, again, all of these documents I cited to explain how pervasive the FIPPs are across sectors and industries and how well known, almost as if they are best practices or norms. And that's why, despite the fact that these aren't legally binding, the recommendations in all these documents are substantially similar. And not only that, but they're industry groups that also make recommendations that are substantially similar to all of these documents, and Yodlee has publicly claimed that it follows these guidelines.

BY MR. BOSSET:

Q. Has Yodlee claimed that it follows the Network Advertising Initiative Code of Conduct? Is that what your testimony is?

**A. No. The point of that one in particular was to demonstrate it's not just the ones that Yodlee claims to follow, but other industry stand -- you know, other industry initiatives also fall -- you know, claim to follow the FIPPs.**

Q. I mean, the network gathering initiative focuses on advertising technology providers --

**A. Mm-hmm.**

Q. In the online ecosystem, correct?

And Yodlee is not an advertising technology provider.

Do you agree with me on that?

**A. I'm not aware that Yodlee is in the advertising business.**

Q. Okay. Do you have any reason to believe Yodlee is an NAI member?

**A. I have no idea who is and who is not an NAI member. But, again, I already said that the citation wasn't because I was claiming Yodlee is an NIA member, but to demonstrate that these principles are pervasive.**

Q. The NAI Code of Conduct has no binding effect on Yodlee, correct?

**A. Correct.**

MR. STEINBERG: Objection.

BY MR. BOSSET:

Q. And likewise, the Center For Financial Services Innovation paper that you cite from 2016, that has no legal effect either, does it?

MR. STEINBERG: Objection.

THE DEPONENT: Doesn't Yodlee claim to be

involved with that and abide by those principles?

BY MR. BOSSET:

Q. That's not my question.

**A. Well, I think --**

Q. You want the question read back?

**A. -- if Yodlee -- if Yodlee is making representations that it follows a set of principles when, in fact, it does not, it seems like that's a -- that would be a legal issue.**

Q. Do you think that those are legally binding on Yodlee? Is that your testimony?

**A. No. My -- my --**

MR. STEINBERG: Objection. Misstates his testimony.

THE DEPONENT: My testimony is that if Yodlee makes representations that it follows certain guidelines and that's demonstrably false, then I presume there would be some legal implications there.

MR. BOSSET: That wasn't my question. I will move to strike that testimony as nonresponsive to my question.

BY MR. BOSSET:

Q. My question was very clear, sir. Is it your testimony that the 2016 CFSI paper is binding on Yodlee?

MR. STEINBERG: Objection.

BY MR. BOSSET:
Q. Yes or no?
MR. STEINBERG: Asked and answered. Calls for a legal conclusion.
THE DEPONENT: To the ex --
MR. STEINBERG: If you have anything new to respond, you can.
THE DEPONENT: To the extent that Yodlee has made public representations that they follow those principles.
BY MR. BOSSET:
Q. You think that's legally binding? What's your basis for that assumption?
MR. STEINBERG: Objection.
THE DEPONENT: Just being familiar with many cases that I've consulted on for regulators that involve similar deceptive statements.
BY MR. BOSSET:
Q. So you are able to provide legal conclusions after all?
**A. No. I'm not a lawyer.**
Q. Is that your testimony?
**A. I'm just saying --**
MR. STEINBERG: Objection.
THE DEPONENT: -- in my experience, I have seen

**A. That was -- I did answer the question.**
Q. Well, let's try it again.
IAPP publications have no legal effect, correct?
MR. STEINBERG: Objection. Calls for a legal conclusion.
BY MR. BOSSET:
Q. It's a yes-or-no question.
MR. STEINBERG: Calls for a legal conclusion. Objection.
THE DEPONENT: I'm saying that if Yodlee paid attention to -- to that, then there might be a legal effect. They might be in a better place legally.
BY MR. BOSSET:
Q. But that's not my question, sir. Can you answer my question or --
**A. You asked whether there's a legal effect.**
Q. Right.
**A. And I'm saying that yes, there is a legal effect, in that organizations that pay attention to those recommendations generally have fewer legal problems concerning privacy.**
Q. Are IAPP publications binding on anyone?
MR. STEINBERG: Objection. Legal conclusion.
THE DEPONENT: On anyone? I mean, certainly I think the members who are certified by them.

BY MR. BOSSET:
Q. Okay. How about, are they binding on Yodlee?
MR. STEINBERG: Objection. Legal conclusion.
THE DEPONENT: No.
BY MR. BOSSET:
Q. Okay. Are you aware of any court that's ruled that the FIPPs have the force of law in the United States?
**A. I'm not a lawyer. I don't -- I'm not familiar with case law.**
Q. So you're not aware of any court that has held the FIPPs have a force of law as you sit here today?
MR. STEINBERG: Objection. Foundation. Asked and answered.
THE DEPONENT: Which instantiation of the FIPPs?
BY MR. BOSSET:
Q. Any instantiation of the FIPPs.
**A. Well, I mean, they're -- as I said, they're elements of the FIPPs. In most of the data protection laws that we have in this country, both state and federally, and certainly courts have found violations of those laws; ergo, there have been violations of the FIPPs.**
Q. Okay.
**A. I mean, there are disclosure requirements. You**

**know, there -- there are sites that don't post privacy policies. That goes to transparency. I'm certainly aware of cases where companies have gotten in trouble for not meeting that transparency principle.**

Q. Are you giving the opinion that PayPal users are aware of the FIPPs?

MR. STEINBERG: Objection.

THE DEPONENT: I didn't -- I don't know why you would think I said that.

BY MR. BOSSET:

Q. So you -- that's not part of your opinion today, that PayPal users would have been aware of the FIPPs?

MR. STEINBERG: Objection.

BY MR. BOSSET:

Q. Or the norms, standards, and practices set forth therein?

**A. I think most consumers are aware of norms, certainly. Norms play a huge role in how people interact with each other and with organizations.**

Q. Are PayPal users aware of the FIPPs, then?

MR. STEINBERG: Objection.

THE DEPONENT: I don't know what PayPal users are or are not aware of.

BY MR. BOSSET:

Q. Okay. You didn't survey PayPal users, as?

**A. -- I did not.**

Q. -- said earlier?

Okay. Do you know if any other company providing online instant account verification service has implemented the FIPPs as you describe them in the report?

MR. STEINBERG: Objection. Foundation.

THE DEPONENT: I haven't looked at other companies.

BY MR. BOSSET:

Q. Okay.

MR. BOSSET: Let's go off the record for a second.

So it's 12:32 --

THE VIDEOGRAPHER: This marks -- this marks the end of media file labeled No. 3. Off the record at 12:32 p.m.

(A recess transpires.)

THE VIDEOGRAPHER: This marks the beginning of media file labeled No. 4. Back on the record at 1:33 p.m.

MR. BOSSET: What exhibit number are we on?

THE REPORTER: 183.

MR. BOSSET: Okay. Let's mark that.

(Exhibit No. 183 marked for identification.)

BY MR. BOSSET:
Q. Dr. Egelman, I've just handed you what's been marked Exhibit 183. I'd like you to read that. It's about a page and a half. And I'll be back. Let me get my phone while you're reading it.
Are you finished?
**A. Yep.**
Q. So I will represent to you, Dr. Egelman, that the email marked as Exhibit 183 is not listed on your appendix; and, therefore, I infer it's not a document you have seen before, even though it was produced in the case.
**A. I -- I don't know why you would infer that.**
Q. So you -- do you recognize this document as having seen it before, since it wasn't on your Appendix 2?
**A. I mean, I -- I already told you repeatedly that not every document I read appears in Appendix 2.**
Q. Okay. Do you think you read Exhibit 183, Dr. Egelman?
**A. It -- it looks familiar.**
Q. Okay. Exhibit 183 is an email from Julie Solomon to a number of people that include both Yodlee and PayPal individuals.
Do you agree with that?

**A. That's what it appears, yeah.**
Q. And it's dated November 19, 2015, and the subject line is PayPal IAV+ Project Meeting Notes For November 19, 2015.
Do you see that?
**A. Yep.**
Q. And at the very beginning, Julie thanks all for their time this morning.
Do you see that?
**A. Yep.**
Q. Okay. And there's an identification of the meeting participants, and on the left side are PayPal participants and on the left side are Yodlee participants.
Do you see that?
**A. Mm-hmm.**
Q. Okay. And if you would look under -- at the bottom of the first page, where it says "Meeting Notes."
**A. Mm-hmm.**
Q. All right. The -- the little bullet points, the second from the bottom reads as follows:
Quote, "PayPal had a question re storage for 90 days transactions," parens, "does Yodlee store," question mark, close parens.
Underneath that, bullet, "Yodlee does store

those transactions."

Did I read that correctly?

**A. That's what the text says, of this document.**

Q. Okay. So at least by November 19, 2015, PayPal was aware that Yodlee stores transaction data for the IAV+ service, correct?

MR. STEINBERG: Objection.

THE DEPONENT: I don't know the full context of this email. I honestly don't know the answer to that. I don't know whether -- yeah, I don't know which transactions this is specifically talking about, and I just don't know the context of this, why -- what Paypal's exact question was.

BY MR. BOSSET:

Q. Well, as recited here, PayPal was made aware that Yodlee does store transactions, 90 days of transactions, correct?

MR. STEINBERG: Objection. Document speaks for itself.

BY MR. BOSSET:

Q. And this is relating to IAV+, correct?

MR. STEINBERG: Objection. Form.

THE DEPONENT: That's what the text -- the text of the document says that. Whether PayPal was aware of the full extent of Yodlee's data collection and data

handling practices, this doesn't really address that.

BY MR. BOSSET:

Q. Well, it's pretty clear that PayPal was made aware on November 19th, 2015, of what the document says. Would you at least agree with that, Dr. Egelman?

MR. STEINBERG: Object. Objection. Asked and answered.

BY MR. BOSSET:

Q. Yes or no?

**A. PayPal -- PayPal employees were -- received an email with this text.**

Q. Okay. Thank you, sir.

And PayPal implemented IAV+ for its users after this meeting. Isn't that correct?

**A. That is my understanding.**

Q. Okay. And according to your report, PayPal had a relationship with Yodlee that begins at least as far back as 216. Do you agree with that?

**A. Yes.**

Q. All right. And outside of the selected emails cited in your report, you have no knowledge of any communications between PayPal and Yodlee concerning data storage over the past 18 years, do you?

MR. STEINBERG: Objection. Form. Foundation.

THE DEPONENT: I'm aware of the depositions of

MR. STEINBERG: Go ahead.

THE DEPONENT: I honestly don't remember.

BY MR. BOSSET:

Q. Okay. When we took a break, we were talking -- began to talk about transaction data enrichment. That's the subject of this declaration, right?

**A. Mm-hmm.**

Q. Okay. And Mr. Deshmukh, who is head of data science and innovation at Yodlee, states in paragraph 3, which I will read completely into the record, quote:

"I understand that plaintiffs in this case have alleged that Yodlee trains TDE models using all transaction data in its systems. This is incorrect. Yodlee's process is to train TDE models on [redacted] Specifically, Yodlee uses [redacted] Thus, only [redacted] No other transaction data is used to train TDE models. This has been the

case since the initial development of Yodlee's TDE models in 2017."

Did I read paragraph 3 correctly?

**A. That's what it says.**

Q. And do you have any reason to believe that this testimony is false?

MR. STEINBERG: Objection. Foundation. This was -- this was signed two days ago, Eric. How -- he has never seen this before.

MR. BOSSET: Okay.

MR. STEINBERG: How can you ask him that question.

THE DEPONENT: I mean, I have questions about it talks about [REDACTED]. I have questions about what that methodology is. He talks about [REDACTED]

[REDACTED] Yeah, I have lots of questions.

BY MR. BOSSET:

Q. But if -- if you assume for purposes of this question the -- the validity and accuracy of Mr. Dehsmukh's testimony that [REDACTED]

MR. STEINBERG: Objection. Hypothetical.

THE DEPONENT: I mean, we can assume all sorts of different things to arrive at many different conclusions. I mean, without knowing more details, it's hard to interpret this document.

BY MR. BOSSET:

Q. So you can't answer my question as an expert who deals in --

**A. As an --**

Q. -- assumptions and hypotheticals as a matter of living?

MR. STEINBERG: Objection. Argumentative. Calls for speculation. Form.

THE DEPONENT: As an expert, again, I repeat, I would want to know more about

BY MR. BOSSET:

Q. Is the declaration of Mr. Deshmukh marked as 186 relevant to your opinions in this case?

MR. STEINBERG: Objection. Foundation.

THE DEPONENT: There's nothing in here that I

felt the need to cite in my report, forgetting the fact that -- was this really signed two days ago? Yeah. Okay. I mean, it -- did you expect the report to contain a declaration that was signed two days ago.

BY MR. BOSSET:

Q. No, that's not my question. Do you want me to read that back to you?

**A. Yeah. Yeah. Please read your question back to you -- to me.**

Q. Is the declaration of Mr. Deshmukh marked as Exhibit 186 relevant to your opinions in the case?

MR. STEINBERG: Objection. Foundation.

THE DEPONENT: I honestly don't know without knowing more about his statement here.

BY MR. BOSSET:

Q. So for that reason, you don't credit it at all. Am I hearing you correctly?

**A. I would want to know more about the things that I already mentioned before offering an opinion on his statement.**

Q. Okay. So does that mean, without knowing more, you don't consider this declaration relevant to your opinions concerning whether PayPal IAV transaction data is used to train TDE models?

MR. STEINBERG: Objection.

THE DEPONENT: It may be relevant about the TDE model training aspect of this, but in terms of whether or not this changes any of my opinions in my report, it's hard to say without knowing more about this declaration and the details of these statements.

BY MR. BOSSET:

Q. If you can turn to paragraph 44 of your report, please. And I'm interested in the sentence actually on the top of page 22. You write:

"To keep its data storage a secret and continue accumulating more data, Yodlee employees misled PayPal about its data retention practices while failing to take action to delete PayPal user data or otherwise curb its collection of PayPal user data."

And my question to you is: Are -- are you giving an opinion in this case concerning the intent of Yodlee's employees --

MR. STEINBERG: Objection.

BY MR. BOSSET:

Q. -- with respect to data storage?

MR. STEINBERG: Objection.

THE DEPONENT: The emails that were shared with me made it very clear that Yodlee wanted to keep this from PayPal.

///

the rest of the story?

**A. Well, they convinced PayPal to switch over the product they were using so it would sort of back-justify Yodlee's collection of this data that they weren't supposed to be collecting under the previous product offering. So there was that. I mean, there's also --**

Q. So -- so that's another intention --

**A. Do you want me to go on or --**

Q. -- that you're ascribing.

Well, I'll let you, but I want to ask you about that one.

So where do you get -- how do you reach your conclusion that that step was taken for the reason you just described?

MR. STEINBERG: Objection.

BY MR. BOSSET:

Q. How do you reach that conclusion?

MR. STEINBERG: Objection. Foundation. Misstates his testimony.

BY MR. BOSSET:

Q. What's your methodology for discerning the --

**A. Where does it --**

Q. -- motivation for the conduct that you're describing?

MR. STEINBERG: Objection. Vague.

THE DEPONENT: I don't see where that even comes up, though, in this sentence.

BY MR. BOSSET:

Q. That's my question. It's a new question.

MR. STEINBERG: What's your question?

THE DEPONENT: Yeah, what is the question, then?

BY MR. BOSSET:

Q. You said they convinced PayPal to switch over the product they were using so it would sort of back-justify Yodlee's collection of this data that they weren't supposed to be collecting under the previous product offering. Isn't that a statement of motivation, sir?

MR. STEINBERG: Objection.

THE DEPONENT: There -- yeah, and that's separate from paragraph 44.

BY MR. BOSSET:

Q. It sure is. I agree with that.

**A. Yep.**

Q. So it's another statement that you're making in this case about the motivation of Yodlee's behavior, right?

MR. STEINBERG: Objection.

THE DEPONENT: There are email exchanges documented in the report where they try and get PayPal

to move over to IAV+ so they wouldn't have to delete the data per their contractual obligation.

BY MR. BOSSET:

Q. Well, PayPal moved over to IAV+ in 2016, right, long before the email that you just referred to?

MR. STEINBERG: Objection.

THE DEPONENT: Which -- yeah, which -- this is a different email I'm talking about.

BY MR. BOSSET:

Q. Mm-hmm. I know.

**A. Okay. So I don't understand why you brought that up.**

Q. You were the one that brought that up, not me. You referred to --

**A. When you were asking --**

Q. -- that email.

**A. Yes, and I said there is's page of this --**

Q. Mm-hmm.

**A. -- where Bill Parsons says, we should be making better use of the data. We have to monetize it.**

Q. Mm-hmm.

**A. And there's also multiple depositions where multiple Yodlee employees have said, oh, for training the machine learning models, it's better that we get more data.**

talking about.

BY MR. BOSSET:

Q. Well, I mean, whether or not you had the experience you described, at the end, you've just read emails and deposition transcripts and are drawing some conclusions about what you think they say and what you think they mean, right?

MR. STEINBERG: Objection.

THE DEPONENT: And leveraging my experience.

BY MR. BOSSET:

Q. What's the leverage that comes to play?

**A. Understanding how these concepts works. Understanding how data is generally stored in these systems. Understanding normal data practices. Yeah, someone without any of this knowledge could read documents and come to the same conclusions. Someone could come to different conclusions. There are many hypotheticals.**

MR. BOSSET: Okay. I have no further questions. Thank you for your time.

THE DEPONENT: Okay. Thanks.

THE REPORTER: Anything, Counsel.

MR. STEINBERG: No. I think, because there's a lot of confidential documents that have been discussed, we can mark this as highly confidential, attorneys' eyes